**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| FitFactariDC, LLC, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>COSTAR GROUP, INC.; CBRE GROUP, INC.; JONES LANG LASALLE INCORPORATED; CUSHMAN & WAKEFIELD PLC; COLLIERS INTERNATIONAL GROUP INC.; COLLIERS INTERNATIONAL USA, LLC; and NEWMARK GROUP, INC.<br><br>      Defendants. | No._____<br><br>**JURY TRIAL DEMANDED** |

<u>**CLASS ACTION COMPLAINT**</u>

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................................2

II.    PARTIES ..............................................................................................................................4

     A.    Plaintiff ....................................................................................................................4

     B.    Defendants ...............................................................................................................4

III.   JURISDICTION AND VENUE ...........................................................................................6

IV.   THE MARKET FOR THE LEASE OF COMMERCIAL REAL ESTATE ....................................6

     A.    Relevant Product Markets.........................................................................................6

     B.    Relevant Geographic Markets...................................................................................9

V.    DEFENDANTS' HUB-AND-SPOKE CONSPIRACY ....................................................13

     A.    CoStar Acted as the Hub.........................................................................................14

     B.    Broker Defendants Acted as Spokes........................................................................21

     C.    Broker Defendants Formed and Implemented the Rim ...........................................25

     D.    Defendants Exchanged Current, Non-Public Lease Transaction Data ............................28

     E.    Defendants Rejected Less Restrictive Alternatives ............................................................36

VI.   DEFENDANTS CAUSED ANTICOMPETITIVE EFFECTS IN THE INDUSTRIAL, OFFICE, AND RETAIL LEASE MARKETS.........................................................................................37

     A.    Defendants Reduced Pricing Uncertainty and Facilitated Coordinated Pricing ..............37

     B.    Defendants Caused Supracompetitive Rents and Harm to Tenants.................................38

     C.    Defendants' Conduct Substantially Affected Interstate Commerce .................................41

VII.  CLASS INJURY AND STANDING ...................................................................................41

VIII. CLASS ALLEGATIONS....................................................................................................42

CLAIM FOR RELIEF .....................................................................................................................43

DEMAND FOR JURY TRIAL ........................................................................................................45

PRAYER FOR RELIEF ..................................................................................................................45

FitFactariDC, LLC ("FitFactariDC" or "Plaintiff"), individually and on behalf of all others similarly situated, brings this action against CoStar Group, Inc. ("CoStar"), CBRE Group, Inc. ("CBRE"), Jones Lang LaSalle Incorporated ("JLL"), Cushman & Wakefield plc ("Cushman & Wakefield"), Colliers International Group Inc. and Colliers International USA, LLC (together, "Colliers"), and Newmark Group, Inc. ("Newmark," and collectively with CBRE, JLL, Cushman & Wakefield, and Colliers, the "Broker Defendants") and allege as follows:

## I. INTRODUCTION

1. This action challenges a hub-and-spoke conspiracy among competing commercial real estate brokers and landlords to exchange current, non-public, deal-specific lease information through a dominant data intermediary, resulting in supracompetitive rents paid by commercial tenants.

2. Defendants are not accused of merely using the same vendor or relying on public data. Rather, Defendant CoStar facilitated and orchestrated the exchange of confidential, property-level lease transaction terms—including effective rents, concessions, and other lease economics—among competing brokers and landlords. This information would otherwise remain confidential between the negotiating parties.

3. The Broker Defendants knowingly submitted competitively sensitive lease data to CoStar to access competitors' similarly sensitive data. Each acted against its unilateral self-interest in disclosing sensitive pricing information and did so with the understanding that competitors were simultaneously contributing and receiving the same type of information, making reciprocal participation essential to the scheme's value.

4. Through this conspiracy, Defendants eliminated the uncertainty that ordinarily promotes price competition in industrial, office, and retail leasing markets. Armed with near-real-

time visibility into competitors' bottom-line lease terms, Defendants were able to align asking rents, reduce concessions, and resist tenant negotiations without fear of being undercut.

5.      CoStar, which controls an overwhelming share of the market for commercial real estate information services, acted as the hub of the conspiracy. It collected and redistributed non-public lease transaction data; designed its products to permit property- and unit-level inference; and promoted its services as enabling landlords and brokers to "optimize [their] pricing."[1] The value of CoStar's platform increased as more competitors participated, reinforcing the coordinated conduct.

6.      The Broker Defendants, acting as spokes, entered into vertical agreements with CoStar and a horizontal agreement with one another, as inferred from their conduct and shared understanding, to exchange and use current, disaggregated lease pricing information. Through mutual monitoring enabled by CoStar, the Broker Defendants detected deviations from prevailing market rents, replacing independent pricing decisions with coordinated conduct.

7.      Defendants' conduct has caused and continues to cause net anticompetitive harm. Competition in the industrial, office, and retail real estate leasing markets was suppressed, effective rents were inflated above competitive levels, and Plaintiff and the proposed Class paid more for commercial space than they would have in a competitive market.

8.      Accordingly, on behalf of a class of individuals and businesses that leased commercial real estate in the local geographic markets affected by Defendants' conspiracy and described below, Plaintiff seeks to redress and enjoin Defendants' unlawful conduct, which began at least as early as June 12, 2022, and continues through the present (the "Class Period").

---

[1] *Owners and Investors*, COSTAR, https://www.costar.com/who-we-serve/owners-investors (last visited Apr. 15, 2026).

## II.    PARTIES

### A.    Plaintiff

9.    Plaintiff FitFactariDC, LLC is a Florida limited liability company. It is a commercial tenant that leased commercial real estate located at 7505 E. 35th Ave., Suite 345, Quebec Square, Denver, Colorado during the Class Period. Plaintiff FitFactariDC's lease was brokered by one or more of the Broker Defendants. Plaintiff FitFactariDC paid effective rents that were artificially inflated by Defendants' coordinated conduct in the Denver-Aurora-Lakewood local market.

### B.    Defendants

10.    Defendant CoStar Group, Inc. ("CoStar") is a Delaware corporation with its principal place of business in Arlington, Virginia. CoStar is the dominant provider of commercial real estate ("CRE") lease transaction data and analytics, offering subscription-based information services that include property-level and transaction-level leasing data, market analytics, and related tools used by brokers, landlords, and other commercial real estate professionals throughout the United States. CoStar describes itself as "[t]he most comprehensive platform for commercial real estate information, analytics & news."[2] CoStar is a publicly traded company with estimated revenue of US$2.7 billion (2024).

11.    Defendant CBRE Group, Inc. ("CBRE") is a Delaware corporation with its principal place of business in Dallas, Texas. CBRE is a global commercial real estate services and investment firm that provides brokerage, leasing, property management, valuation, and advisory services to owners, occupiers, and investors of commercial real estate. CBRE is a publicly traded company with estimated revenue of US$35.8 billion (2024).

---

[2] COSTAR GRP., INC., https://www.costargroup.com (last visited Apr. 15, 2026).

12.     Defendant Jones Lang LaSalle Incorporated ("JLL") is a Maryland corporation with its principal place of business in Chicago, Illinois. JLL is a global provider of commercial real estate brokerage, leasing, investment management, and professional services, serving corporate, institutional, and public-sector clients. JLL is a publicly traded company with estimated revenue of US$23.4 billion (2024).

13.     Defendant Cushman & Wakefield plc ("Cushman & Wakefield") is a public limited company organized under the laws of England and Wales, with its principal place of business in Chicago, Illinois. Cushman & Wakefield provides commercial real estate brokerage, leasing, capital markets, valuation, and advisory services worldwide. Cushman & Wakefield is a publicly traded company with estimated revenue of US$9.5 billion (2023).

14.     Defendant Colliers International Group Inc. is a corporation organized under the laws of Canada, with its principal place of business in Toronto, Ontario. Its U.S. subsidiary, Colliers International USA, LLC, is a Delaware limited liability company and is wholly owned by Colliers International Group Inc. (together, "Colliers"). Colliers provides commercial real estate brokerage, leasing, advisory, and investment management services through offices in the United States and internationally. Colliers is a publicly traded company with estimated revenue of US$4.8 billion (2024).

15.     Defendant Newmark Group, Inc. ("Newmark") is a Delaware corporation with its principal place of business in New York, New York. Newmark provides commercial real estate brokerage, leasing, capital markets, valuation, and advisory services to institutional and corporate clients. Newmark is a publicly traded company with estimated revenue of $2.7 billion (2024).

