**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| FITFACTARIDC, LLC, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COSTAR GROUP, INC., CBRE GROUP, INC., JONES LANG LASALLE INCORPORATED, CUSHMAN & WAKEFIELD PLC, COLLIERS INTERNATIONAL USA, LLC, and NEWMARK GROUP, INC.,<br><br>Defendants. | No. 1:26-cv-06997<br><br>District Judge Joan H. Lefkow |

**DEFENDANT COSTAR GROUP, INC.'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................4

A. CoStar's CRE Database And "Lease Comps" Data ..........................................4

B. The Broker Defendants ....................................................................................5

C. The Alleged Conspiracy ...................................................................................5

LEGAL STANDARD..............................................................................................6

ARGUMENT .........................................................................................................6

I. FITFACTARI LACKS STANDING TO BRING ITS CLAIM ...............................6

A. FitFactari Lacks Antitrust Standing Because It Does Not Plausibly Allege Antitrust Injury Or Causal Directness..........................................................7

B. FitFactari Lacks Article III Standing To Seek Injunctive Relief............................8

II. FITFACTARI FAILS TO PLAUSIBLY ALLEGE ANY AGREEMENT AMONG THE DEFENDANTS..........................................................................................9

A. FitFactari Does Not Plausibly Allege That CoStar Is A Conspiratorial "Hub" ......................................................................................................10

B. FitFactari Pleads No Horizontal "Rim" Among The Broker Defendants.............13

1. FitFactari Does Not Allege Parallel Conduct ..........................................14

2. FitFactari's Purported Plus Factors Add Nothing....................................15

3. The Complaint's Conspiracy Theory Is Implausible ................................17

III. THE COMPLAINT DOES NOT PLEAD ANY PLAUSIBLE ANTICOMPETITIVE EFFECTS IN ANY RELEVANT MARKET ..............................19

A. FitFactari Pleads No Direct Evidence Of Anticompetitive Effects .......................20

B. FitFactari Also Does Not Plausibly Allege Anticompetitive Effects Indirectly ...........................................................................................23

CONCLUSION.......................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Agnew v. NCAA*,
683 F.3d 328 (7th Cir. 2012) ........................................19

*Alarm Detection Sys., Inc. v. Vill. of Schaumburg*,
930 F.3d 812 (7th Cir. 2019) ........................................6

*Always Towing & Recovery, Inc. v. City of Milwaukee*,
2 F.4th 695 (7th Cir. 2021) ........................................9

*Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)........................................7

*Aurora Astro Prods. LLC v. Celestron Acquisition, LLC*,
691 F. Supp. 3d 1132 (N.D. Cal. 2023) ........................................24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................6, 9, 14, 15, 18, 21

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979)........................................21

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)........................................7

*Bunker Ramo Corp. v. United Bus. Forms, Inc.*,
713 F.2d 1272 (7th Cir. 1983) ........................................7

*Car Carriers, Inc. v. Ford Motor Co.*,
745 F.2d 1101 (7th Cir. 1984) ........................................19

*Centers v. Centennial Mortg., Inc.*,
398 F.3d 930 (7th Cir. 2005) ........................................12

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)........................................8

*Cornish-Adebiyi v. Caesars Entertainment, Inc.*,
-- F.4th --, 2026 WL 2182291 (3d Cir. July 29, 2026) ........................................10

*Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*,
46 F.4th 535 (7th Cir. 2022) ........................................1

*Five Smiths, Inc. v. NFL Players Ass'n*,
788 F. Supp. 1042 (D. Minn. 1992) ... 17

*Forsyth v. Humana, Inc.*,
114 F.3d 1467 (9th Cir. 1997) ... 21

*FTC v. Facebook, Inc.*,
560 F. Supp. 3d 1 (D.D.C. 2021) ... 25

*Gibson v. Cendyn Grp., LLC*,
148 F.4th 1069 (9th Cir. 2025) ... 15, 20

*Gibson v. Cendyn Grp., LLC*,
2024 WL 2060260 (D. Nev. May 8, 2024), *aff'd*, 148 F.4th 1069 (9th Cir. 2025) ... 10, 14, 15

*Gibson v. MGM Resorts Int'l*,
2023 WL 7025996 (D. Nev. Oct. 24, 2023) ... 14

*Hansen v. Nw. Univ.*,
2025 WL 2731378 (N.D. Ill. Sept. 24, 2025) ... 16

*In re Concrete & Cement Additives Antitrust Litig.*,
2025 WL 1755193 (S.D.N.Y. June 25, 2025) ... 23

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011) ... 8

*In re FICO Antitrust Litig. Related Cases*,
2023 WL 6388247 (N.D. Ill. Sept. 28, 2023) ... 13

*In re Generic Pharms. Pricing Antitrust Litig.*,
2025 WL 388813 (E.D. Pa. Feb. 3, 2025) ... 10, 11

*In re Loc. TV Advert. Antitrust Litig.*,
2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) ... 11

*In re Manufactured Home Lot Rents Antitrust Litig.*,
2025 WL 3485693 (N.D. Ill. Dec. 4, 2025) ... 14, 17, 19, 21

*In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Pracs. Litig.*,
275 F. Supp. 3d 218 (D.D.C. 2017) ... 7

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ... 14

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
2026 WL 879018 (N.D. Ohio Mar. 31, 2026) ... 22

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
767 F. Supp. 3d 681 (N.D. Ohio 2025)....................15, 21

*In re RealPage, Inc.*,
709 F. Supp. 3d 478 (M.D. Tenn. 2023)....................10, 17

*In re Text Messaging Antitrust Litig.*,
782 F.3d 867 (7th Cir. 2015)....................14

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009)....................15

*Int'l Equip. Trading, Ltd. v. Illumina, Inc.*,
312 F. Supp. 3d 725 (N.D. Ill. 2018)....................24

*Leeder v. Nat'l Ass'n of Realtors*,
601 F. Supp. 3d 301 (N.D. Ill. 2022)....................8

*Maple Flooring Mfrs.' Ass'n v. United States*,
268 U.S. 563 (1925)....................2, 11, 17, 20

*Marion Diagnostic Cent., LLC v. Becton Dickinson & Co.*,
29 F.4th 337 (7th Cir. 2022)....................9

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020)....................9, 11, 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....................18

*McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*,
937 F.3d 1056 (7th Cir. 2019)....................7, 8

*Mirage Wine + Spirit's Inc. v. Apple Inc.*,
2025 WL 1896006 (S.D. Ill. July 9, 2025)....................7

*Mountain Crest SRL, LLC v. Anheuser-Busch InBev SA/NV*,
456 F. Supp. 3d 1059 (W.D. Wis. 2020)....................6

*New York v. Deutsche Telekom AG*,
439 F. Supp. 3d 179 (S.D.N.Y. 2020)....................24

*Ohio v. Am. Exp. Co.*,
585 U.S. 529 (2018)....................20, 23

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
629 F.3d 697 (7th Cir. 2011)....................19

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
911 F.3d 505 (8th Cir. 2018) ....................15