5

16.     The Broker Defendants are all reported clients of CoStar,[3] compete with one another in leasing CRE, and act on behalf of landlords in negotiating lease terms with tenants. Through their participation in CoStar's platform, the Broker Defendants submitted and accessed competitively sensitive lease transaction data and used comparable information supplied by competitors, with CoStar serving as the centralized intermediary facilitating that exchange.

## III.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the value of $5,000,000, exclusive of interest and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant. This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 15.

18.     Venue lies within this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

19.     This Court has personal jurisdiction over Defendants because Defendants transacted business in this District, and this action arises out of Defendants' conduct in this District.

## IV.     THE MARKET FOR THE LEASE OF COMMERCIAL REAL ESTATE

### A.     Relevant Product Markets

20.     The relevant product markets are three distinct markets for the lease of commercial real estate where landlords and brokers, including Broker Defendants, compete for commercial tenants: the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market. Each market involves properties with distinct physical characteristics, tenant requirements, and

---

[3]     CoStar Grp., Inc., Annual Report (Form 10-K) (Feb. 20, 2015), at 14, https://investors.costargroup.com/static-files/2b47fb98-af52-4ff8-96a0-baf5769347fe.

6

competitive conditions, and none is reasonably interchangeable with the others or with other real estate transactions. CoStar itself recognizes and separately tracks these property types as distinct market segments.[4]

21.     The **Industrial Lease Market** consists of properties adapted for uses such as assemblage, processing, manufacturing, warehousing, and distribution. Industrial properties are characterized by high ceiling heights, heavy industrial zoning, and may include features such as loading docks, cranes, floor drains, and trailer parking.[5] Tenants in this market include logistics companies, e-commerce fulfillment operators, manufacturers, and wholesalers. Industrial space is not reasonably interchangeable with office or retail space because such properties lack the physical characteristics, infrastructure, and zoning required for industrial operations. Accordingly, the cross-elasticity of demand between properties in the Industrial Lease Market and other types of commercial real estate is such that a hypothetical monopolist in the Industrial Lease Market could profitably increase prices by 5 percent (or more) above competitive levels.

22.     The **Office Lease Market** consists of properties whose primary intended use supports the activities of knowledge workers and professional services. Office buildings are typically configured for high-density use and feature interior finishes and structural designs that support administrative, corporate, and professional activities.[6] Tenants in this market include law firms, financial services companies, technology companies, healthcare organizations, and other professional service providers. Office space is not reasonably interchangeable with industrial or retail space because office tenants require professional environments configured for administrative work, and such properties lack the physical characteristics required for manufacturing,

---

[4] *CoStar Glossary,* COSTAR, https://www.costar.com/about/costar-glossary (last visited Apr. 15, 2026).
[5] *Id.*
[6] *Id.*

warehousing, or direct-to-consumer retail sales. Accordingly, the cross-elasticity of demand between properties in the Office Lease Market and other types of commercial real estate is such that a hypothetical monopolist in the Office Lease Market could profitably increase prices by 5 percent (or more) above competitive levels.

23. The **Retail Lease Market** consists of properties whose primary intended use is to promote, distribute, or sell products and services to the general public. Retail buildings are configured for the display of merchandise or the interaction of company sales personnel with customers, and are often located in high-traffic or easily accessible areas. Tenants in this market include retailers, restaurants, personal service providers, and entertainment venues. Retail space is not reasonably interchangeable with office or industrial space because retail tenants require customer-facing environments, prominent signage, and locations optimized for consumer access rather than professional services or logistics operations. Accordingly, the cross-elasticity of demand between properties in the Retail Lease Market and other types of commercial real estate is such that a hypothetical monopolist in the Retail Lease Market could profitably increase prices by 5 percent (or more) above competitive levels.

24. The purchase of commercial real estate is not a substitute for leasing in any of these markets because ownership requires substantial capital investment, access to financing, long-term balance-sheet commitments, and exposure to property-specific risk, whereas leasing allows businesses to preserve capital and maintain operational flexibility. Nor are residential properties substitutes, as they are not zoned, designed, or legally permitted for commercial operations and cannot serve the same functional use.

25. Consistent with these market realities, a hypothetical monopolist in any of the Industrial Lease Market, the Office Lease Market, or the Retail Lease Market could profitably

impose a small but significant and non-transitory increase in rents without inducing sufficient substitution to ownership, other CRE lease markets, or other real estate transactions to defeat the price increase.

26.     Industry participants likewise recognize industrial, office, and retail CRE leasing as distinct markets: commercial real estate brokers, landlords, and market data providers—including CoStar—separately track, analyze, and price lease transactions by property type, reflecting the lack of reasonable interchangeability among these markets.[7] Accordingly, the relevant product markets are the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market.

### B.     Relevant Geographic Markets

27.     The relevant geographic markets are no broader than the metropolitan statistical areas ("MSAs") identified below, because commercial real estate leasing competition occurs at the local (as opposed to national) level. Broker Defendants compete with one another for tenants and lease transactions within discrete metropolitan areas, not on a nationwide basis. Accordingly, competition is appropriately analyzed at the MSA level.

28.     A hypothetical monopolist in each MSA could profitably impose a small but significant and non-transitory increase in lease prices or terms without losing sufficient business to properties located outside the MSA to defeat the price increase. MSAs provide a sound and commonly used framework for evaluating competitive effects in industrial, office, and retail leasing.

---

[7] *Id* (recognizing Office, Retail, and Industrial as separate "property types used by CoStar COMPS."); *see also* https://www.costar.com/sites/costar.com.na/files/2025-10/Listings_EN_US_Product_1.jpg (CoStar platform breaking down properties into leasing and sales.).

29.     Commercial real estate customers do not regard properties in different MSAs as reasonable substitutes. Before listing properties for lease, and before searching for commercial real estate information or services, customers focus on a specific MSA. Likewise, tenants seeking commercial space would not regard office space in one MSA as a substitute for office space in another MSA. For example, a tenant seeking commercial space in the Chicago–Naperville–Elgin MSA would not consider a comparable space in the Los Angeles–Long Beach–Anaheim MSA to be a reasonable substitute.

30.     The following MSAs each independently constitute a relevant geographic market for purposes of antitrust analysis (the "Local Markets"): Boston-Cambridge-Newton; Seattle-Tacoma-Bellevue; Washington-Arlington-Alexandria; Charlotte-Concord-Gastonia; Atlanta-Sandy Springs-Alpharetta; Nashville-Davidson-Murfreesboro-Franklin; San Francisco-Oakland-Berkeley; Minneapolis-St. Paul-Bloomington; Denver-Aurora-Lakewood; San Diego-Chula Vista-Carlsbad; Phoenix-Mesa-Chandler; Portland-Vancouver-Hillsboro; Louisville/Jefferson County; Jacksonville; Austin-Round Rock-Georgetown; Columbus; Philadelphia-Camden-Wilmington; Orlando-Kissimmee-Sanford; Milwaukee-Waukesha; Tampa-St. Petersburg-Clearwater; Tucson; New York-Newark-Jersey City; Riverside-San Bernardino-Ontario; Las Vegas-Henderson-Paradise; Bridgeport-Stamford-Norwalk; Cincinnati; St. Louis; Providence-Warwick; Indianapolis-Carmel-Anderson; Oklahoma City; Chicago-Naperville-Elgin; Memphis; Sacramento-Roseville-Folsom; Los Angeles-Long Beach-Anaheim; Albany-Schenectady-Troy; Miami-Fort Lauderdale-Pompano Beach; Dallas-Fort Worth-Arlington; Salt Lake City; San Antonio-New Braunfels; Hartford-East Hartford-Middletown; Cleveland-Elyria; Omaha-Council Bluffs; Pittsburgh; Kansas City; Detroit-Warren-Dearborn; Grand Rapids-Kentwood; New Haven-Milford; New Orleans-Metairie; and Houston-The Woodlands-Sugar Land.