*Phillips v. Prudential Ins. Co. of Am.*,
714 F.3d 1017 (7th Cir. 2013) ....................12

*Pistacchio v. Apple Inc.*,
2021 WL 949422 (N.D. Cal. Mar. 11, 2021)....................7

*Portillo v. Costar Grp., Inc.*,
2025 WL 2495053 (W.D. Wash. Aug. 29, 2025) ....................11, 12, 15

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
917 F.3d 1249 (11th Cir. 2019) ....................21

*Rocha v. FedEx Corp.*,
15 F. Supp. 3d 796 (N.D. Ill. 2014) ....................12

*Segal v. Amadeus IT Grp., S.A.*,
2025 WL 963751 (N.D. Ill. Mar. 31, 2025)....................8, 13, 15

*Simic v. City of Chicago*,
851 F.3d 734 (7th Cir. 2017) ....................8

*Supreme Auto Transp. LLC v. Arcelor Mittal*,
238 F. Supp. 3d 1032 (N.D. Ill. 2017), *aff'd*, 902 F.3d 735 (7th Cir. 2018) ....................8

*Swanson v. Citibank, N.A.*,
614 F.3d 400 (7th Cir. 2010) ....................6, 9

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)....................11, 16

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
552 F.3d 430 (6th Cir. 2008) ....................9

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000) ....................10

*United Mag. Co. v. Murdoch Mags. Distrib., Inc.*,
146 F. Supp. 2d 385 (S.D.N.Y. 2001)....................18

*United States v. Citizens & S. Nat'l Bank*,
422 U.S. 86 (1975)....................19

*United States v. U.S. Gypsum Co.*,
438 U.S. 422 (1978)....................2, 19, 21

*Vital Pharms., Inc. v. Berlin Packaging LLC*,
632 F. Supp. 3d 780 (N.D. Ill. 2022) ........................................................................25

*Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
328 F. Supp. 3d 824 (N.D. Ill. 2018) ....................................................................18, 21

**STATUTES**

15 U.S.C. § 1 .......................................................................................2, 5, 6, 7, 9, 18, 19

**RULES**

Fed. R. Civ. P.
12(b)(1) .........................................................................................................................1
12(b)(6) ...............................................................................................................1, 6, 25

**OTHER AUTHORITIES**

*CoStar v. Com. Real Est. Exch., Inc.*,
No. 2:20-cv-08819 (C.D. Cal. May 5, 2022), Dkt. 162 ..........................................................24

Press Release, CREXi, *Commercial Real Estate Digital Adoption Surges* (Dec. 2025), https://www.prnewswire.com/news-releases/commercial-real-estate-digital-adoption-surges-crexi-tops-815-6-billion-in-active-property-for-sale-listings-302630606.html ..........................................................................................24

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendant CoStar Group, Inc. ("CoStar") moves to dismiss the Complaint.

## INTRODUCTION

For more than three decades, CoStar has operated the nation's leading commercial real estate ("CRE") information and analytics platform. That platform provides CRE market data—including historical information about completed lease transactions ("lease comps")—to anyone who obtains a subscription, including tenants, landlords, brokers, lenders, and investors. Plaintiff FitFactariDC LLC ("FitFactari") tries to recast CoStar's business as an illicit per se violation of the antitrust laws, alleging that by making "lease comps" data publicly available, CoStar operates as the "hub" of a conspiracy among five brokerage firms (the "Broker Defendants") to "fix" commercial rents nationwide.

These allegations make no sense, as neither CoStar nor the Broker Defendants set commercial lease rates, and CoStar's database provides no lease rate recommendations of any kind. More fundamentally, the Complaint's own allegations and incorporated sources unravel the supposed "conspiracy" at every turn. FitFactari acknowledges that tenants and tenant-side brokers subscribe to CoStar and access the very same data it brands "non-public" and portrays as confined to a landlord-side cabal. Compl. ¶¶ 48, 56. And, unsurprisingly, tenants wield those same "lease comps" to drive rents *down*: The Complaint's incorporated sources show tenants using such data to "save[] millions of dollars" and "enter negotiations better prepared." Ex. A[1]; *see, e.g.*, Compl.

---

[1] This exhibit, like the others attached to this motion, originates from a website that the Complaint cites and relies upon as support for several factual allegations. *See* Compl. ¶¶ 16, 32, 42-44, 48, 53-55, 59, 66-70. The exhibits are therefore incorporated by reference and should be considered in resolving this motion. *See Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*, 46 F.4th 535, 543 (7th Cir. 2022) ("A district court may consider documents attached to a motion to dismiss if the documents are referenced in the plaintiffs' complaint and are central to the claim.").

¶ 56. There can be no information-sharing "conspiracy" when the relevant information is equally available to the alleged victims and their representatives—who use it to their benefit.

In addition, for over a century, the Supreme Court has recognized that the exchange of market data—particularly historical data about completed transactions—*promotes* competition by reducing informational asymmetries and enabling better-informed decisions. *See Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 582-84 (1925); *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). As the Court explained, "the public interest is served by the gathering and dissemination" of market data—including "prices in actual sales"—because making such data available "stabilize[s] trade and industry," "produce[s] fairer price levels," and "avoid[s] the waste which inevitably attends the unintelligent conduct of economic enterprise." *Maple Flooring*, 268 U.S. at 582-83. Anyone who has ever searched to purchase a home, or to lease an apartment or commercial space, would appreciate this commonsense reality. The alleged exchange of historical pricing information, whether or not the recipients include competing brokerages, is accordingly not a per se violation of the antitrust laws, but instead is evaluated under the rule of reason. FitFactari's Complaint disregards that controlling precedent.

FitFactari's claim, purportedly brought under Section 1 of the Sherman Act, is implausible, legally deficient, and should be dismissed for three independent reasons:

*First*, FitFactari lacks antitrust standing. It alleges it paid "supracompetitive" rent at some point—but never identifies what it paid, what a competitive rent should have been, or why or how the two diverge. FitFactari does not even identify which broker handled its lease—much less allege that any broker set or influenced the rent it paid. Nor could it, as landlords set lease terms. Independently, FitFactari's bid for injunctive relief fails for lack of Article III standing because it alleges only one past commercial lease and no future intention to enter another.

*Second*, FitFactari fails to plausibly allege any agreement among Defendants to exchange competitively sensitive data or to "fix" lease terms. The Complaint invokes a purported "hub-and-spoke" conspiracy but pleads none of its elements. FitFactari does not allege that CoStar recommends commercial rents, participates in lease negotiations, or somehow policed any scheme—so there is no plausible "hub." FitFactari also does not allege any agreement among the Broker Defendants to exchange lease data or "fix" commercial lease terms—so there is no plausible "rim." The entire "conspiracy" reduces to the allegation that the Broker Defendants—along with thousands of others—all subscribe to and use CoStar's database. Taken to its logical conclusion, that theory would transform *every* data repository of completed transactions—from home-sale histories to bond-trade reports—into de facto cartels. That is not the law.