31.     At all relevant times, CoStar held more than 50% of the market for commercial real estate information services in the Local Markets.[8] Table 1 shows market share estimates at the MSA level, based on prior litigation allegations. These estimates are obtained by dividing the dollar value of for-sale CRE listings on CoStar's platform by the total value of closed CRE sales transactions in each MSA.[9] CoStar's monopoly-like power in these Local Markets magnified the anticompetitive effects of the conduct alleged in this Complaint.

| Metropolitan Statistical Area | CoStar Market Share |
|---|---|
| Boston-Cambridge-Newton | 97% |
| Seattle-Tacoma-Bellevue | 96% |
| Washington-Arlington-Alexandria | 95% |
| Charlotte-Concord-Gastonia | 94% |
| Atlanta-Sandy Springs-Alpharetta | 94% |
| Nashville-Davidson-Murfreesboro-Franklin | 93% |
| San Francisco-Oakland-Berkeley | 92% |
| Minneapolis-St. Paul-Bloomington | 91% |
| Denver-Aurora-Lakewood | 91% |
| San Diego-Chula Vista-Carlsbad | 91% |
| Phoenix-Mesa-Chandler | 91% |
| Portland-Vancouver-Hillsboro | 90% |
| Louisville/Jefferson County | 90% |
| Jacksonville | 89% |
| Austin-Round Rock-Georgetown | 89% |
| Columbus | 87% |
| Philadelphia-Camden-Wilmington | 87% |
| Orlando-Kissimmee-Sanford | 87% |
| Milwaukee-Waukesha | 86% |
| Tampa-St. Petersburg-Clearwater | 85% |
| Tucson | 85% |
| New York-Newark-Jersey City | 84% |

---

[8] Defined as data and analytical tools used by CRE brokers and other customers to locate, research, evaluate, and optimize the sale or lease of CRE. *See CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, No. 2:20-cv-08819 (C.D. Cal.), First Amended Counterclaim, Dkt. No. 162.

[9] *See CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1070 (9th Cir. 2025).

11

| | |
|---|---|
| Riverside-San Bernardino-Ontario | 84% |
| Las Vegas-Henderson-Paradise | 84% |
| Bridgeport-Stamford-Norwalk | 84% |
| Cincinnati | 83% |
| St. Louis | 82% |
| Providence-Warwick | 82% |
| Indianapolis-Carmel-Anderson | 81% |
| Oklahoma City | 80% |
| Chicago-Naperville-Elgin | 79% |
| Memphis | 79% |
| Sacramento-Roseville-Folsom | 77% |
| Los Angeles-Long Beach-Anaheim | 75% |
| Albany-Schenectady-Troy | 75% |
| Miami-Fort Lauderdale-Pompano Beach | 74% |
| Dallas-Fort Worth-Arlington | 74% |
| Salt Lake City | 70% |
| San Antonio-New Braunfels | 68% |
| Hartford-East Hartford-Middletown | 66% |
| Cleveland-Elyria | 66% |
| Omaha-Council Bluffs | 65% |
| Pittsburgh | 63% |
| Kansas City | 61% |
| Detroit-Warren-Dearborn | 60% |
| Grand Rapids-Kentwood | 59% |
| New Haven-Milford | 59% |
| New Orleans-Metairie | 58% |
| Houston-The Woodlands-Sugar Land | 58% |

**Table 1**: Estimated shares of CoStar in the market for CRE information service (2022)[10]

32.     At all relevant times, more than 50% of all CRE activity in the Local Markets occurred on CoStar. The Broker Defendants all use CoStar services. Together, the Broker Defendants comprise the dominant group of CRE brokerage firms in the United States, commonly

---

[10] *See CoStar v.* CREXi First Amended Counterclaim, *supra* note 9.

referred to as the "Big Five."[11] Industry reporting notes that these firms "have expanded geographically and gained market share by swallowing up smaller firms in consolidations over the years."[12] Defendant CBRE alone is estimated to account for over 20% of the U.S. CRE brokerage services market,[13] which has estimated combined annual revenue of about $112 billion.[14]

33. The Broker Defendants offered commercial real estate brokerage and leasing services within the Local Markets and competed with one another for tenants, listings, and lease transactions in each such market.

## V. DEFENDANTS' HUB-AND-SPOKE CONSPIRACY

34. Defendants entered into a hub-and-spoke conspiracy in which: CoStar served as the central hub actively soliciting Broker Defendants' proprietary data and enabling them to benchmark against competitors; Broker Defendants served as spokes; and a horizontal agreement (the "rim") existed among competing Broker Defendants, formed through mutual understanding, reciprocal participation, and coordinated conduct.

---

[11] CoStar News Staff, *Commercial Real Estate's Big Five See Profits Surge: Explore CoStar's Full Coverage*, COSTAR (Oct. 30, 2025), https://www.costar.com/article/1058498563/commercial-real-estates-big-five-see-profits-surge-explore-costars-full-coverage (last visited Apr. 15, 2026).

[12] Elizabeth Cryan, *Meet NYC's next generation of top office brokers: How the younger dealmakers are reshaping the business*, THE REAL DEAL (May 1, 2024), https://therealdeal.com/magazine/may-2024/new-yorks-next-top-leasing-brokers/ (last visited Apr. 15, 2026).

[13] Jordan B., *Broker Rankings 2025 Show CBRE Leading Small Deal Surge*, CRE DAILY (Aug. 22, 2025), https://www.credaily.com/briefs/broker-rankings-2025-show-cbre-leading-small-deal-surge/ (last visited Apr. 15, 2026).

[14] *Commercial Real Estate Brokerage Industry Profile*, FIRST RESEARCH (Dec. 1, 2025), https://www.firstresearch.com/industry-research/Commercial-Real-Estate-Brokerage.html (last visited Apr. 15, 2026).

### A. CoStar Acted as the Hub

#### i. *CoStar Built and Exercised Market Power Over CRE Information Services*

35.     CoStar has spent more than three decades building and entrenching dominance in commercial real estate data and analytics. Since its founding in 1987, CoStar has pursued a deliberate strategy of growth through acquisition and exclusion, acquiring more than thirty competitors and systematically eliminating rival sources of CRE information. As a result of this strategy, CoStar has become what industry participants describe as an "industry behemoth,"[15] with a market capitalization exceeding tens of billions of dollars and a scope and scale unmatched in the history of CRE information services.[16]

36.     CoStar's acquisition strategy culminated in CoStar's consolidation of the markets for internet CRE listing services, internet CRE information services, and related analytics tools. After the acquisition of LoopNet and the subsequent exit of Xceligent—its last significant nationwide competitor—CoStar was left with what plaintiffs in prior litigation describe as a monopoly position. CoStar allegedly now holds over 90% of the U.S. internet CRE information services market, including databases used to research space available for lease, lease histories, comparable lease pricing, tenant information, and vacancy data.[17]

37.     With competition largely eliminated, CoStar's subscription database became the *de facto* industry standard. Commercial real estate professionals, including brokers, brokerages, owners, investors, and lenders, routinely rely on CoStar in their day-to-day work. In the words of

---

[15] Cheryl Reid-Simons, *FTC Weighs In on Antitrust Allegations Leveled Against CoStar*, REAL ESTATE NEWS (Jan. 31, 2024), https://www.realestatenews.com/2024/01/31/ftc-weighs-in-on-antitrust-allegations-leveled-against-costar (last visited Apr. 15, 2026).

[16] *See* Konrad Putzier et al., *Search and Destroy: How CoStar Became a $15B Juggernaut*, REAL DEAL (Sept. 1, 2018), https://therealdeal.com/magazine/new-york-september-2018/how-costar-became-a-15-billion-dollar-juggernaut/ (last visited Apr. 15, 2026).

[17] *See CoStar v.* CREXi First Amended Counterclaim, *supra* note 9.

JLL Senior Vice President Andy O'Brien, "[f]rom a pure broker perspective, it's crucial," so much so that "[w]e can't do our job without it."[18]

38.     As CoStar's dominance increased, so did customer dependence. Industry participants reported high renewal rates, regularly over 90%,[19] and rising subscription prices, consistent with the exercise of market power. As key competitors exited the market, CoStar significantly increased prices—by as much as 80% for new customers within months—while customers continued to subscribe due to the lack of viable alternatives.[20]

39.     This dependence further entrenched CoStar's position as the primary, and in many markets the only, comprehensive source of CRE leasing data, including for industrial, office, and retail properties.

### ii.    CoStar Actively Solicited Non-Public Lease Transaction Data

40.     CoStar operates one of the largest and most comprehensive CRE information and analytics platforms in the world. Since its founding, CoStar has continuously built and expanded a proprietary database covering millions of commercial properties and related transactions.