*Third*, FitFactari does not plead any plausible anticompetitive effects in any relevant market. Under the rule of reason—the governing standard for information-exchange claims—FitFactari must allege substantial anticompetitive harm, either directly through allegations of supracompetitive pricing or reduced output, or indirectly through alleged market power in a properly defined market. FitFactari does neither. Its price allegations are entirely conclusory, and its "regression" analysis measures CoStar's presence in the wrong alleged market—the CRE *listings* market, not the CRE *information-services* market alleged in the Complaint. The regression also reveals nothing more than a supposed correlation with a benign explanation: CoStar penetrates more expensive markets *because* the commercial stakes justify the investment, not because CoStar's presence inflates rents. And the Complaint's market-power allegations are woefully deficient—they are copied wholesale from a years-old pleading in an unrelated case, measure the wrong market, and rely on a flawed methodology that FitFactari does not even bother to validate.

The Complaint does not plausibly allege anticompetitive effects in *any* market, let alone the ones where FitFactari claims injury.

These pleading deficiencies are not curable. The Court should dismiss the Complaint with prejudice.

## BACKGROUND

### A. CoStar's CRE Database And "Lease Comps" Data

Since its founding in 1987, CoStar has become a leading provider of CRE data, analytics, and online property marketplaces. Compl. ¶¶ 10, 35. CoStar offers two principal CRE services. The first is LoopNet—an online marketplace where brokers and property owners advertise CRE properties for sale or lease, and prospective buyers or tenants search for them. *See id.* ¶ 36. The second is CoStar's subscription-based CRE information-services platform—a "comprehensive" database offering CRE property- and transaction-level data, market analytics, and related tools to tenants, landlords, brokers, investors, and other CRE professionals. *Id.* ¶ 10. More than 240,000 subscribers from across the CRE industry use it. *Id.* ¶¶ 10, 48. Historical lease activity is one component of the database: subscribers can search, filter, and sort lease comparables (or "comps") by building, submarket, size, tenant type, execution date, and economic terms. *Id.* ¶ 79. Those data, tools, and analytics are available to all CoStar subscribers—including tenants and tenant-side brokers, who can use the lease comps data to negotiate more favorable lease terms. *Id.* ¶ 56.

CoStar populates its CRE database through extensive independent research: its "1,600+ dedicated market researchers" gather information from the "field, aerial and drone research, data feeds[,] and public record[s]." Ex. B. CoStar subscribers (both landlords and building occupiers) may also contribute data regarding closed leases, but CoStar's terms of use impose no obligation to do so; they require only that subscribers "use reasonable efforts to keep CoStar informed about *properties available for lease and/or sale* and transaction information." Compl. ¶ 54 (emphasis

added). Nowhere does the Complaint allege that subscribers cannot access lease comps, or CoStar's database itself, unless they contribute their own comp data.

**B. The Broker Defendants**

The Complaint names five CRE brokerage firms as defendants: CBRE, JLL, Cushman & Wakefield, Colliers, and Newmark. *Id.* ¶¶ 11-15. These firms provide brokerage, leasing, and advisory services to *both* landlords and tenants. *Id.* ¶¶ 11-15, 33. The Complaint alleges that each Broker Defendant is a CoStar client, citing a 2015 CoStar Form 10-K filing listing certain Broker Defendants among CoStar's customers as of that time. *Id.* ¶ 16 & n.3. But the Complaint never identifies when any Broker Defendant's subscription began or when—if ever—any Broker Defendant submitted lease comp data or became aware of its competitors doing so.

**C. The Alleged Conspiracy**

On June 12, 2026, FitFactari—a Florida company alleged to have "leased" commercial space at a single address in Denver "during the Class Period"—filed this putative class action under Section 1 of the Sherman Act. Compl. ¶ 9. FitFactari seeks to represent a class of tenants that leased industrial, office, or retail CRE in specified Metropolitan Statistical Areas ("MSAs") from June 12, 2022 to the present. *Id.* ¶¶ 8, 100-02. FitFactari alleges that "one or more of the Broker Defendants" brokered its Denver lease and that "Defendants' coordinated conduct" caused it to pay "artificially inflated" rent. *Id.* ¶ 9. But the Complaint does not identify which Broker Defendant "brokered" that lease, the landlord from whom FitFactari leased, the rent FitFactari paid (or whether it in fact did *not* pay rent, at least for some period), whether the lease is extant (or terminated), or even whether the "commercial" space was "industrial," "office," or "retail."

FitFactari attempts to frame a "hub-and-spoke conspiracy," casting CoStar as the "hub" and the Broker Defendants as the "spokes." *Id.* ¶¶ 1-8, 34. The alleged scheme has two parts: (1) vertical agreements between each Broker Defendant and CoStar supposedly requiring the

Broker Defendants to provide CoStar with "current, non-public lease pricing" information, *id.* ¶¶ 35-62; and (2) a horizontal agreement among the Broker Defendants to use the lease data shared with and obtained through CoStar to "fix, stabilize, or otherwise coordinate effective rents and lease concessions," *id.* ¶¶ 63-84. Yet FitFactari does not allege that any Broker Defendant or CoStar had any role in setting rent amounts or other lease terms. Nor does it allege that any commercial landlord—the party that *actually* accepts lease terms and receives rent, *id.* ¶ 74—joined the purported conspiracy.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57, 570 (2007). A complaint that pleads facts "merely consistent with" liability "stops short of the line between possibility and plausibility." *Id.*; *see Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 828 (7th Cir. 2019) (same). In "complex" cases like this "antitrust" action, "more detail" is required, *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010)—"in part because of the added burdens associated with" antitrust discovery, *Mountain Crest SRL, LLC v. Anheuser-Busch InBev SA/NV*, 456 F. Supp. 3d 1059, 1072 (W.D. Wis. 2020). A court will not presume unlawful conduct where "obvious alternative" (and lawful) explanations account for the alleged conduct. *Twombly*, 550 U.S. at 567-68.

## ARGUMENT

### I. FITFACTARI LACKS STANDING TO BRING ITS CLAIM

FitFactari's Section 1 claim fails at the threshold because it lacks antitrust standing. It does not plausibly allege antitrust injury—or any nonspeculative causal link between the challenged conduct and whatever rent it paid. The Complaint does not allege that *any* broker set or influenced the rent FitFactari paid, let alone that the landlord who did set that rent participated in the supposed

conspiracy. And, independently, FitFactari lacks Article III standing to seek injunctive relief because it alleges only a prior lease and no threat of future harm.

### A. FitFactari Lacks Antitrust Standing Because It Does Not Plausibly Allege Antitrust Injury Or Causal Directness

To have antitrust standing, a Section 1 plaintiff must allege both antitrust injury—harm "of the type the antitrust laws were intended to prevent"—and a sufficiently direct causal link between the alleged violation and the harm. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535-44 (1983); *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1065 (7th Cir. 2019). FitFactari's Complaint satisfies neither requirement.