41.     A key component of CoStar's dataset is its lease comparables ("lease comps") database, through which subscribers can access detailed transaction records tied to specific properties, tenants, and units. These records include terms that are not otherwise publicly

---

[18] Jon Banister & Ethan Rothstein, *Xceligent Files Antitrust Suit Against CoStar, Alleges Years of Anticompetitive Behavior*, BISNOW (June 28, 2017), https://www.bisnow.com/national/news/commercial-real-estate/xceligent-costar-antitrust-lawsuit-76054 (last visited Apr. 15, 2026).

[19]     CoStar Grp., Inc., Annual Report (Form 10-K) (Feb. 19, 2025), at 37, https://investors.costargroup.com/static-files/43112839-fea7-435f-bff3-5f53ec531a0d.

[20] Putzier et al., *supra note 17*. ("The research firm Morningstar recently characterized the company as a 'borderline monopoly' with 'no true threats in terms of competition.' Seven months after Xceligent filed for bankruptcy, CoStar said the average monthly price it charges new customers had jumped to $466 per broker, up from $255 the previous January — an increase of over 80 percent.").

accessible, such as effective rents (net of concessions), free rent periods, tenant improvement allowances, escalation clauses,[21] lease start and end dates, contract terms, and other economic details of lease transactions. Lease comps reflect deal terms that would otherwise remain confidential between the landlord, broker, and tenant. Figure 1 below shows the form through which users input their non-public lease data.



**Figure 1**: CoStar form used to collect lease comp data[22]

---

[21] Clause in a lease which increases rent over the term of the lease, usually on an annual basis. Most multi-year leases will have an escalation clause.

[22] *New Lease Comp Entry*, COSTAR LEASE ANALYSIS HELP, https://product.costar.com/ LeaseComps/Help/en-US/main.htm#LC_New_Lease_Comp_Entry.htm (last visited Apr. 15, 2026).

42.     CoStar describes its data-gathering process as a "census-level approach to researching the world of commercial real estate . . . gathering data from market participants."[23] CoStar actively solicits commercially sensitive and non-public lease information from its network of brokers, including the Broker Defendants, who are induced to submit detailed lease transaction data to populate the lease comps database.[24]

43.     CoStar customers describe routinely and enthusiastically sharing transaction data with CoStar. For example, Capworth Commercial Realty stated: "If we know a deal has transacted, we send an email to our researcher at CoStar, and they verify it immediately . . . [everyone] should treat CoStar as their own database. This will help maintain the most accurate database in the market."[25] CoStar further encourages frequent self-reporting by instructing users to "update [their] listings every 30-60 days to make sure that the information is accurate" and warning that "[l]istings that have not been updated in 75 days will be removed."[26] Critically, brokers who update a listing status to "leased" are consistently prompted to provide the deal terms, ensuring that executed lease information is captured and shared.[27]

---

[23] COSTAR GRP., INC., COSTAR BROCHURE (n.d.), https://www.costar.com/sites/costar.com.na/files/costar-brochure---lenders.pdf (last visited Apr. 15, 2026).

[24] *See, e.g.,* video testimonial from Morguard Investments (https://www.costar.com/case-studies#owners-1301414892) and Marcus and Millichap (https://www.costar.com/case-studies#brokers-1568642112) (last visited Apr. 15, 2026).

[25] Capworth Commercial Realty Testimonial, COSTAR (Aug. 2023), https://www.costar.com/sites/costar.com.na/files/2023-08/Testimonial-Capworth-Commercial-Realty-EN.pdf (last visited Apr. 15, 2026).

[26] COSTAR GRP., INC., MARKETING CENTER USER GUIDE: UPDATE A LISTING (Feb. 2023), https://www.costar.com/sites/costar.com.na/files/2023-02/update-a-listing.pdf (last visited Apr. 15, 2026).

[27] *Id.*

44. CoStar also proactively extracts data beyond subscriber submissions through its own research operations, which are organized around direct outreach to brokers and landlords to gather and refresh commercial property- and space-level data. CoStar touts its research team of more than 1,600 employees, who collect non-public lease information and regularly communicate directly with brokers and landlords—often by phone—to verify and update transaction details.[28]

### iii. CoStar's Subscription Model Monetizes Access to a Tool That Enables Price Coordination Among Competing Brokers

45. CoStar's business is built on a subscription-based revenue model that monetizes access to a tool enabling commercial real estate brokers and owners to observe and benchmark against their competitors' confidential lease terms. CoStar's high market share combined with broad adoption among competing brokers and landlords is what makes the information exchange effective and valuable. The more market participants that subscribe, the more comprehensive the non-public lease data becomes—and the greater the joint market power of the spokes operating through the hub. According to CoStar's investor disclosures, the vast majority of its revenue comes from subscriptions,[29] making ongoing renewals—not one-time transactions—the central driver of its financial performance.[30]

---

[28] *CoStar Market Analytics*, COSTAR, https://www.costar.com/products/market-analytics (last visited Apr. 15, 2026).

[29] CoStar Grp., Inc., Annual Report (Form 10-K) (Feb. 19, 2025), at 37, https://investors. costargroup.com/static-files/43112839-fea7-435f-bff3-5f53ec531a0d ("Revenues from our subscription-based contracts were approximately 96%, 95%, and 93% of total revenues for the years ended December 31, 2024, 2023, and 2022, respectively.").

[30] *CSGP Investor Relations - CoStar Group Inc*, ALPHA SPREAD, https://www.alphaspread .com/security/nasdaq/csgp/investor-relations (last visited Apr. 15, 2026).

46. This subscription-based model gives CoStar a direct financial incentive to facilitate coordination among the Broker Defendants, because the more effectively brokers can use CoStar's data to align their pricing, the greater their willingness to pay for—and renew—CoStar's services.

47. For the information exchange to most effectively facilitate coordination, subscribers must keep the platform continuously updated with current lease transaction data. CoStar's economic incentives are therefore directly tied to ensuring the data quality needed for horizontal competitors to benchmark against each other in near real-time. Stale or incomplete information would undermine the value of the benchmarking tool, weaken renewals, and limit CoStar's ability to command premium pricing. The breadth and density of CoStar's lease comps and property coverage therefore increase the platform's value and reinforce customer dependence, enabling CoStar to raise prices, expand subscriptions, and earn high margins at relatively low marginal cost. Conversely, it is only in landlords' and brokers' interest to pay for this service if the information exchange increases their profits, by enabling them to charge higher rents and reduce competitive uncertainty.

48. CoStar now serves a large user base of commercial real estate professionals across the United States and internationally, with over 240,000 paying subscribers[31] relying on its data. Combined with high renewal rates, this scale has produced a steady and predictable revenue stream, contributing to annual revenues exceeding $2 billion and sustained financial returns.

### iv. CoStar Reinforced Its Role as the Industry Hub Through Sponsored Events and Industry Convenings

49. In addition to controlling the primary channels through which CRE data is collected and distributed, CoStar has positioned itself as a central convener of the CRE industry by

---

[31] *Products - Overview*, COSTAR, https://www.costar.com/products (last visited Apr. 15, 2026).

sponsoring and organizing industry events, conferences, and recognition programs attended by brokers, landlords, and other market participants.

50. CoStar sponsors and hosts proprietary industry programs, including its annual CoStar Impact Awards, which it markets as a nationwide initiative recognizing CRE transactions and professionals across multiple markets.[32] Each year, CoStar solicits nominations, selects award recipients, and convenes brokers and landlords at award ceremonies and related events held in more than 120 locations nationwide. In each location, CoStar assembles a panel of up to ten judges—often comprising senior industry leaders and direct competitors—to evaluate nominations. For example, in Atlanta in 2025, the judging panel included executives affiliated with all five Broker Defendants.[33] These CoStar-branded events repeatedly bring together competing brokers and landlords in a CoStar-curated environment closely tied to CoStar's data, analytics, and market narratives.

51. CoStar also sponsors and participates in third-party industry conferences and meetings attended by commercial real estate professionals, including events that feature structured programming and networking opportunities.[34]

52. By sponsoring such events while simultaneously serving as the dominant source of lease transaction data and analytics, CoStar facilitates direct communication among rival brokers,

---

[32] CoStar Grp., Inc., *CoStar Group Opens Nominations for Its Fifth Annual CoStar Impact Awards* (2025), https://www.costargroup.com/press-room/2025/costar-group-opens-nominations-its-fifth-annual-costar-impact-awards (last visited Apr. 15, 2026).