***Antitrust Injury.*** The Complaint asserts that FitFactari "paid effective rents" that were "artificially inflated" or "supracompetitive." Compl. ¶¶ 9, 97. But those are labels, not well-pleaded facts. *See Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1285 (7th Cir. 1983) (rejecting "bare allegation" of "'artificially high, non-competitive price'"); *Pistacchio v. Apple Inc.*, 2021 WL 949422, at *2 (N.D. Cal. Mar. 11, 2021) ("bald conclusory statement" of "supracompetitive" prices "insufficient" to survive motion to dismiss). The Complaint does not allege what rent ("effective" or otherwise) FitFactari paid, when, or to whom; what a competitive rent would have been absent the supposed antitrust violation; or any fact supporting the conclusion that its rent exceeded competitive levels. That is insufficient. *See In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Pracs. Litig.*, 275 F. Supp. 3d 218, 225 (D.D.C. 2017) ("Conclusory allegations of supracompetitive prices are not sufficient.").

***Causal Directness.*** Even assuming a plausibly alleged overcharge, the Complaint does not connect it to the alleged exchange of "lease comps" data. *See Mirage Wine + Spirit's Inc. v. Apple Inc.*, 2025 WL 1896006, at *12 (S.D. Ill. July 9, 2025) (dismissal for failure to "state a

sufficient link between the alleged antitrust violation and antitrust injury"); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 402 (S.D.N.Y. 2011) (similar). FitFactari's causal chain breaks at the outset: the Complaint never alleges that *brokers* have the power to influence the rents *landlords* charge—even though the Complaint depends on that unpleaded premise. FitFactari's claim thus requires the Court to stack inference upon inference: that an unidentified landlord-side broker consulted CoStar data; that such data drove the *landlord* to demand higher rent; and that FitFactari's own broker was precluded from accessing the same data to negotiate the rent down.

The Complaint plausibly alleges none of this. Nor could it, given that CoStar data is available to anybody—brokers included—who subscribe. *Supra* at 4. The claim's chain of speculation is thus far too attenuated to confer antitrust standing. *See McGarry*, 937 F.3d at 1065-66 (affirming dismissal where "alleged injury is quite attenuated from the claimed price-fixing"); *Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1042 (N.D. Ill. 2017) ("conclusory statement that supracompetitive prices were a direct and proximate result of defendants' unlawful acts … cannot survive a motion to dismiss"), *aff'd*, 902 F.3d 735 (7th Cir. 2018); *Segal v. Amadeus IT Grp., S.A.*, 2025 WL 963751, at *6 (N.D. Ill. Mar. 31, 2025) (dismissal where connection between information exchanged and supracompetitive prices too "attenuated").

**B. FitFactari Lacks Article III Standing To Seek Injunctive Relief**

To have Article III standing to obtain injunctive relief, a plaintiff must allege a "real and immediate" threat of future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-05 (1983). "[A] past injury alone" will not do. *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017). The Complaint alleges that FitFactari entered one previously negotiated and executed lease at a Denver address, Compl. ¶ 9, but says nothing about when that lease began or ended, or whether it remains in effect. Nor does it allege that FitFactari intends to lease commercial space again—anywhere. A completed transaction cannot support a claim for prospective injunctive relief. *See Leeder v.*

*Nat'l Ass'n of Realtors*, 601 F. Supp. 3d 301, 314 (N.D. Ill. 2022) (no standing where plaintiff "has already purchased his home and does not allege that he intends to purchase a new home"). FitFactari's request for injunctive relief should be dismissed for lack of Article III standing.

## II. FITFACTARI FAILS TO PLAUSIBLY ALLEGE ANY AGREEMENT AMONG THE DEFENDANTS

The Complaint independently fails on the merits. FitFactari alleges that Defendants conspired to exchange competitively sensitive lease data in order to "fix" commercial rents. Compl. ¶¶ 63, 88, 112-15. But a Section 1 claim—whether for an illicit information exchange or outright price fixing—demands a plausible *agreement* among Defendants, grounded in "allegations of fact." *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021). Allegations that "could just as easily reflect innocent conduct or rational self-interest" do not satisfy that requirement. *Marion Diagnostic Cent., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 351 (7th Cir. 2022) ("*Marion II*").

The Complaint offers conclusions and labels, but pleads no facts establishing who agreed, with whom, when, or how. *See Twombly*, 550 U.S. at 565 n.10 (rejecting complaint that "mentioned no specific time, place, or person involved in the alleged conspiracies"); *Swanson*, 614 F.3d at 405 (similar); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436-37 (6th Cir. 2008) ("[s]imple allegations" like "a general date of when the conspiracy likely began and that parties are acting in a similar fashion" are "insufficient").

Calling the arrangement a "hub-and-spoke" conspiracy does not fill those gaps. A hub-and-spoke conspiracy requires (1) a hub that actively "coordinat[es]" the scheme; (2) spokes that consciously join it; and (3) a "rim" of horizontal agreement connecting the spokes. *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 841-42 (7th Cir. 2020) ("*Marion I*"). The Complaint plausibly alleges none of this. That is hardly surprising, as the Complaint's theory

is implausible on its face: It depends on brokers who represent *both* landlords *and* tenants agreeing to inflate rents—harming their own tenant clients—even though brokers do not set lease terms and the landlords who *do* sit outside the conspiracy.

**A. FitFactari Does Not Plausibly Allege That CoStar Is A Conspiratorial "Hub"**

The Complaint does not plausibly allege that CoStar serves as the "hub" of the alleged conspiracy. To qualify as a "hub" for a price-fixing conspiracy, a data provider must do more than sell its products or services to competitors—it must also coordinate their conduct, whether by exercising delegated pricing authority, issuing pricing directives, or policing adherence to some common scheme. *See Gibson v. Cendyn Grp., LLC*, 2024 WL 2060260, at *1, *3 (D. Nev. May 8, 2024) ("*Gibson II*") (dismissal where hotels were "not required to and often [did] not accept" pricing recommendations), *aff'd*, 148 F.4th 1069 (9th Cir. 2025); *In re Generic Pharms. Pricing Antitrust Litig.*, 2025 WL 388813, at *5 (E.D. Pa. Feb. 3, 2025) (dismissal where plaintiff did not show hub "had some power to set or influence prices"). The paradigmatic hub takes competitors' confidential data, processes it, and generates pricing directives that participants agree to follow (and that are visible only to co-conspirators). *Cf. In re RealPage, Inc.*, 709 F. Supp. 3d 478, 494 (M.D. Tenn. 2023) (hub generated "pricing recommendations" from competitors' "sensitive pricing and supply data"); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 933 (7th Cir. 2000) (hub "served as the central clearinghouse for complaints about breaches in the agreement").

Nothing remotely comparable is alleged here. FitFactari does not allege that CoStar recommended, set, coordinated, or enforced any lease term—including rent. Nor does it allege that CoStar monitored compliance, relayed complaints, punished deviations, or otherwise policed any common pricing scheme among the Broker Defendants. These missing features distinguish this case entirely from *Cornish-Adebiyi v. Caesars Entertainment, Inc.*, -- F.4th --, 2026 WL 2182291, at *5-12 (3d Cir. July 29, 2026), where the alleged hub purportedly transformed

competitors' real-time, non-public data into price recommendations that participants allegedly followed, subject to practical constraints on deviating from those recommendations.