[33] *CoStar Impact Award Winners*, COSTAR IMPACT AWARDS, https://www.costarimpactawards.com/winners?field_market_target_id=11&field_year_value=20 25 (last visited Apr. 15, 2026).

[34] *See, e.g.,* Am. Real Est. Soc'y, ARES Spring Program 2023 Meeting Program (2023), https://cdn.ymaws.com/www.ares.org/resource/resmgr/docs/meetingprograms/ARES-Spring-Program-2023.pdf (showing CoStar as largest sponsor); *see also* list of live webinars at Available Webinars, COSTAR GRP., INC., https://costar.ewebinar.com (last visited Apr. 15, 2026).

(i) further entrenching its position as the central hub through which industry participants connect, communicate, and interpret market conditions, and (ii) complementing its control over the flow of competitively sensitive lease information.

### B. Broker Defendants Acted as Spokes

#### i. Broker Defendants Entered into Vertical Agreements with CoStar

53. The Broker Defendants entered into agreements with CoStar governing access to CoStar's commercial real estate information services. Those agreements did not merely grant access to data; they also affirmatively required and encouraged brokers to provide and update information concerning properties available for lease and completed transactions.[35]

54. Under CoStar's Terms and Conditions, brokers that purchase a license agree "to use reasonable efforts to keep CoStar informed about properties available for lease and/or sale and transaction information with respect to properties that Licensee owns, controls, represents or holds exclusives."[36] This provision applies directly to Broker Defendants engaged in leasing commercial space and obligates them to provide CoStar with current transaction-level information.

55. In addition, licensees grant CoStar a broad, non-exclusive, and irrevocable license to use, reproduce, modify, and distribute the real estate information they submit. This license authorizes CoStar to integrate broker-supplied lease data into its databases and make it available to other subscribers, including competitors of the submitting broker.[37]

#### ii. Broker Defendants Disclosed Competitively Sensitive Lease Data Against

---

[35] MARKETING CENTER USER GUIDE: UPDATE A LISTING, *supra note 27.*

[36] *CoStar License Agreement Terms and Conditions* § 10 (eff. Feb. 6, 2025), https://www.costar.com/CoStarTerms-and-Conditions (last visited Apr. 15, 2026).

[37] *Id.*

21

*Their Unilateral Self-Interest*

56. The lease transaction information that the Broker Defendants were required and encouraged to submit to CoStar included competitively sensitive, non-public data, such as effective rents net of concessions, free rent periods, tenant improvement allowances, escalation terms, and lease start and end dates. Absent coordination, the routine disclosure of such information would be against a broker's unilateral economic self-interest. Revealing bottom-line lease terms and concessions risks weakening a broker's negotiating position by allowing direct competitors—representing rival landlords or tenants—to infer pricing strategies, reservation points, and resistance to concessions.

57. Indeed, Broker Defendants' vertical agreements with CoStar have a horizontal effect. The exchange of current, disaggregated pricing and concession data among competitors reduces uncertainty and facilitates coordinated outcomes. Nonetheless, the Broker Defendants supplied precisely this type of information to CoStar on a recurring basis under their vertical agreements with CoStar.

58. They did so because participation provided access to the same non-public, transaction-level lease data submitted by their direct competitors, enabling each Broker Defendant to observe prevailing market terms, benchmark its own negotiations, and adjust its conduct accordingly. In other words, the value of submitting sensitive lease information depended on reciprocal participation by competing brokers and landlords, without which disclosure would have conferred no rational competitive benefit.

### iii. Broker Defendants Submitted Lease Data with Knowledge of Reciprocal Participation by Competitors

59. The Broker Defendants understood that CoStar's lease comps database was populated by nonpublic information from multiple competing market participants and that the

transaction-level information they submitted would be made available to other CoStar subscribers. CoStar's Terms expressly authorize the redistribution and use of submitted data within CoStar's products,[38] making clear that information provided by one broker would not remain siloed or exclusive.

60.    CoStar's product descriptions and marketing reinforce this understanding by characterizing the platform as delivering broad, market-wide commercial real estate information and analytics, offering subscribers access to millions of detailed lease records that can be searched and analyzed alongside property, tenant, and ownership data. *See e.g.*, Figure 2.

---

[38] *Id.*



 



**Figure 2**: YouTube ad for CoStar's lease comps, advertising that "commercial real estate professionals use CoStar to see key details on over 14.9 million lease transactions. With CoStar, you'll see the lease transactions and deal terms that matter to you, including tenant information, starting and effective rent, lease length, time on market, and the players involved." [39]

61. Each Broker Defendant therefore submitted non-public lease transaction data knowing that it would be shared with competitors and with the understanding that competitors

---

[39] CoStar, *CoStar In A Minute | Lease Comps*, YOUTUBE (Apr. 16, 2024), https://www.youtube.com/watch?v=oL1G16UJ4Gg (last visited Apr. 15, 2026).

were simultaneously contributing similar data. Participation was thus conditional rather than unilateral, as no rational broker or landlord would repeatedly disclose confidential lease pricing, concessions, and deal economics absent such mutual reliance.

62. This shared understanding was reinforced through CoStar's onboarding processes, product demonstrations, and training materials emphasizing the breadth, accuracy, and market coverage of the lease comps database.[40]

### C. Broker Defendants Formed and Implemented the Rim

#### i. *Broker Defendants Entered into a Horizontal Agreement to Exchange Non-Public Lease Data*

63. Through CoStar, competing Broker Defendants entered into a horizontal agreement, inferred from their conduct and shared understanding, to exchange current, non-public lease pricing and concession information.

64. The existence of this agreement is supported by the following circumstantial facts (among others): (i) widespread and simultaneous participation by competing brokers and landlords in submitting and accessing non-public lease transaction data through CoStar, despite the costs of doing so—including CoStar subscription fees and the staffing required to keep the platform updated on a timely basis; (ii) conduct against unilateral self-interest, in that each Broker Defendant repeatedly disclosed sensitive lease pricing and concession information that would ordinarily be kept confidential, thereby exposing its negotiating position to direct competitors; and (iii) conditional participation, because the value of submitting such information depended on

---

[40] CoStar Grp., *The Power of Knowing: CoStar for Commercial Real Estate Professionals* (2021), https://www.costar.com/sites/costar.com.na/files/costar-brochure---general.pdf (last visited Apr. 14, 2026) (listing 48 "Top commercial real estate firms rely on CoStar").

competitors contributing similar data, as understood by market participants, ensuring that the database reflected the broader market rather than isolated transactions.

65.     The purpose and effect of this hub-and-spoke conspiracy was to fix, stabilize, or otherwise coordinate effective rents and lease concessions by eliminating or reducing uncertainty over competitors' pricing and pricing strategies. As set forth in Section VI below, economic analysis confirms that the hub-and-spoke conspiracy reduced pricing uncertainty, weakened competition, and kept rents artificially high. For example, from 2015 to 2025, every 1-point increase in CoStar's market share corresponded to a 0.3% to 0.8% increase in rent per square foot across industrial, office, and retail leases.

66.     Access to current lease comps through CoStar allowed Broker Defendants to observe competitors' effective rents and concessions for comparable properties, reducing uncertainty about prevailing market terms and diminishing reliance on independent negotiation or market testing in the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market. Indeed, CoStar's website markets to its clients that it can help "optimize your pricing" by using "verified sale and lease comps to value your properties, set rents and evaluate investment opportunities."[41]

67.     Brokers and other industry participants tout how CoStar's platform helps them raise prices and otherwise increase revenue. One property manager explained: "I was looking for a tenant for our commercial space, and I initially surmised that we could likely find a lease deal for $10 per square foot. I felt this was a bit low, so I did further research in the CoStar database, and learned similar spaces were leasing for $18 per square foot. We earned $240,000 more than we

---

[41] *Owners and Investors*, COSTAR, https://www.costar.com/who-we-serve/owners-investors (last visited Apr. 15, 2026).

expected in our first month of using CoStar."[42] Capworth Commercial Realty, a brokerage, similarly stated that "CoStar is the reason why we've been able to increase our revenues by 25% in our first year of using the product."[43] Defendant JLL reported that "CoStar has been one of our integral partners in helping JLL to increase its revenues by 20 percent in the past year alone."[44]

68. JLL executives further stated that "the first place [brokers] need to include the information is in the CoStar database," that listings placed on CoStar "generate leads fast," and that "it just doesn't get better than that."[45] CoStar functions as the default and indispensable platform through which Broker Defendants access market information, distribute listings, and compete for leasing business.