Unable to allege anything like that here, FitFactari falls back on CoStar marketing statements that it helps clients "optimize [their] pricing," and broker testimonials of revenue gains. Compl. ¶¶ 66-67. But those statements describe the ordinary function of a market-information product: helping customers make informed decisions. They do not suggest CoStar had "power" over those decisions. *In re Generic Pharms. Pricing Antitrust Litig.*, 2025 WL 388813, at *5.

Nor does the Complaint plausibly allege that CoStar served as a conduit for an unlawful information exchange. A conduit "facilitate[s] [the] conspiracy" by "circulat[ing] … information" among competitors in a way that "enable[s] co-conspirators to tacitly communicate with one another." *In re Loc. TV Advert. Antitrust Litig.*, 2022 WL 3716202, at *4, 6 (N.D. Ill. Aug. 29, 2022); *see Marion I*, 952 F.3d at 842 (hub must be a "central coordinating party"). Courts accordingly look for features that distinguish a conduit from an ordinary information service—most notably, a "give-to-get" setup requiring competitors to contribute sensitive data as the price of access to the information of others, with dissemination restricted to those same competitors. *See Portillo v. Costar Grp., Inc.*, 2025 WL 2495053, at *4-5 (W.D. Wash. Aug. 29, 2025) (no hub where hotels not required to give sensitive data to access platform); *Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001) (dissemination to both sides of market procompetitive); *Maple Flooring*, 268 U.S. at 573-74 (no antitrust violation where exchanged information widely disseminated).

FitFactari alleges that brokers are "affirmatively required" to update CoStar with lease data to "access" its platform, Compl. ¶¶ 53, 56, 58, but the supposedly supporting materials undermine

that allegation.[2] CoStar's Marketing Center User Guide asks users to update their *active listings*—properties currently available for sale or lease—every 30-60 days, but says nothing about reporting the terms of *completed* lease transactions. *Id.* ¶ 43; *see* Ex. C. And CoStar's terms of use ask brokers (and others) to use "reasonable efforts" to keep CoStar informed about "properties available for lease and/or sale" and related "transaction information." Compl. ¶ 54; *see* Ex. D § 10. That limited request (asking only for reasonable efforts) neither requires disclosure of *all* lease terms nor identifies any allegedly sensitive field—effective rent or concessions—that must be disclosed. At most, it calls for notice that a transaction occurred and updating the listing status. *See Portillo*, 2025 WL 2495053, at *4-5 (dismissal where terms of use referenced in complaint showed purported spokes were not required to share price information).

FitFactari's own allegation that CoStar "encourage[s]" subscribers to submit transaction data, Compl. ¶¶ 43, 53, 56, only confirms what the contract text already shows: submission of such information is voluntary. There is thus no plausible "give-to-get" arrangement here. *See Marion I*, 952 F.3d at 843 (affirming dismissal where there was no "quid pro quo according to which [the hub] compensated [the spokes] for participating in the alleged antitrust conspiracy"); *Rocha v. FedEx Corp.*, 15 F. Supp. 3d 796, 811 (N.D. Ill. 2014) (rejecting allegation that plaintiff was forced to buy product when cited contract showed otherwise).

Nor does FitFactari allege that access to lease data in CoStar's database is confined to the Broker Defendants. Quite the opposite: The Complaint acknowledges that CoStar serves over 240,000 subscribers spanning the entire CRE industry—tenants, landlords, brokers, investors, and

---

[2] "To the extent that an exhibit attached to or referenced by the complaint contradicts the complaint's allegations, the exhibit takes precedence." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013); *see Centers v. Centennial Mortg., Inc.*, 398 F.3d 930, 933 (7th Cir. 2005) (similar).

lenders. Compl. ¶¶ 37, 48, 56. Indeed, the 2015 Form 10-K the Complaint cites to establish that the Broker Defendants were CoStar customers also identifies major tenants—7-Eleven, Walgreens, and Spencer Gifts—as CoStar customers, and describes its user base as including "tenants," "retailers," and "tenant vendors." Ex. E at 8, 14; *see* Ex. F (listing "Occupiers" as one of CoStar's core user categories). Worse still for FitFactari, the Complaint's incorporated sources show that tenants do not merely access CoStar's data—they deploy it in negotiations: one tenant reports "sav[ing] millions of dollars by relying on CoStar's sale and lease transaction data" to "enter negotiations better prepared." Ex. A; *see* Compl. ¶ 56 (access to "bottom-line lease terms" helps "tenants"). A data platform open to every side of the market—including the commercial tenants the conspiracy supposedly harms—is the antithesis of an illicit conduit for one side.

**B. FitFactari Pleads No Horizontal "Rim" Among The Broker Defendants**

Even if CoStar could plausibly be cast as a hub, the Complaint independently fails because it does not allege a horizontal agreement among the Broker Defendants—the essential "rim."[3] Without a rim, there is no hub-and-spoke conspiracy. *See Segal*, 2025 WL 963751, at *5 (no hub-and-spoke conspiracy absent "allegations that the hotel defendants, the 'spokes,' made agreements with one another sufficient to form a 'rim'"); *In re FICO Antitrust Litig. Related Cases*, 2023 WL 6388247, at *7 (N.D. Ill. Sept. 28, 2023) (similar).

FitFactari concedes it has no direct evidence of any broker-to-broker agreement. *See* Compl. ¶ 63 (acknowledging that a horizontal agreement can only be "inferred from [the Broker Defendants'] conduct and shared understanding"); *id.* ¶ 112 (similar). But to plead a rim circumstantially, a plaintiff must allege both (1) parallel conduct and (2) "plus factors" that render

[3] To the extent that the Broker Defendants' motion to dismiss raises additional arguments on this and other issues, CoStar joins in those arguments.

conspiracy plausible—not merely possible. *In re Manufactured Home Lot Rents Antitrust Litig.*, 2025 WL 3485693, at *4 (N.D. Ill. Dec. 4, 2025). FitFactari alleges neither.

**1. FitFactari Does Not Allege Parallel Conduct**

Parallel conduct requires nonconclusory allegations that competitors acted similarly or in lockstep in a manner probative of agreement—through, for example, uniform pricing, coordinated announcements, or synchronized policy changes. *See Gibson II*, 2024 WL 2060260, at *3. Courts have held that the "slow adoption of similar policies does not raise the specter of collusion." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195-96 (9th Cir. 2015). FitFactari fails even to allege that here.

The only "parallel" conduct the Complaint identifies is that each Broker Defendant subscribed to CoStar at some point and allegedly submitted lease data to its platform. Compl. ¶¶ 16, 53-55, 64. But CoStar has operated its information-services database for nearly forty years, and FitFactari does not plausibly allege that the Broker Defendants subscribed "around the same time," *In re Musical Instruments*, 798 F.3d at 1193—or even in the same decade—let alone identify when any allegedly began contributing landlord-side lease comps. A broker that began using a database in the 1990s is not, by that fact alone, conspiring with one that subscribed twenty years later. *Id.* at 1195; *see Gibson v. MGM Resorts Int'l*, 2023 WL 7025996, at *4 (D. Nev. Oct. 24, 2023) (no parallel conduct where plaintiff failed to allege when defendants began using pricing software).