### ii. Broker Defendants Implemented the Horizontal Agreement Through Shared Use of CoStar's Lease Comps System

69. By providing competitors with ongoing access to current, transaction-level lease data, the information exchange through CoStar altered the conditions under which Broker Defendants made leasing decisions. Broker Defendants themselves describe CoStar as a centralized and indispensable source of market information. For example, Defendant JLL has described CoStar as its "principal and most significant supplier of third-party market data,"

---

[42] COSTAR GRP., INC., LEASE COMPS PRODUCT INFORMATION (Aug. 20, 2018), archived at https://web.archive.org/web/20180820041042/http:/www.costar.com/docs/default-source/costar_compare_pdfs/lease_comps.pdf?sfvrsn=2.

[43] Capworth Commercial Realty Testimonial, *supra note 26.*

[44] COSTAR GRP., INC., CASE STUDY: JLL BOOSTS PRODUCTIVITY, FUELS CONTINUED MARKET LEADERSHIP USING COSTAR SUITE (Feb. 2023), https://www.costar.com/sites/costar.com.na/files/2023-02/case-study---jll.pdf; *See also* COSTAR GRP., INC., CASE STUDY: JG CAPITAL REALTY INC. FIRM USES COSTAR AND LOOPNET TO BOOST REVENUES BY 25%; FINDS 70% MORE LISTINGS (Feb. 2023), https://www.costar.com/sites/costar.com.na/files/2023-02/case-study---jg-capital-realty_0.pdf (CoStar helped him reduce research time by 80% and increase revenues by 25%).

[45] *Id.*

explaining that it has "discontinued use of all other commercial real estate data services in favor of CoStar." JLL further stated that its listings placed on CoStar are "put in front of thousands of other brokers."[46]

70.     Similarly, other brokers emphasize the collective and continuous nature of data submission to CoStar. As one CoStar case study explains:

> If we know a deal has transacted, we send an email to our researcher at CoStar, and they verify it immediately[.]
>
> Everyone should treat CoStar as their own database. This will help maintain the most accurate database in the market.[47]

71.     Rather than negotiating in isolation, Broker Defendants therefore operated with a shared understanding of prevailing lease terms derived from the same centralized data source—described by one broker as "an assistant, researcher, and analyst, all in one." [48]

72.     Accordingly, the Broker Defendants' parallel participation in CoStar's lease comps system connected otherwise competing brokers through shared access to non-public lease information, consistent with the rim of a hub-and-spoke conspiracy.

**D.     Defendants Exchanged Current, Non-Public Lease Transaction Data**

73.     The lease comps data visible to and accessible by competing brokers and landlords through CoStar consisted of current, deal-specific, non-public transaction information that went directly to the bottom-line economic terms of commercial lease negotiations. This competitor-facing data included, among other things:

*   Gross Asking Rent: Total rent asked for by a landlord including utilities, taxes, insurance, maintenance.

---

[46] JLL Testimonial, *supra note 45.*

[47] Capworth Commercial Realty Testimonial, *supra note 26.*

[48] JG Capital Realty, *supra note 45.*

- Gross Starting Rent: Total rent paid by tenant including utilities, taxes, insurance.

- Effective Rent: Rent paid by tenant, including any rent-free periods.

- Discount to Asking Rent: Discount given by landlord on rent.

- TI Allowance: Tenant improvement allowance. A benefit given by a landlord to a tenant as reimbursement for property improvements.

- Months Free Rent: Months where rent is not paid. A benefit given by landlords.

- Months on Market: How long it takes for a property to be rented after being listed.

- Deal Size: The total value of the lease.

- Lease Term in Years: Length of lease.

- Floor Number: Number of floors in the property.

74. This information was not aggregated or meaningfully anonymized. Instead, CoStar presents lease comps at the property and unit level, allowing subscribers to identify comparable transactions for specific buildings and spaces and to infer competitors' pricing strategies, concession thresholds, and negotiation outcomes. The data reflects completed lease transactions, routinely revealing the actual terms landlords accepted rather than asking prices or aspirational listings. In the words of CoStar:[49]

> Powered by 37 years of commercial real estate data and analytics, 1,600 researchers and cutting-edge technology, commercial real estate professionals use CoStar to see key details on over 14.9 million lease transactions. With CoStar, you'll see the lease transactions and deal terms that matter to you, including tenant information, starting and effective rent, lease length, time on the market, and the players involved. You can even generate leasing analytics for a custom set of properties. Get the data you need to make informed commercial real estate decisions in the markets that matter to you.

75. CoStar has similarly touted its platform as enabling customers to "[f]ind a comprehensive inventory of properties, for-sale and for-lease listings" and "[e]xplore who is

---

[49] CoStar, *CoStar In A Minute | Lease Comps*, YOUTUBE (Apr. 16, 2024), https://www.youtube.com/watch?v=oL1G16UJ4Gg (last visited Apr. 15, 2026).

buying and selling commercial real estate and know the details behind the deals."[50] When selecting

a building, users are able to see all the units available within (see Figure 3). This enables them to

see competitors' properties in a market.



---

A Detail Page contains all the information CoStar has on the property. You'll use this to see if a property meets your needs. The Detail Page is organized by tabs.

**3 Summary:** Displays basic information about the building, its location and surrounding infrastructure, as well as summarized bits of information from the other tabs.

**Lease:** Contains the stacking plan, any lease comparables, and any available information about the building's available spaces.

**Lease Analysis:** Lets you create a cash flow model that includes the property or some of its spaces.

**Peers:** Shows you comparable properties as determined by CoStar. You can also modify these results.

**Sale:** Shows you relevant sale comparables, any available information on previous sales, and information on the current sale listing, if applicable.

**Tenant:** Contains any available information on the current tenants as well as the stacking plan.

**Analytics:** Contains analytic information on the property, submarket, and market.

**Changes:** Houses a running record of important changes to the property such as space additions, space removals, sale status changes, and more.

**Demographics:** Find stats on demographic factors such as the area's population, household income, and more.

**Public Record:** View any public record information that is available for the property.

**Contacts:** Shows all contacts associated with a building, as well as their contact information. A research contact is also displayed at the bottom should you need help finding additional building information.

**Images:** View the images you see on the right of the Summary page more easily.

**Map:** Shows you the property on a Google map, complete with street view and enhanced with CoStar's analytic layer options.

**My Data:** Lets you create, view and edit custom data sets, which you can update to include information from this detail page if desired.

**News:** See any CoStar News stories related to the property.

**Figure 3**: Reviewing properties on CoStar and accessing lease comps.[51]

76. The lease comps data is current and continuously updated.[52] CoStar represents that its platform provides near real-time access to transaction information, driven by constant updates to its listings database and ongoing communications between CoStar researchers and market participants. CoStar emphasizes that subscribers can access updated lease data "without waiting for periodic reports,"[53] and that its researchers update listings and transaction records on a rolling

---

[51] CoStar Grp., *Introduction to For Lease* (Feb. 2023), available at https://www.costar.com/sites/costar.com.na/files/2023-02/introduction-to-for-lease.pdf (last visited Apr. 15, 2026).

[52] *See* AMAZON WEB SERVS., INC., ACHIEVING 30-MILLISECOND SEARCH RESULTS USING AMAZON OPENSEARCH SERVICE WITH COSTAR GROUP (2023), https://aws.amazon.com/solutions/case-studies/costar-opensearch-case-study/ (last visited Apr. 15, 2026) ("In most use cases, CoStar stores model topic data using Amazon DynamoDB, a fully managed, serverless, key-value NoSQL database service for single-digit millisecond performance at virtually any scale.").

[53] COSTAR GRP., INC., MARKET ANALYTICS FOR OWNERS, INVESTORS AND

basis throughout the day. CoStar customers are encouraged and contractually required to update listings frequently and to report lease executions promptly, ensuring that the database reflects close to real-time market outcomes rather than historical averages.[54]

77. Figure 4 below shows the results a subscriber searching specific lease comps would see. Data entries in blue reflect "My Data" which are the lease comps that the subscriber conducting this search had previously inputted. It is "their own private lease comps database" showing "proprietary data" that "[o]nly [they] can see."[55] Any data in black reflect data from "CoStar Research." This data is collected by CoStar by "speaking with thousands of industry participants each day to gather and maintain information on lease transactions."[56] The data collected "includes Tenant Names, Square Footage, Sign & Move Date, Starting & Effective Rent, Concessions, Lease Term, and more" and "is searchable by CoStar Lease Comps subscribers."[57]

78. The added red frames show how the conspiracy operates. The same data entry appears in both blue and black. This means that the "private" data was directly shared with the CoStar "research" team and is now fully available to any subscriber at the same level of granularity.