In any event, subscribing to an "industry standard" platform, Compl. ¶ 37, is "just as much in line with a wide swath of rational and competitive business strategy" as with any illicit agreement. *Twombly*, 550 U.S. at 554; *see In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015) ("We can … without suspecting illegal collusion, expect competing firms to keep close track of each other's pricing and other market behavior."). Indeed, the Complaint

identifies *nondefendant* brokers engaging in identical conduct—contributing lease data, consulting competitors' transactions, and using CoStar to "increase … revenues" and "reduce research time." Compl. ¶¶ 43, 67 & n.44, 70-71, 83. Conduct common to alleged conspirators and nonconspirators alike suggests rational use of a valuable product, not horizontal agreement. As the Ninth Circuit put it, antitrust law does not require "businesses to decline to take advantage of a service because its competitors already use that service," and obtaining information from a common source "does not reduce the incentive to compete." *Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1083-84 (9th Cir. 2025) ("*Gibson III*").

Courts routinely refuse to infer conspiracy from similar allegations. *See Gibson II*, 2024 WL 2060260, at *3 ("too implausible to infer that each Hotel Defendant was signing up for a price fixing conspiracy when it agreed to license" the same software); *Segal*, 2025 WL 963751, at *5 (no rim from merely "us[ing] Demand360"); *Portillo*, 2025 WL 2495053, at *5-6 (use of same benchmarking reports not of "any significance"); *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681, 714-15 (N.D. Ohio 2025) (software allegations "establish only a possibility of unlawful collusion and therefore do little to move the needle from possible to plausible"). The same result follows here. Where an "obvious alternative explanation" accounts for the alleged conduct, a complaint "stops short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 567; *see In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 908 (6th Cir. 2009) (affirming dismissal where defendants' conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior").

**2. FitFactari's Purported Plus Factors Add Nothing**

Because the Complaint alleges no parallel conduct, FitFactari's plus factors are beside the point. *See Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018). But even taken on their own terms, the three purported plus factors the Complaint appears

to invoke fail individually and collectively. *See Hansen v. Nw. Univ.*, 2025 WL 2731378, at *9 (N.D. Ill. Sept. 24, 2025) (dismissal for failure to plausibly allege plus factors).

***No action against self-interest.*** The Complaint asserts that "[a]bsent coordination, the routine disclosure of [lease comps data] would be against a broker's unilateral economic self-interest." Compl. ¶ 56. The Complaint's own allegations refute that assertion.

The Complaint alleges that CoStar is the "*de facto* industry standard" and that Broker Defendants "cannot do [their] job without it." *Id.* ¶¶ 37-38. If that is true, then every broker had a powerful unilateral incentive to keep the platform accurate and current. *Id.* ¶¶ 43, 70 (non-defendant broker urging "everyone" to "treat CoStar as their own database" to "maintain the most accurate database in the market"). By submitting lease data, a broker improves the database and the analytics it will rely on in future transactions—the definition of rational self-interest. And much of the alleged "sharing" consists of updating listings—conduct that markets available properties for lease or sale and generates leads—which is obviously good business. *Id.* ¶ 68.

The Complaint's own "network effects" theory drives in the final nail. FitFactari alleges that the value of submitting data "depended on reciprocal participation by competing brokers," *id.* ¶¶ 58, 64, and that CoStar's platform becomes more valuable as more participants contribute, *id.* ¶¶ 45-48. That is a textbook description of a network effect—users contribute because a richer database makes their own subscription more valuable. But if reciprocal participation makes the platform more valuable to each user, then contributing data is *rational*—not conspiratorial.

***The lease data is not competitively sensitive.*** The shared data at issue consists of *completed* lease transactions—leases already signed and closed. *Id.* ¶¶ 41, 73. That is the opposite of the sharing of forward-looking pricing data that courts have found problematic. *Cf. Todd*, 275 F.3d at 212-13 (defendants exchanged "future salary budget information" revealing "where each

other participant is going … for the upcoming year"); *In re RealPage*, 709 F. Supp. 3d at 494, 510 (hub generated forward-looking "pricing recommendations" from competitors' current supply data). Indeed, as the Supreme Court held over a century ago, there is no "unlawful restraint of commerce" where, as here, "[a]ll reports of sales and prices dealt exclusively with past and closed transactions." *Maple Flooring*, 268 U.S. at 573, 586. Nor is this data the exclusive province of the Broker Defendants: CoStar employs over 1,600 researchers who collect CRE data from "public record[s]" and other sources, including tenants and their brokers. Ex. B; *see* Ex. G; *supra* at 4.

Moreover, unlike the confidential exchanges restricted to competitors that have raised antitrust concerns, CoStar's data is available to over *240,000* subscribers on every side of the market—including the allegedly harmed tenants. *See supra* at 4. Broadly disseminated historical data is precisely the kind of information the Supreme Court has held promotes competition, not the kind that suppresses it. *See Maple Flooring*, 268 U.S. at 573-74; *see also Five Smiths, Inc. v. NFL Players Ass'n*, 788 F. Supp. 1042, 1055 (D. Minn. 1992) (dissemination of salary information not "anticompetitive" where players received same information as teams).

***Supposed opportunities to collude are insufficient.*** The Complaint makes a weak attempt to suggest that the Broker Defendants' presence at CoStar-sponsored industry events, conferences, and award ceremonies constitutes a plus factor. Compl. ¶¶ 49-52. But it never alleges that any Broker Defendant communicated with any other at such events about lease data, rental pricing, or concession strategies—much less that they reached any agreement before, during, or after these events. Competitors attending the same industry gatherings is common to virtually every industry and "fail[s] to move the needle." *In re Manufactured Home*, 2025 WL 3485693, at *11.

**3. The Complaint's Conspiracy Theory Is Implausible**

At bottom, FitFactari's conspiracy theory is economically incoherent. The Broker Defendants are full-service firms representing tenants and landlords alike. Compl. ¶¶ 10-16; *id.*

¶ 33 (Broker Defendants "compete[] with one another for tenants"); *see* Ex. H (JLL describing its "fully-integrated service delivery platform [that] spans tenant and landlord representation"). So the same broker who submits a lease comp in a landlord-side transaction can use the database to press a landlord's rent *down* on behalf of a tenant client in the next. And tenant representation by brokers is, according to the Complaint's sources, "the most lucrative segment of the business." Ex. I. The Complaint never explains why firms with a substantial stake in securing lower rents for tenants would join a conspiracy to *inflate* them. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (courts should not infer conspiracies that "simply make[] no economic sense"); *United Mag. Co. v. Murdoch Mags. Distrib., Inc.*, 146 F. Supp. 2d 385, 401 (S.D.N.Y. 2001) (dismissal of Section 1 claim that "makes no economic sense"); *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 835 (N.D. Ill. 2018) (similar).