---

LENDERS (July 2021), https://costar.co.uk/sites/costar.com.uk/files/resources/files/2021-07/CoStar%20Market%20Analytics%20for%20Owners%2C%20Investors%20and%20Lenders.pdf (last visited Apr. 15, 2026).

[54] Capworth Commercial Realty Testimonial, *supra note 26* ("If we know a deal has transacted, we send an email to our researcher at CoStar, and they verify it immediately[.]").

[55] COSTAR GRP., INC., *Lease Comps Sources* (tutorial video), COSTAR LEASE COMPS HELP, http://bcove.me/umohzlkh (last visited Apr. 15, 2026).

[56] *Id.*

[57] *Id.*



**Figure 4**: Screenshot showing a lease comps search; highlighted in red are private data that were made public through CoStar

79.     Subscribers can search, filter, and sort lease comps by building, submarket, size, tenant type, execution date, and economic terms, enabling direct comparisons among competing landlords and brokers. By revealing effective rents net of concessions—rather than headline asking rents—the platform exposes the true economic price of leasing transactions, information that would otherwise remain confidential between the negotiating parties.

80.     The data is not anonymized. Subscribers can identify specific owners using "intuitive search filters including owner type, portfolio composition and transaction history to quickly identify suitable owner and investor targets,"[58] as shown in Figure 5.

---

[58] *CoStar Owners*, COSTAR (U.K.), https://costar.co.uk/products/owners (last visited Apr. 15, 2026).

33



**Figure 5**: Searching owners on CoStar[59]

81.     Similarly, subscribers can obtain "a detailed view of commercial tenants at the location or portfolio level." CoStar "continuously tracks commercial tenants across industries and geographies,"[60] allowing users to identify specific tenants associated with particular properties. Figure 6 shows a non-anonymized list of tenants available to subscribers.

---

[59] *Id.*

[60] *CoStar Tenants*, COSTAR (U.K.), https://www.costar.co.uk/products/tenants (last visited Apr. 15, 2026).



**Figure 6**: Searching tenants on CoStar[61]

82.     This exchange of current, disaggregated, transaction-level pricing and concession data among competitors created opportunity for coordination because it reduces uncertainty about competitors' pricing behavior and future conduct. CoStar markets its platform as providing *exactly* this type of information. Users get access to real-time data "without waiting for periodic reports,"[62] driven by its large number of daily phone calls and round-the-clock updates to its listings databases. CoStar's lease comps system therefore delivers current, transaction-level information in a form that allows competing brokers and landlords to observe recent lease outcomes, assess how aggressively competitors are pricing space, and adjust their own negotiation strategies accordingly.

---

[61] *Id.*

[62]     CoStar     Grp.,     *Solutions     for     Investors,     Owners     and     Lenders*, https://costar.co.uk/sites/costar.com.uk/files/resources/files/202107/CoStar%20Market%20Analy tics%20for%20Owners%2C%20Investors%20and%20Lenders.pdf (last visited Apr. 14, 2026).

35

83. Market participants themselves describe using CoStar's lease comps data to monitor competitors' leasing activity and inform negotiation strategy. For example, an executive at Fiera Real Estate explained that his team "needs to constantly monitor activity in key markets so that we are armed with accurate comps to help negotiate leases and make the best decisions, quickly," and that CoStar allows "access to leasing velocity and lease deals done for a specific period in our markets of interest."[63]

84. In short, the data exchanged through CoStar is competitively sensitive by design: it is relevant, timely, disaggregated, transaction-specific, tied to identifiable properties and units, and focused on the effective economic terms that determine leasing prices.

**E.      Defendants Rejected Less Restrictive Alternatives**

85. Information that is aggregated across multiple market participants, stripped of property- and transaction-level identifiers, and released only after a meaningful delay does not reveal competitors' current pricing strategies and is far less likely to facilitate coordination.

86. Such less restrictive alternatives are well known and widely used in the CRE industry. For example, providers such as *MSCI Real Capital Analytics* and *Moody's Analytics REIS* publish market-level commercial real estate data that is aggregated across properties and participants and typically reported with a historical lag. These products report statistics such as average rents, vacancy rates, absorption, pricing indices, and market trends at the market or submarket level, without disclosing property-specific or unit-level lease terms. These products are widely relied upon by investors, lenders, and analysts to assess market conditions and long-term

---

[63] COSTAR GRP., INC., FIERA REAL ESTATE CASE STUDY (Feb. 2023), https://www.costar.com/sites/costar.com.na/files/2023-02/case-study---fiera-real-estate.pdf (last visited Apr. 15, 2026).

trends, demonstrating that useful and commercially valuable market intelligence can be provided without exposing current, deal-specific pricing information.

87.     Despite the availability and feasibility of these less restrictive alternatives, CoStar instead facilitated the routine exchange of current, disaggregated, property- and unit-level lease transaction data, including effective rents and concessions. By distributing the most competitively sensitive form of information—rather than aggregated or lagged data—CoStar and the Broker Defendants adopted an approach that exceeded what was necessary to provide market insight, in direct violation of Section 1 of the Sherman Act.

## VI.     DEFENDANTS CAUSED ANTICOMPETITIVE EFFECTS IN THE INDUSTRIAL, OFFICE, AND RETAIL LEASE MARKETS

88.     Defendants' conduct constitutes a hub-and-spoke conspiracy, in which CoStar facilitated a horizontal agreement among competing brokers to exchange current, non-public lease pricing and concession information. Because the exchanged information revealed competitors' current effective rents and concessions, it directly constrained price competition and functioned as a mechanism to fix or stabilize prices.

89.     Because *per se* price-fixing agreements are inherently anticompetitive, Plaintiff is not required to plead or prove actual market harm. Nevertheless, and in the alternative under the rule of reason, Defendants' conduct produced anticompetitive effects in the relevant markets, as described below.

### A.     Defendants Reduced Pricing Uncertainty and Facilitated Coordinated Pricing

90.     The challenged information exchange between Defendants eliminated uncertainty that ordinarily promotes competition in the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market at the local level, including uncertainty regarding competitors' bottom-line effective rents and the concessions offered to comparable tenants. By providing competing

brokers and landlords with access to current, transaction-level lease data, Defendants were able to observe recent lease outcomes and prevailing market terms rather than negotiate in isolation or with more limited information.

91. This reduction in uncertainty facilitated coordinated pricing behavior. Armed with near real-time visibility into competitors' effective rents and concessions, Defendants were better able to align asking rents, limit or standardize concessions, and resist tenant negotiations without fear of being undercut. As a result, independent pricing discretion was diminished, and competitive pressures that would otherwise lead to discounting or more aggressive concessions were reduced.

**B.      Defendants Caused Supracompetitive Rents and Harm to Tenants**

92. As a consequence of Defendants' conduct, competition in the affected markets was substantially restrained. In markets where Defendants participated in the exchange of non-public lease transaction data through CoStar, effective rents were higher than in comparable markets, and tenants paid inflated prices relative to competitive benchmarks, consistent with reduced uncertainty over competitors' pricing and facilitated coordination.

93. Economic analysis using market data from the top 50 MSAs confirms this impact. Figure 7 shows the correlation between CoStar's market share and rent levels in the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market. As shown, rents in each market are positively correlated with CoStar's market share.



**Figure 7:** There is a correlation between CoStar's market share and rent levels in the industrial, office, and retail leasing markets.