Nor does the Complaint explain how such a conspiracy could succeed without the participation of the thousands of independent landlords who decide whether to accept lease terms and collect the rents at issue. A price-fixing conspiracy that excludes the alleged price setters makes no sense. This is precisely the sort of implausible theory that *Matsushita* and *Twombly* were designed to screen out. *See Matsushita*, 475 U.S. at 587; *Twombly*, 550 U.S. at 556-57.

FitFactari's own testimonial evidence further undercuts its theory that sharing lease comps harms tenants. FitFactari repeatedly cites a testimonial from Capworth Commercial Realty to show that brokers "routinely and enthusiastically" share data with CoStar. Compl. ¶¶ 43, 67, 70. But that testimonial describes a broker using CoStar to help *a tenant* find replacement space. Ex. J. That the Complaint's best evidence of a conspiracy against tenants is a broker using the platform to *help* one tells the Court everything it needs to know about the plausibility of this claim.

## III. THE COMPLAINT DOES NOT PLEAD ANY PLAUSIBLE ANTICOMPETITIVE EFFECTS IN ANY RELEVANT MARKET

Even if FitFactari had plausibly alleged an agreement, its Section 1 claim would fail because it does not allege anticompetitive effects in any relevant market. *See Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012) ("Under a [r]ule of [r]eason analysis, the plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area."). FitFactari tries to sidestep that requirement by labeling the alleged scheme "horizontal price fixing" and invoking the per se rule. Compl. ¶¶ 88-89, 114. But labels do not control whether a claim is governed by the per se rule or the rule of reason. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1108 (7th Cir. 1984) ("plaintiffs' attachment of the per se label is simply inadequate … to sustain the complaint"). As explained, the Complaint does not allege that any Defendant agreed to charge a particular rent, follow a common concession policy, or delegate pricing authority to CoStar. *See supra* at 13-18. Calling the alleged conduct "price fixing" does not make it so.

Stripped of rhetoric, the conduct alleged is—at most—an exchange of lease data. *See* Compl. ¶¶ 6, 34, 112. But the Supreme Court has "long held" that "the dissemination of price information"—even among competitors—"is not itself a per se violation of the Sherman Act," but instead is evaluated under the rule of reason. *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975); *see In re Manufactured Home*, 2025 WL 3485693, at *14 ("[B]inding precedent establishes that Section 1 information-exchange claims are evaluated under the rule of reason."); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 709 (7th Cir. 2011) ("Information exchange … is not on its own demonstrative of anticompetitive behavior, even where pricing data is what is exchanged."). That rule exists for good reason: information sharing can "increase economic efficiency and render markets more, rather than less, competitive," *Gypsum*, 438 U.S.

at 441 n.16—particularly where, as here, the information concerns completed transactions and is available to participants on both sides of the market.

FitFactari's contention that the alleged information exchange "eliminated the uncertainty that ordinarily promotes price competition," Compl. ¶ 4, thus has it exactly backwards. A tenant armed with comparable-lease data is a harder negotiator, not an easier mark. *See Maple Flooring*, 268 U.S. at 582-83 (dissemination of market information produces "fairer price levels"); *Gibson III*, 148 F.4th at 1083 ("the fact that competing hotels possess the same knowledge … does not take away any hotel's incentive to compete on quality or price").

Because FitFactari's claim is subject to the rule of reason, it must plead facts establishing that the alleged information exchange produced "substantial anticompetitive effect[s]" in a relevant market—either directly, through "proof of actual detrimental effects on competition, such as reduced output [and] increased prices," or indirectly, through plausible allegations of "market power plus some evidence that the challenged restraint harms competition." *Ohio v. Am. Exp. Co.*, 585 U.S. 529, 530, 541-42 (2018) ("*Amex*"). The Complaint satisfies neither test.

**A. FitFactari Pleads No Direct Evidence Of Anticompetitive Effects**

Direct evidence requires "actual detrimental effects" on competition—reduced output, supracompetitive prices, or decreased quality. *Id.* at 542. FitFactari pleads none. It identifies no reduction in the volume of commercial leases, no decline in lease quality, and no market-wide deterioration in competitive conditions traceable to the challenged conduct. What the Complaint offers instead is the bare assertion that CoStar's lease comps data enabled landlords to charge "supracompetitive" rents. Compl. ¶¶ 4, 66, 82, 90-91. As discussed, those allegations are conclusory—the sort of "legal conclusion[s] couched as … factual allegation[s]" that courts need not accept—and, in all events, implausible, given the Complaint's own acknowledgement that

tenants and tenant-side brokers access the very same lease comps data. *Twombly*, 550 U.S. at 555; *see supra* at 7-8.

Even taken at face value, the Complaint does not plausibly allege that any purported price increase was *anticompetitive*. *See Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475-76 (9th Cir. 1997) (distinguishing "high prices" from "supracompetitive prices"); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir. 1979) (same). Allegations that brokers somehow "limit[ed] or standardize[d] concessions" and "resist[ed] tenant negotiations," Compl. ¶¶ 4, 91, are equally consistent with—and, indeed, more naturally explained by—lawful competition. Better market data enables participants to price more accurately by reducing informational asymmetries. As markets become more transparent, prices may converge—not because competition has been restrained, but because participants better understand prevailing market conditions. *See Gypsum*, 438 U.S. at 441 n.16; *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1263, 1266 (11th Cir. 2019) (uniform pricing did not establish conspiracy where plaintiffs failed to allege "variables that would ordinarily result in divergent prices").

The Complaint also ignores the many reasons, having nothing to do with the use of CoStar's database, CRE rents could have risen during the class period—post-COVID inflation, rising construction and financing costs, increased demand, and constrained supply. A complaint that attributes a market-wide price increase to a conspiracy without addressing the most obvious alternative explanations does not plead plausible anticompetitive effects. *See Washington Cnty. Health*, 328 F. Supp. 3d at 832 (dismissal where defendants' conduct consistent with lawful independent efforts); *In re Passenger Vehicle Replacement Tires*, 767 F. Supp. 3d at 731 ("the fact that defendants raised their prices while inflation and supply chain logistics were worsening suggests rational pricing behavior in an interdependent market, not conspiracy"); *In re*

*Manufactured Home*, 2025 WL 3485693, at *13 (dismissal where plaintiffs failed to address alternate explanation for rent increases, including that "demand for manufactured home rentals increased while supply decreased or remained stagnant").

FitFactari's regression "analysis" cannot rescue its claim. Compl. ¶¶ 94-95. For starters, FitFactari's regression does not even measure the right thing. It purports to show that rents are higher in MSAs where CoStar has a larger presence, but it compares "the dollar value of *for-sale* CRE *listings* on CoStar's platform" to "the total value of *closed CRE sales* transactions" in each MSA. Compl. ¶ 31. In other words, the regression purports to measure CoStar's share of the *for-sale-listings* market. The regression thus says nothing about the volume of lease comps data available in any MSA or the share of completed lease transactions for which CoStar reports data. Nor is the regression's proxy for CoStar's *for-sale-listings* market share even reliable: As explained below, CRE listings are not exclusive, so the same property often appears on competing platforms—meaning the ratio of CoStar listings to sales overstates CoStar's footprint in every MSA it purports to measure. *See infra* at 24-25.