94.     The relationship between CoStar's presence and rental prices is confirmed by regression analysis, as shown in Figure 8. Using CoStar market share data and controlling for other

39

factors that may influence rental prices (such as MSA-level GDP, vacancy rates, and inventory levels), Figure 8 shows rental prices increase with CoStar's market share. Results are positive and statistically significant for all three markets – showing rents per square foot increase by 0.3% to 0.8% with each additional point of market share CoStar has in a local market. In other words, all else equal, as the share of transactions listed on CoStar's platform in a given MSA increases, rental prices in the Industrial Lease, Office Lease, and Retail Lease Markets in that MSA also increase.

|  | Industrial | Office | Retail |
|---|---|---|---|
|  | 1 | 2 | 3 |
| Intercept | 1.154*** | 2.931*** | 3.144*** |
|  | (0.048) | (0.055) | (0.042) |
| CoStar Market Share | 0.008*** | 0.007*** | 0.003*** |
|  | (0.001) | (0.000) | (0.000) |
| MSA GDP | 0.000*** | 0.000*** | 0.000*** |
|  | (0.000) | (0.000) | (0.000) |
| Vacancy Rate | -0.036*** | -0.033*** | -0.062*** |
|  | (0.002) | (0.001) | (0.002) |
| Inventory (Million SF) | -0.000** | 0.000*** | -0.000 |
|  | (0.000) | (0.000) | (0.000) |
| Num.Obs. | 1037 | 1680 | 1680 |
| R2 | 0.570 | 0.647 | 0.728 |
| R2 Adj. | 0.569 | 0.646 | 0.727 |
| Log.Lik. | 125.008 | 380.052 | 999.318 |
| F | 342.644 | 767.712 | 1118.121 |
| RMSE | 0.21 | 0.19 | 0.13 |

+ $p < 0.1$, * $p < 0.05$, ** $p < 0.01$, *** $p < 0.001$

**Figure 8**: Weighted average rents in high and low CoStar market share MSAs (2015–2025)[64]

---

[64] Regression results of log average commercial real estate rent on CoStar market share, including MSA-level controls for GDP, vacancy rates, and inventory levels.

95.     These anticompetitive effects were market-wide and flowed directly from Defendants' uniform conduct. By replacing independent negotiation with coordinated reliance on shared, current lease data, Defendants suppressed competition on price and terms, harming commercial tenants and reducing the benefits of competition in the Industrial Lease, Office Lease, and Retail Lease Markets.

### C.     Defendants' Conduct Substantially Affected Interstate Commerce

96.     At all relevant times, Defendants' conduct substantially affected interstate commerce. CoStar provides CRE information services nationwide and transmits data, analytics, and communications across state lines. The Broker Defendants operate on a national scale and regularly negotiate and execute commercial leases for tenants engaged in interstate business activity. The challenged conduct affected lease transactions, pricing, and negotiations in multiple states, involved interstate communications and financial transactions, and restrained competition in a manner that had a substantial effect on interstate commerce within the meaning of Section 1 of the Sherman Act.

## VII.     CLASS INJURY AND STANDING

97.     Defendants' unlawful conduct caused antitrust injury of the type the antitrust laws were intended to prevent, and that flows directly from the challenged restraint. By entering into and implementing a hub-and-spoke conspiracy to exchange disaggregated, current, non-public lease pricing and concession information, Defendants suppressed competition in the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market in the Local Markets and caused commercial tenants to pay supracompetitive rents.

98.     Plaintiff and the Classes paid higher effective rents, received fewer concessions, and faced diminished negotiating leverage as a direct and proximate result of Defendants' conduct.

41

These injuries were not speculative or incidental; they were the foreseeable and intended result of Defendants' coordinated actions to stabilize and inflate lease pricing.

## VIII.    CLASS ALLEGATIONS

99.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all others similarly situated. The proposed Classes consist of the following:

100.    Industrial Lease Class: All persons and entities that leased industrial commercial real estate in the Local Markets during the Class Period, from a landlord that was a CoStar client or used a broker that was a CoStar client.

101.    Office Lease Class: All persons and entities that leased office commercial real estate in the Local Markets during the Class Period, from a landlord that was a CoStar client or used a broker that was a CoStar client.

102.    Retail Lease Class: All persons and entities that leased retail commercial real estate in the Local Markets during the Class Period, from a landlord that was a CoStar client or used a broker that was a CoStar client.

103.    Excluded from each class are (i) Defendants, their officers, directors, management, employees, subsidiaries, parents, and affiliates; (ii) the Judge, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person; and (iii) any federal governmental entities.

104.    The members of each Class are so numerous that joinder of all members is impracticable. Commercial tenants in the Local Markets number in the thousands, and Defendants' conduct affected leasing transactions in the Industrial Lease Market, Office Lease Market, and Retail Lease Market throughout the Class Period.

105.    Questions of law and fact common to each Class include, but are not limited to:

42

(a) Whether Defendants entered into a hub-and-spoke conspiracy in violation of Section 1 of the Sherman Act;

(b) Whether Defendants exchanged current, non-public lease pricing and concession data;

(c) Whether Defendants' conduct suppressed competition and inflated effective rents;

(d) Whether Plaintiff and Class members were injured by Defendants' conduct; and

(e) The proper measure of damages.

106. Plaintiff's claims are typical of those of each Class because Plaintiff and all Class members were injured by the same unlawful conduct and suffered the same type of antitrust injury—payment of supracompetitive rents.

107. Plaintiff will fairly and adequately protect the interests of each Class. Plaintiff's interests are aligned with those of each Class, and Plaintiff has retained counsel experienced in prosecuting complex antitrust class actions.

108. Common questions of law and fact predominate over any questions affecting only individual members of each Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual damages are relatively small compared to the cost of litigation, and absent a class action, Defendants would retain the benefits of their unlawful conduct.

## CLAIM FOR RELIEF

### Count One
(Violation of Section 1 of the Sherman Act)

109. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

110. The Defendants are separate and distinct economic entities capable of conspiring under Section 1 of the Sherman Act.

43

111. At all relevant times, Defendants entered into, participated in, and implemented a hub-and-spoke conspiracy in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

112. Through this conspiracy, Defendant CoStar acted as the hub, and the Broker Defendants acted as spokes, entering into vertical agreements with CoStar and an inferred horizontal agreement among themselves to exchange current, non-public lease pricing and concession information and to use that information to coordinate leasing conduct.

113. The purpose and effect of Defendants' conspiracy was to fix, stabilize, or otherwise coordinate effective rents and lease concessions, eliminate price uncertainty, and suppress competition in the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market.

114. Defendants' conduct constitutes horizontal price fixing, which is unlawful *per se*. The challenged agreements are not ancillary to any legitimate procompetitive collaboration and lack any redeeming competitive justification.

115. In the alternative, if analyzed under the rule of reason, Defendants' conduct constitutes an unreasonable restraint of trade. Defendants' agreements and coordinated conduct produced substantial anticompetitive effects in each Local Market in the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market, including inflated effective rents, reduced concessions, diminished negotiation leverage for tenants, and the suppression of independent pricing decisions.

116. Defendants' conspiracy was nationwide in scope and affected multiple Local Markets. It involved interstate communications, data transmissions, and financial transactions, and substantially affected interstate commerce.

117. Plaintiff and the Classes suffered antitrust injury as a direct and proximate result of Defendants' unlawful conduct. In each relevant market, Plaintiff and Class members paid supracompetitive rents and received fewer or less favorable lease concessions than they would have in a competitive market.

118. Defendants' conduct was knowing, willful, and intentional, and Plaintiff and the Classes are entitled to treble damages, injunctive relief, costs, and attorneys' fees under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

## DEMAND FOR JURY TRIAL

119. Plaintiff respectfully demands a jury trial.

## PRAYER FOR RELIEF

120. WHEREFORE, Plaintiff, individually and on behalf of the Classes, respectfully requests the following relief:

(a) Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Classes;

(b) Require the Defendants to pay for sending notice to the certified Classes;

(c) Appoint Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

(d) Enjoin Defendants from continuing the anticompetitive conduct alleged in this Complaint;

(e) Award compensatory damages to Plaintiff and the proposed Classes in an amount to be established at trial;

(f) Award treble damages as permitted by law;

(g) Award pre- and post-judgment interest;

(h) Award reasonable attorneys' fees and costs; and

(i) Award any other and further relief as may be just and proper.

Dated: June 12, 2026

Respectfully Submitted,

/s/  Vel Freedman
**FREEDMAN NORMAND FRIEDLAND LLP**
Devin (Velvel) Freedman
Kyle Roche
Stephen Lagos (*pro hac vice forthcoming*)
Joseph Lemoine (*pro hac vice forthcoming*)
155 E. 44th Street, Suite 915
New York, New York 10017
(646) 494-2900
vel@fnf.law
kroche@fnf.law
slagos@fnf.law
jlemoine@fnf.law

*Counsel for Plaintiff*

46