Even setting aside the market mismatch, FitFactari's regression establishes only correlation, not causation—and a correlation fully consistent with lawful competition. *See In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 2026 WL 879018, at *29 (N.D. Ohio Mar. 31, 2026) (rejecting regression-based allegations because model could not distinguish conspiracy from conscious parallelism and failed to rebut alternative explanation for rising prices). All the "regression" shows is that MSAs with more for-sale listings on CoStar, like New York, tend to have higher rents than MSAs where CoStar has fewer listings, like New Haven. Compl. ¶ 31. Hardly a surprise. Or, assuming for argument's sake that the Complaint had alleged anything about the penetration of CoStar's information service product, the regression would show, at most,

that MSAs with high penetration of that product tend to have higher rents than MSAs with lower penetration. But that is what one would expect absent a conspiracy: Larger, denser, more commercially active metropolitan areas could have *both* higher rents *and* greater demand for sophisticated market-data tools. The positive correlation thus has a straightforward benign explanation: CoStar penetrates expensive markets *because* the commercial stakes justify the investment, not because CoStar's presence makes them more expensive.

The regression's methodological defects compound the problem. The Complaint claims the regression controls for MSA-level GDP, vacancy rates, and inventory. Compl. ¶ 94 n.64. But those *three* variables cannot isolate the effect of CoStar from the dozens of property- and transaction-specific rent determinants the regression ignores: building class, submarket, age, amenities, lease length, square footage, buildout costs, local demand, among others. A Class A office tower in a prime downtown MSA will command higher rent than a Class B walk-up in a secondary market for reasons having nothing to do with CoStar. Courts do not credit statistical allegations that assume the very causal relationship they must plausibly plead. *See In re Concrete & Cement Additives Antitrust Litig.*, 2025 WL 1755193, at *17 (S.D.N.Y. June 25, 2025) (dismissal where regression did not show prices exceeded those explainable by market forces).

**B. FitFactari Also Does Not Plausibly Allege Anticompetitive Effects Indirectly**

Because the Complaint offers no direct evidence of anticompetitive effects, FitFactari must proceed indirectly—by alleging that Defendants possess market power in a properly defined market sufficient to produce the harms alleged. *Amex*, 585 U.S. at 542. The question is whether the Complaint plausibly alleges that Defendants can raise rents above competitive levels in the industrial, office, or retail *lease markets* where FitFactari claims injury. It does not come close.

Starting with CoStar, FitFactari alleges that CoStar holds more than 50% of the market for "[CRE] information services" in certain MSAs. Compl. ¶ 31. But that allegation is copied

wholesale from another plaintiff's (CREXi's) years-old pleading in an unrelated case. *Id.* (citing First Am. Countercl., *CoStar v. Com. Real Est. Exch., Inc.*, No. 2:20-cv-08819 (C.D. Cal. May 5, 2022), Dkt. 162). Those borrowed numbers cannot establish market power here for multiple independent reasons.

*First*, the data is stale: CREXi estimated CoStar's purported "market share" using 2021 figures—a full year before the Class Period began on June 12, 2022. *See* CREXi First Am. Countercl. ¶ 223 (alleging "CoStar's *2021* estimated market shares for internet *CRE listings*" (emphasis added)). Those five-year-old numbers say nothing about market conditions from 2022 to the present. *See New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 241-42 (S.D.N.Y. 2020) (relying on "outdated assumption[s]" is error); *Aurora Astro Prods. LLC v. Celestron Acquisition, LLC*, 691 F. Supp. 3d 1132, 1147-48 (N.D. Cal. 2023) (dismissal where market-share allegations post-dated class period).[4]

*Second*, the cut-and-paste "market shares" measure the wrong market. CREXi purported to estimate CoStar's share of the *internet CRE listing services* market by comparing "the dollar value of *for-sale listings* on CoStar's *listings* platform [LoopNet]" to total "closed *CRE sales transactions*." CREXi First Am. Countercl. ¶ 223 (emphasis added); *see supra* at 22. But CoStar's supposed share of the CRE *listings* market says little, if anything, about its share of the alleged CRE *information-services* market; indeed, CREXi's own pleading disclaimed having MSA-level market share data for the CRE information-services market. *See* CREXi First Am. Countercl. ¶ 224; *see also Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, 312 F. Supp. 3d 725, 731 (N.D. Ill.

---

[4] The reason the Complaint cannot offer any current data is obvious: CREXi itself now publicly claims to be the nation's "leading" CRE marketplace. *See, e.g.*, Press Release, CREXi, *Commercial Real Estate Digital Adoption Surges* (Dec. 2025), https://www.prnewswire.com/news-releases/commercial-real-estate-digital-adoption-surges-crexi-tops-815-6-billion-in-active-property-for-sale-listings-302630606.html.

2018) (dismissal where market-power allegations concerned a market "entirely distinct from" alleged relevant market). Regardless, the methodology is unsound even for the listings market it purports to measure: neither CREXi nor FitFactari alleges that for-sale listings are *exclusive*, meaning the same property may—and often does—appear on CoStar and competing marketplaces simultaneously. *See* CREXi First Am. Countercl. ¶ 257 ("over 500" brokers simultaneously advertise properties on CREXi and CoStar). Applying the same calculation to a competitor could therefore yield an equal or even higher ratio for the same supposed market.

As for the Broker Defendants, the Complaint alleges only that CBRE accounts for over 20% of the national CRE *brokerage services market*. Compl. ¶ 32. It does not allege CBRE's share of any relevant *lease market*—or any market share *at all* for JLL, Cushman, Colliers, or Newmark. The Complaint simply labels these firms the "Big Five" and observes that they have "expanded geographically," *id.*, but descriptors and platitudes are not well-pleaded market-power allegations. *See Vital Pharms., Inc. v. Berlin Packaging LLC*, 632 F. Supp. 3d 780, 787-88 (N.D. Ill. 2022) ("conclusory allegations" of market power "do not forestall dismissal under Rule 12(b)(6)"); *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 17-18 (D.D.C. 2021) (allegations that Facebook "maintained a dominant share of the U.S. personal social networking market" "fall short of plausibly establishing … market power").

Without plausible allegations of market power in any market—let alone the MSA-level lease markets where FitFactari claims injury—its indirect theory of anticompetitive effects fails.

## CONCLUSION

Because the defects identified above are not curable by amendment, CoStar respectfully requests that the Complaint be dismissed with prejudice.

Date: August 17, 2026

Respectfully submitted,

*/s/ Gary Feinerman*

Gary Feinerman (Bar No. 6206909)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: 312-876-7700
Email: gary.feinerman@lw.com

Lawrence E. Buterman (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Email: lawrence.buterman@lw.com

Nicholas J. Boyle (*pro hac vice*)
David Johnson (*pro hac vice*)
Christina R. Gay (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
Email: nicholas.boyle@lw.com
david.johnson@lw.com
christina.gay@lw.com

Elyse M. Greenwald (*pro hac vice*)
LATHAM & WATKINS LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Tel: (424) 653-5500
Email: elyse.greenwald@lw.com

*Counsel for Defendant CoStar Group, Inc.*