**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FITFACTARIDC, LLC, individually and on behalf of all others similarly situated,

Plaintiff,

v.

COSTAR GROUP, INC.; CBRE GROUP, INC.; JONES LANG LASALLE INCORPORATED; CUSHMAN & WAKEFIELD PLC; COLLIERS INTERNATIONAL USA, LLC; and NEWMARK GROUP, INC.,

Defendants.

Case No. 1:26-cv-06997

Hon. Joan H. Lefkow

**BROKER DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS

Page


INTRODUCTION ..... 1

RELEVANT FACTUAL ALLEGATIONS ..... 3

LEGAL STANDARD ..... 6

ARGUMENT ..... 7

I. Plaintiff Fails Plausibly to Allege a Conspiracy Under *Twombly* ..... 7

A. The Complaint Does Not Plausibly Allege a Horizontal Agreement Among Broker Defendants ..... 8

B. Plaintiff's Conspiracy Theory Is Implausible ..... 10

II. Plaintiff Does Not Plead a *Per Se* Unlawful Restraint ..... 12

III. Plaintiff Fails to Plead a Plausible Rule-of-Reason Claim ..... 13

A. The Relevant Market Allegations Are Implausible ..... 13

1. The Product Markets Are Not Plausibly Defined ..... 14

2. The Geographic Markets Are Similarly Implausible ..... 15

B. The Complaint Does Not Plausibly Allege Direct Evidence of Anticompetitive Effects ..... 16

C. Plaintiff Cannot Establish Anticompetitive Effects Indirectly Because It Does Not Plausibly Allege Market Power in the Relevant Markets ..... 17

IV. Plaintiff Fails to Plead Antitrust Injury, Cannot Recover Damages from the Broker Defendants, and Lacks Standing to Seek Injunctive Relief ..... 19

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) ........ *passim*

*Alarm Detection Sys., Inc. v. Village of Schaumburg*,
930 F.3d 812 (7th Cir. 2019) ........ 8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 6, 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ *passim*

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ........ 19

*Cornish-Adebiyi v. Caesars Enter., Inc.*,
2026 WL 2182991 (3d Cir. 2026) ........ 11

*Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*,
46 F.4th 535 (7th Cir. 2022) ........ 3

*Deslandes v. McDonald's USA, LLC*,
81 F.4th 699 (7th Cir. 2023) ........ 13

*Gibson v. Cendyn Grp., LLC ("Gibson II")*,
2024 WL 2060260 (D. Nev. May 8, 2024), *aff'd on other grounds*, 148 F.4th 1069 (9th Cir. 2025) ........ 9, 10

*Gibson v. Cendyn Grp., LLC*,
148 F.4th 1069 (9th Cir. 2025) ........ 9

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ........ 20

*Leeder v. Nat'l Ass'n of Realtors*,
601 F. Supp. 3d 301 (N.D. Ill. 2022) ........ 20

*In re Manufactured Home Lot Rents Antitrust Litigation*,
2025 WL 3485693 (N.D. Ill. Dec. 4, 2025) ........ 16

*Maple Flooring Mfrs.' Ass'n v. United States*,
268 U.S. 563 (1925) ........ 16

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020) ....................7, 8, 20

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
302 F.3d 1207 (11th Cir. 2002) ....................18

*McCauley v. City of Chicago*,
671 F.3d 611 (7th Cir. 2011) ....................6

*Mirage Wine + Spirit's, Inc. v. Apple Inc.*,
2025 WL 1896006 (S.D. Ill. July 9, 2025) ....................19

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)....................13, 16, 18

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
629 F.3d 697 (7th Cir. 2011) ....................13, 17

*Portillo v. Costar Grp., Inc.*,
2025 WL 2495053 (W.D. Wash. Aug. 29, 2025) ....................6

*In re RealPage, Inc. Rental Software Antitrust Litig. (No. II)*,
709 F. Supp. 3d 478 (M.D. Tenn. 2023)....................11

*Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*,
412 F. Supp. 3d 941 (N.D. Ill. 2019)....................14

*Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*,
87 F. Supp. 3d 874 (N.D. Ill. 2015)....................14

*Segal v. Amadeus IT Grp., S.A.*,
2025 WL 963751 (N.D. Ill. Mar. 31, 2025)....................8

*Segal v. Amadeus IT Grp., S.A. ("Segal II")*,
2026 WL 879583 (N.D. Ill. Mar. 31, 2026)....................9, 11, 13

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
950 F.3d 911 (7th Cir. 2020) ....................13, 14, 15

*Siva v. Am. Bd. of Radiology*,
38 F.4th 569 (7th Cir. 2022) ....................14, 15

*Supreme Auto Transp. LLC v. Arcelor Mittal*,
238 F. Supp. 3d 1032 (N.D. Ill. 2017), *aff'd*, 902 F.3d 735 (7th Cir. 2018) ....................19

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ....................6, 7

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) ........................................................ 14

*United States v. U.S. Gypsum Co.*,
438 U.S. 422 (1978) ........................................................ 13, 16

**Statutes**

15 U.S.C. § 15 ........................................................ 20

## INTRODUCTION

The Complaint attempts to transform the Broker Defendants'[1] use of CoStar—a commercial real estate platform described as the "de facto industry standard" that real estate professionals "routinely rely on"—into a nationwide antitrust conspiracy. Compl. ¶¶ 37, 40. But common use of the same widely used platform by multiple industry participants does not itself establish concerted action in violation of federal antitrust law. The Complaint must plausibly allege that the Broker Defendants agreed with one another to participate in an alleged anticompetitive scheme. It does not.

Plaintiff attempts to allege a hub-and-spoke conspiracy with CoStar as the alleged hub, the Broker Defendants as the spokes, and a purported horizontal agreement among the Broker Defendants as the necessary "rim." *Id.* ¶ 34. But the rim is missing. The Complaint alleges no agreement, communication, assurance, or coordination mechanism among the Broker Defendants concerning their use of CoStar. Nor does it plausibly allege facts that any Broker Defendant conditioned its participation on another's participation. Instead, the Complaint at most alleges separate vertical relationships between CoStar and its customers—nothing to support a claim that the Broker Defendants agreed with one another to join an anticompetitive scheme.

The Complaint also fails to explain how the supposed conspiracy could accomplish its alleged objective of artificially inflating commercial rents. CoStar is not alleged to set rents, recommend rents, or require users to follow a pricing methodology. And landlords, not brokers, ultimately determine what rents and concessions they will accept. Yet landlords are not plausibly alleged to have joined the supposed conspiracy, agreed to follow any pricing derived from CoStar,

[1] The Broker Defendants are CBRE Group, Inc., Jones Lang LaSalle Incorporated, Cushman & Wakefield plc, Colliers International USA, LLC, and Newmark Group, Inc.

or delegated pricing to any Broker Defendant. The Complaint therefore supplies no plausible mechanism by which the Broker Defendants' use of CoStar could produce coordinated or supracompetitive rents.

The theory is implausible for an additional reason: the same information that Plaintiff alleges enables a landlord's broker to demand higher rents simultaneously enables a tenant's broker to identify lower comparables, demand greater concessions, or resist above-market terms. By Plaintiff's own account, CoStar's platform is available not only to brokers but to owners, investors, lenders, and tenants themselves. *Id*. ¶¶ 37, 40. The Complaint does not explain how a conspiracy premised on shared access to CoStar data could produce a unidirectional upward effect on rents when the same data is available to tenants and their brokers.

Even if Plaintiff had plausibly alleged an agreement, its *per se* theory fails independently. The *per se* rule is reserved for a narrow class of restraints—such as naked price fixing—that almost always harm competition. This is not that kind of case. At most, the Complaint alleges an information exchange, which is not *per se* unlawful merely because the information concerns price. Plaintiff therefore must proceed under the rule of reason, and it fails there too. The Complaint does not plausibly define relevant leasing markets or allege anticompetitive effects attributable to the challenged conduct.

Apart from the Complaint's failure to plead a viable Section 1 violation, Plaintiff's claims independently fail for three plaintiff-specific reasons. The Complaint does not plausibly connect Plaintiff's alleged rent overcharge to any Broker Defendant's conduct; it does not allege the direct-purchaser status necessary to recover that overcharge from the Broker Defendants; and it alleges no threatened future injury sufficient to support prospective injunctive relief.

In short, the Complaint seeks to turn independent use of an industry-standard information platform into a nationwide antitrust conspiracy, but it fails at every step: it does not plausibly allege a horizontal agreement, a mechanism capable of producing coordinated rents, an economically coherent theory of harm, a restraint subject to *per se* condemnation or a rule-of-reason violation, or a plaintiff-specific injury traceable to the Broker Defendants. The Complaint should be dismissed.

## RELEVANT FACTUAL ALLEGATIONS

**CoStar's Services.** According to the Complaint, CoStar has operated a commercial real estate ("CRE") information and analytics platform since 1987—nearly four decades—used by brokers, owners, investors, lenders, and others, with over 240,000 subscribers. Compl. ¶¶ 35, 37, 40, 48. Among other things, CoStar provides subscribers market intelligence, historical lease comparisons, advertising and lead-generation opportunities, and tools intended to improve research and productivity. *See id.* ¶¶ 35–37, 43, 54, 67–70, 75. CoStar's subscriber base includes not only landlord-side brokers but also tenants and tenant-side brokers,[2] who can access the same lease comps data to negotiate lower rents and greater concessions. *Id.* ¶¶ 37, 48, 56.

**The Broker Defendants are Five of the 240,000 CoStar Subscribers.** Broker Defendants serve different client bases representing both landlords and tenants, *see Who We Serve, Brokers*, *supra* n.2, range in annual revenue from $2.7 billion to $35.8 billion, and "compete[] with one another for tenants, listings, and lease transactions" in local markets. Compl. ¶¶ 11–16, 33.

---

[2] *See Who We Serve: Brokers*, CoStar Grp., Inc. (2026), https://www.costar.com/who-we-serve/brokers (last visited Aug. 16, 2026) ("*Who We Serve: Brokers"*) (related page of CoStar website cited in Compl. n.1 & n.41). Because the Complaint cited these materials, they are incorporated by reference and can be considered in assessing Broker Defendants' Motion. *See Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*, 46 F.4th 535, 543 (7th Cir. 2022).

**CoStar's Platform Reflects Completed Transaction Data and Does Not Set or Recommend Rents.** CoStar populates its database in significant part through its own research operations and direct outreach to brokers and landlords, employing more than 1,600 researchers. *Id.* ¶ 44. Through CoStar's "lease comps" feature, any subscriber may access data concerning "completed lease transactions," including rents, concessions, tenant-improvement allowances, and lease duration. *Id.* ¶¶ 56, 73–74. Although Plaintiff characterizes the information as "current" and available in "near real-time," *id.* ¶¶ 4, 47, 76, 91, Plaintiff admits the data reflects transaction terms that landlords already "accepted." *Id.* ¶ 74. The Complaint does not allege that CoStar recommends, suggests, or dictates any rent or other lease term, uses any model that generates such a term, or requires any subscriber to follow pricing recommendations.

**The Broker Defendants' Vertical Relationships with CoStar.** The Complaint alleges that the Broker Defendants "entered into agreements with CoStar governing access to CoStar's [CRE] information services." *Id.* ¶ 53. According to Plaintiff, those agreements "required and encouraged brokers to provide and update information concerning properties available for lease and completed transactions"—but the CoStar form terms that Plaintiff quotes require only "reasonable efforts to keep CoStar informed." *Id.* ¶¶ 53–54. Plaintiff alleges that Broker Defendants supplied competitively sensitive lease transaction information to CoStar, accessed the same type of information supplied by others, and knew that information they submitted could be available to other subscribers. *Id.* ¶¶ 53–62. At the same time, the Complaint acknowledges that each Broker Defendant could "observe prevailing market terms, benchmark its own negotiations, and adjust its conduct accordingly," *id.* ¶ 58, and that non-defendant brokers could do the same, *see id.* ¶¶ 43, 67, 70.

**No Alleged Enforcement or Broker-to-Broker Coordination.** The Complaint alleges that CoStar encourages users to update listings "every 30-60 days" and warns that old listings that have not been updated in 75 days will be removed. *Id.* ¶ 43. It does not allege that CoStar withholds platform access from brokers that do not supply completed lease data. The Complaint also alleges that CoStar sponsors industry conferences and events. *Id.* ¶¶ 49–52. But it does not identify any broker-to-broker communication, meeting, or other interaction at those events as allegedly supporting Plaintiff's claims, let alone any Broker Defendant agreeing with another to exchange information or coordinate lease terms. The sole factual allegation connecting the Broker Defendants to any CoStar event is that they each had an executive on a judging panel for an award in one out of the "more than 120 locations" where CoStar hosts events. *Id.* ¶ 50.

Notably absent from the Complaint is any allegation that: (a) any Broker Defendant communicated with another about whether, when, or how much lease data to submit to CoStar; (b) any Broker Defendant verified that a competitor was submitting data before doing so itself; (c) any Broker Defendant monitored a competitor's deviation from any pricing expectation; (d) any Broker Defendant refused to deal with a tenant or landlord in reliance on information obtained from a competitor through CoStar; or (e) any two Broker Defendants discussed any lease term, pricing strategy, or negotiation approach at any CoStar-sponsored event or otherwise.

**The Proposed Product and Geographic Markets.** The Complaint proposes three relevant product markets—Industrial Leasing, Office Leasing, and Retail Leasing. *Id.* ¶¶ 20, 27, 30. The Complaint alleges that industrial, office, and retail properties are distinct because of their physical characteristics and intended uses. *Id.* ¶¶ 20–26. Plaintiff also broadly alleges that tenants seek commercial space within 49 separate Metropolitan Statistical Areas ("MSAs"), and that each MSA constitutes its own relevant geographic market. *Id.* ¶¶ 27–30. But Plaintiff pleads no market

shares for the Broker Defendants collectively, or for any Broker Defendant other than CBRE. Its sole allegation concerning CBRE's market position is that CBRE "is estimated to account for over 20% of the U.S. CRE brokerage services market." *Id.* ¶ 32. But that statistic is limited to a single Broker Defendant, and in any event, concerns nationwide CRE brokerage services, not any of Plaintiff's alleged local industrial, office, or retail leasing markets.

**Plaintiff's Alleged Lease.** Plaintiff FitFactariDC, LLC alleges it leased commercial real estate in Denver, Colorado during the putative class period and that its lease "was brokered by one or more of the Broker Defendants." *Id.* ¶ 9. But Plaintiff does not identify which Broker Defendant brokered its lease, the landlord, the agreed-upon rent or other lease terms, to whom Plaintiff paid rent, or whether CoStar was used in any way in that transaction.

## LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts must disregard labels, boilerplate and conclusory assertions, and determine whether the factual allegations plausibly establish each element of the asserted claim. *Iqbal*, 556 U.S. at 678–79; *see also Portillo v. Costar Grp., Inc.*, 2025 WL 2495053, at *5 (W.D. Wash. Aug. 29, 2025). Rigorous enforcement of this standard is particularly important in antitrust cases, where "the expense of responding to bulky, burdensome discovery" can impose substantial costs even on defendants that ultimately prevail. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 625–26 (7th Cir. 2010). Thus, the "required level of factual specificity rises with the complexity of the claim." *McCauley v. City of Chicago*, 671 F.3d 611, 616–17 (7th Cir. 2011); *see also Twombly*, 550 U.S. at 558 ("[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.").

A Section 1 Sherman Act claim requires well-pleaded facts plausibly establishing "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (citation modified). To plead the threshold element of concerted action, a plaintiff must allege facts supporting a plausible inference of an actual agreement, "not merely consistent with" an agreement. *Twombly*, 550 U.S. at 557. This may be shown through either direct evidence, such as an admission or other facts revealing an express agreement, or through circumstantial evidence that plausibly excludes independent action. *In re Text Messaging Antitrust Litig.*, 630 F.3d at 629.

In a hub-and-spoke case, the plaintiff must plausibly allege not only vertical relationships between the hub and the individual spokes, but a horizontal agreement—the "rim"—among the spokes. *See Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020). The allegations must show that each spoke "recognized that it was part of the greater arrangement," *id*. at 842–43, to "fix, stabilize, or otherwise coordinate effective rents and lease concessions," Compl. ¶ 65.

## ARGUMENT

### I. Plaintiff Fails Plausibly to Allege a Conspiracy Under *Twombly*

CoStar separately demonstrates that it does not plausibly function as a conspiratorial "hub"—it recommends no prices, coordinates no conduct, and polices no scheme. *See* CoStar Br. at Section II.A. The Broker Defendants join that argument in full. This brief focuses on the independent and dispositive deficiency in Plaintiff's theory: even assuming arguendo that CoStar functioned as alleged, the Complaint does not plausibly allege the horizontal "rim" among the Broker Defendants necessary to complete a hub-and-spoke conspiracy. In this regard, Plaintiff's conspiracy theory suffers from two independent deficiencies. ***First***, the Complaint does not

plausibly allege any horizontal agreement among Broker Defendants. ***Second***, the theory itself is implausible because the Complaint offers no coherent account of how the alleged conspiracy could operate.

### A. The Complaint Does Not Plausibly Allege a Horizontal Agreement Among Broker Defendants

Plaintiff's hub-and-spoke theory requires pleading more than separate agreements between CoStar and individual brokerages; it requires a horizontal "rim" supported by facts plausibly showing that the Broker Defendants understood they were participating in a "greater arrangement" with one another. *Marion Healthcare*, 952 F.3d at 842–43; *see also Segal v. Amadeus IT Grp., S.A.*, 2025 WL 963751, at *5 (N.D. Ill. Mar. 31, 2025) (requiring allegations of a horizontal "rim"). The Complaint is devoid of any such allegations. Plaintiff's references to a "mutual understanding," "reciprocal participation," and "coordinated conduct," Compl. ¶¶ 34, 64, are wholly unsupported. *See Twombly*, 550 U.S. at 557; *see also Alarm Detection Sys., Inc. v. Village of Schaumburg*, 930 F.3d 812, 828 (7th Cir. 2019) (rejecting a conspiracy theory requiring "a speculative leap, not a reasonable inference"). Although it names five competing brokerage firms, the Complaint offers no direct evidence of a horizontal agreement—no communication, meeting, or interaction between any pair of Broker Defendants concerning CoStar, lease data, lease pricing, or the alleged scheme. The alleged "rim" rests entirely on the inference that five firms independently subscribing to an "industry standard" platform reflects an agreement among them to participate in the alleged anticompetitive scheme. Compl. ¶ 37.

Plaintiff's circumstantial allegations fare no better. The Complaint identifies three purported indicators of an agreement: (1) widespread participation in CoStar; (2) conduct allegedly contrary to economic self-interest; and (3) conditional participation. *Id.* ¶ 64. None plausibly

suggests concerted action.[3] At most, each is equally—or more readily—explained by each Broker Defendant's independent economic interests. *See Twombly*, 550 U.S. at 556–57.

***First***, common use of CoStar—alongside other brokerages, Compl. ¶¶ 10, 37—does not plausibly imply agreement among Broker Defendants. Plaintiff itself describes CoStar as the "largest and most comprehensive" provider of CRE information services and alleges that CoStar is "in many markets the only" source of CRE leasing data. *Id.* ¶¶ 39–40. Common adoption of a widely used industry platform does not support an inference of conspiracy. *See Segal v. Amadeus IT Grp., S.A.*, 2026 WL 879583, at *5–6 (N.D. Ill. Mar. 31, 2026) ("*Segal II*") (use of a platform by multiple defendants insufficient to establish a conspiracy); *Gibson v. Cendyn Grp., LLC*, 2024 WL 2060260, at *3 (D. Nev. May 8, 2024) ("*Gibson II*"), *aff'd on other grounds*, 148 F.4th 1069 (9th Cir. 2025) ("too implausible to infer that each Hotel Defendant was signing up for a conspiracy when it agreed to license and use" platform). Tellingly, the Complaint does not even allege when each Broker Defendant first subscribed to CoStar's platform that has existed since 1987, let alone whether the conduct was simultaneous or coordinated. *See* Compl. ¶ 35; *cf. Gibson II*, 2024 WL 2060260, at *3–4 (rejecting inference of conspiracy where defendants began licensing software "at different times over an approximately 10-year period"). The Complaint also identifies non-defendant brokers engaging in identical conduct—submitting data to CoStar, accessing competitors' information, and allegedly using the platform to grow revenues. Compl. ¶¶ 43, 67, 70. Conduct common to alleged conspirators and non-conspirators alike suggests rational independent use of a valuable industry tool, not agreement. *See Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1083–84 (9th Cir. 2025).

[3] Whether Plaintiff characterizes these allegations as parallel conduct and plus factors or as circumstantial evidence more broadly is immaterial; they are insufficient under either framing.

***Second***, Plaintiff's own complaint undermines its conclusory assertion that Broker Defendants acted against their unilateral self-interest. Compl. ¶¶ 56–58, 64. The Complaint identifies ***independent*** economic reasons for submitting data to CoStar: CoStar provides lease comparisons and other analytic tools, *id.* ¶ 36; and brokers use CoStar to advertise listings and generate leads, *id.* ¶¶ 43, 68–69. Those benefits provide an obvious rational business explanation for both subscribing to CoStar and supplying information. *See Gibson II*, 2024 WL 2060260, at *6 (platform use was "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by" common market perceptions).

***Third***, the allegation that submitting information to CoStar was "conditional" on other Broker Defendants' conspiratorial agreement rests on the unremarkable assertion that CoStar's database becomes more valuable as more market participants contribute information. Compl. ¶ 64; *see also id.* ¶ 45. But the idea that a platform reflecting "the broader market" is more valuable than a platform with "isolated transactions" does not make every subscriber a conspirator. *See id.* ¶ 64. Plaintiff alleges ***no*** facts that any Broker Defendant actually conditioned its participation on another Broker Defendant joining CoStar, or even communicated with another Broker about participation. Absent such facts, Plaintiff's conclusory characterization of "conditional" participation merely labels the element it must plead. *See Iqbal*, 556 U.S. at 678–79.

**B. Plaintiff's Conspiracy Theory Is Implausible**

Plaintiff's claim also fails because, even assuming the alleged information sharing, Plaintiff offers no coherent account of how the supposed conspiracy could operate. The Complaint does not explain ***how*** access to CoStar data could produce coordinated lease pricing, ***who*** could implement that coordination given that landlords ultimately control lease terms, or ***why*** Broker Defendants that represent tenants, as well as landlords, do not use CoStar data to help their tenant clients negotiate lower rents. Courts do not infer a conspiracy where the alleged conduct is

equally—or more—consistent with independent economic behavior. *See Twombly*, 550 U.S. at 554, 556–57.

***First***, the Complaint identifies no plausible mechanism by which access to CoStar data could produce coordinated lease pricing. It alleges no facts about what data any particular Broker Defendant accessed, when it did so, how it used that information in any particular negotiation, or how the alleged conspiracy produced coordinated rents. Nor does it explain how Broker Defendants coordinated pricing across 147 alleged product/geographic market combinations involving numerous brokers, properties, landlords, and lease negotiations. Instead, Plaintiff offers only the conclusory assertion that Defendants "replac[ed] independent negotiation[s] with coordinated reliance on shared, current lease data . . . ." Compl. ¶ 95. That conclusory assertion does not supply the ***how*** of the alleged conspiracy. *See Twombly*, 550 U.S. at 556–57.

Indeed, the Complaint does not allege that CoStar recommends prices, provides algorithmic pricing tools, exercises authority over lease pricing decisions, or requires subscribers to adopt particular leasing terms. CoStar instead is alleged to provide information concerning completed transactions. There is thus no common pricing mechanism through which access to CoStar itself could generate coordinated lease terms. *See Segal II*, 2026 WL 879583, at *4 ("[t]he connection between prices and the information available from [the platform] remains attenuated and unclear").[4]

***Second***, Plaintiff's theory ignores that landlords, not brokers, control rental pricing. As the Complaint itself alleges, landlords—not brokers—accept the rents and concessions reflected in completed leases. Compl. ¶ 74 (alleging that completed transaction data reveal the terms

[4] This distinguishes the allegations here from cases involving allegations that software recommended prices that users adopted. *Cf. Cornish-Adebiyi v. Caesars Enter., Inc.*, 2026 WL 2182991 (3d Cir. 2026); *In re RealPage, Inc. Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478 (M.D. Tenn. 2023).

"landlords accepted"); *see also id.* ¶¶ 100–102. Yet Plaintiff identifies no landlord that agreed with the Broker Defendants to coordinate rents, agreed to follow CoStar-derived pricing (since there is none), or delegated final pricing authority to a Broker Defendant.[5] Thus, even assuming brokers exchanged information, the Complaint offers no explanation of how that exchange translated into anticompetitive lease terms imposed by landlords.

***Third***, the alleged conspiracy cannot plausibly produce the unidirectional effect Plaintiff alleges. The same Broker Defendants represent tenants as well as landlords. *See id.* ¶¶ 11–16, 33; *Who We Serve: Brokers*, *supra* n.2. The very lease-comparison information that Plaintiff says enables a landlord's broker to demand higher rents simultaneously enables a tenant's broker to identify lower comparables, demand greater concessions, or resist above-market terms. Moreover, by Plaintiff's own account, CoStar's platform is available to anyone with a subscription—including tenants themselves. Compl. ¶¶ 37, 40. The Complaint does not explain how a conspiracy premised on shared access to the same data could produce only upward pressure on rents when that data equally arms the other side of lease negotiations—both tenant-side brokers and tenants directly. That informational symmetry undermines any plausible inference that shared access to CoStar reflects a conspiratorial scheme to inflate rents.

## II. Plaintiff Does Not Plead a *Per Se* Unlawful Restraint

Even if Plaintiff had plausibly alleged a horizontal agreement, it does not allege the type of restraint subject to *per se* condemnation. Plaintiff identifies no agreement among the Broker Defendants to fix rents or concessions, allocate tenants, restrict output, delegate pricing authority

---

[5] The Complaint's own allegations underscore the implausibility of any coordinated-pricing mechanism: the Broker Defendants differ materially in size, organization, and client base, and allegedly "compete[] with one another for tenants, listings, and lease transactions" in local markets. Compl. ¶¶ 11–16, 33. Yet the Complaint pleads no facts explaining how those firms coordinated not only with each other, but also with the landlords who actually set and accept lease terms across 147 product/geographic markets.

to CoStar, or adopt common pricing recommendations. Instead, it alleges an information exchange—that brokers submitted and accessed lease-transaction information through CoStar to observe market terms, benchmark negotiations, and adjust their conduct. *Id*. ¶¶ 53–91.

Information exchanges do not meet the *per se* standard, even where the information concerns prices. In fact, the Supreme Court has recognized that information exchanges may actually increase economic efficiency. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). The Seventh Circuit has also squarely held that "[i]nformation exchange can help support an inference of a price-fixing agreement," but "is not on its own demonstrative of anticompetitive behavior, even when pricing data is what is exchanged." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 709 (7th Cir. 2011). Applying that principle, this District has declined to apply the *per se* rule to exchanges of "non-public" pricing-related information through a platform. *See Segal II*, 2026 WL 879583, at *4–6; *see also* CoStar Br. at Section III.

## III. Plaintiff Fails to Plead a Plausible Rule-of-Reason Claim

Because the alleged information exchange is not subject to *per se* condemnation, Plaintiff can proceed, at most, under the rule of reason. Under that framework, Plaintiff must plausibly allege that the challenged restraint produced a substantial anticompetitive effect in a relevant market. Plaintiff may attempt to do so directly, through actual harm to competition, or indirectly, through market power plus facts showing that the challenged restraint is likely to harm competition. *See Agnew*, 683 F.3d at 335; *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 702–03 (7th Cir. 2023); *Ohio v. Am. Express Co.*, 585 U.S. 529, 541–42 (2018). Plaintiff does neither.

### A. The Relevant Market Allegations Are Implausible

A relevant market must reflect economic substitutability and the commercial realities of competition; a court need not accept a market definition merely because a complaint labels it one. *See Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917 (7th Cir. 2020); *Right*

*Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 886 (N.D. Ill. 2015). A complaint that fails to allege facts plausibly defining the relevant market therefore fails to state a claim. *See Agnew*, 683 F.3d at 337–38.[6]

### *1. The Product Markets Are Not Plausibly Defined*

A relevant product market includes products or services that consumers (here, commercial tenants) consider reasonably interchangeable. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956); *Sharif Pharmacy*, 950 F.3d at 917. The Complaint suggests three sweeping product markets—industrial, office, and retail leasing—but alleges no facts showing that properties within each category are reasonably interchangeable. Instead, it claims in boilerplate fashion that each category is a distinct market and invokes the hypothetical-monopolist test. Compl. ¶¶ 20–26. Those conclusions do not substitute for factual allegations about tenant substitution, cross-price responses, or competitive constraints in the proposed markets. *See Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 578–81 (7th Cir. 2022) (examining whether consumers would substitute between the allegedly competing products).

The proposed "Industrial Lease Market" illustrates the problem. Compl. ¶ 21. Plaintiff groups properties used by logistics companies, manufacturers, and wholesalers, *id.*, without alleging facts showing that spaces suited to those materially different operations compete for the same tenants or constrain one another's rents. Simply sharing the adjective "industrial" does not make these properties economic substitutes for one another. The same deficiency applies to the broad office and retail categories. Plaintiff alleges differences among the three labels, but does not plausibly allege substitutability ***within*** each alleged market.

[6] The "failure to allege the existence of a relevant commercial market is fatal . . . whether per se, quick-look, or rule-of-reason analysis is applied." *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 952 (N.D. Ill. 2019); *see also Agnew*, 683 F.3d at 336.

Nor does Plaintiff identify in which of the three product markets it participated or what alternative properties it regarded as substitutes for the premises it leased. The CoStar Glossary on which Plaintiff relies underscores the problem: it recognizes both substantial differentiation ***within*** Plaintiff's categories and potential overlap ***across*** them, including "flex" properties capable of accommodating industrial, office, retail, and other uses. *See id.* at 7 n.4. Plaintiff cannot simply label those categories as markets; it must plead facts making it plausible that the properties grouped within each category are substitutes for tenants. *See Siva*, 38 F.4th at 579–81; *Sharif Pharmacy*, 950 F.3d at 917–18.

***2. The Geographic Markets Are Similarly Implausible***

A relevant geographic market must reflect commercial realities and the area in which customers can practicably turn to alternative suppliers. *See Sharif Pharmacy*, 950 F.3d at 917. Plaintiff instead identifies 49 MSAs and asserts that each is a relevant geographic market because tenants supposedly would not substitute properties outside the MSA. Compl. ¶¶ 27–30. But an MSA does not become an antitrust market merely because it supplies a convenient statistical boundary. *See Sharif Pharmacy*, 950 F.3d at 917.

The Complaint pleads no facts showing that the boundaries of any of the 49 MSAs correspond to where industrial, office, or retail tenants actually seek substitute space. Its blanket approach instead produces facially questionable results. For example, the Chicago-Naperville-Elgin MSA, Compl. ¶ 30, treats downtown Chicago and outlying portions of the MSA as part of the same geographic market, yet the Complaint alleges no facts showing that a tenant seeking downtown Chicago office space would regard distant suburban office space in Elgin or in Valparaiso, Indiana as a practical substitute.[7] Conversely, Plaintiff alleges no facts explaining why

[7] Indeed, CoStar's website, which Plaintiff relies on, shows dozens of submarkets for office space in Chicago and more broadly, demonstrating that tenants treat these areas differently when assessing their

properties immediately across an MSA boundary would necessarily fall outside the relevant competitive area.

That is the same basic defect Judge Valderrama identified in *In re Manufactured Home Lot Rents Antitrust Litigation*, where the court rejected the plaintiffs' use of MSA-based markets because the alleged consumer search area did not plausibly track those broad statistical boundaries. 2025 WL 3485693, at *15–16 (N.D. Ill. Dec. 4, 2025). The issue is not whether an MSA can ever constitute an antitrust market, but whether Plaintiff has alleged facts showing that these MSAs reflect the actual geographic scope of competition for the relevant type of commercial space. It has not.

### B. The Complaint Does Not Plausibly Allege Direct Evidence of Anticompetitive Effects

Under the rule-of-reason analysis, Plaintiff bears the initial burden of plausibly alleging that the challenged restraint caused a substantial anticompetitive effect in the relevant market. *See Am. Express*, 585 U.S. at 541; *Agnew*, 683 F.3d at 335. Plaintiff may satisfy that burden directly by alleging actual detrimental effects on competition, such as increased prices, reduced output, or diminished quality. *Am. Express*, 585 U.S. at 542. But any alleged effect must be plausibly attributable to the challenged restraint; market outcomes untethered to Defendants' challenged conduct do not suffice. The Complaint alleges no such effect.

Plaintiff alleges that CoStar gave market participants access to current lease-transaction information, thereby reducing pricing uncertainty. Compl. ¶¶ 88–92. But, as explained above, the exchange of pricing information is not inherently anticompetitive and may actually increase efficiency and competition. *See U.S. Gypsum Co.*, 438 U.S. at 441 n.16; *Maple Flooring Mfrs.'*

---

leasing needs. *See Submarket Maps*, CoStar Grp., Inc., https://www.costar.com/about/submarketmaps.aspx (last visited Aug. 16, 2026) (related page of CoStar website cited in Compl. n.1 & n.41).

*Ass'n v. United States*, 268 U.S. 563, 582–84 (1925); *Omnicare*, 629 F.3d at 709. The relevant question is therefore not whether information was exchanged, but whether the challenged exchange plausibly harmed competition in the alleged leasing markets.

The Complaint does not answer that question. It labels rents as "supracompetitive" and alleges that rents were higher in areas where CoStar had a greater presence. Compl. ¶¶ 92–97, 106. But those labels and correlations do not supply the missing causal link between the alleged Broker Defendant information exchange and harm to competition in the leasing space. Plaintiff does not identify any particular rent—not even its own—that was supracompetitive. Nor does it allege that output declined, that landlords stopped setting lease terms independently, that tenant choice diminished, that any meaningful competitive alternative was eliminated, or that any Broker Defendant's use of CoStar data caused any landlord to demand or accept a higher rent. Plaintiff's regression does not cure that defect. It purports to measure the correlation between CoStar's market share and average rents across MSAs. *Id.* ¶¶ 93–94. But it says nothing about any Broker Defendant—it does not measure what lease comp data any Broker Defendant accessed, how frequently any Broker Defendant consulted CoStar in negotiations, whether any Broker Defendant's use of CoStar data affected any particular lease, or any other fact connecting a Broker Defendant's conduct to the observed rent levels. A regression that measures one entity's platform presence but never examines what the alleged conspirators actually did cannot plausibly show that the Broker Defendants' challenged conduct caused anticompetitive effects in any relevant market. *See also* CoStar Br. at Section III (demonstrating additional deficiencies in the regression).

### C. Plaintiff Cannot Establish Anticompetitive Effects Indirectly Because It Does Not Plausibly Allege Market Power in the Relevant Markets

Nor does Plaintiff plead anticompetitive effects indirectly. To do so, Plaintiff must allege market power in a relevant market plus facts showing that the challenged restraint is likely to harm

competition. *See Am. Express*, 585 U.S. at 541–42; *Agnew*, 683 F.3d at 337. But Plaintiff's market-share allegations concern the wrong markets and the wrong Defendant. The Complaint repeatedly relies on ***CoStar's*** alleged share of a CRE information-services market, including MSA-level figures derived from separate litigation. Compl. ¶¶ 31–32. But Plaintiff's alleged relevant markets in this case are not markets for CRE information services; they are industrial, office, and retail ***leasing*** markets in 49 MSAs. *Id.* ¶¶ 20, 27–30. CoStar's share of a different product market does not establish that the Broker Defendants possess market power in any alleged leasing market. *See Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1214 (11th Cir. 2002) (power in one market cannot be "imputed" to a "separate market").

Moreover, the Complaint alleges no market share for the Broker Defendants collectively—or for any Broker Defendant other than CBRE—in any of the 147 alleged product/geographic market combinations. The sole broker-specific figure is an allegation that CBRE accounts for more than 20% of the ***nationwide CRE brokerage-services market***—a market far broader than those Plaintiff defines, encompassing geographic areas throughout the country (rather than MSAs), sales rather than leases, and other property categories like multi-family properties. Compl. ¶ 32; *id.* at n.14. Plaintiff cannot plausibly allege market power in local industrial, office, and retail leasing markets through market-share allegations concerning one defendant's nationwide brokerage services or CoStar's separate information-services business. Even in the Denver-Aurora-Lakewood MSA where Plaintiff claims injury, the Complaint alleges no market share for any Broker Defendant. *See id.* ¶¶ 9, 27–32.

The Complaint alleges a statistical association between ***CoStar's market share*** and rents, asserting that rents increase as CoStar's presence increases. *Id.* ¶¶ 93–94. But that correlation

does not supply the missing allegations of market power in any of Plaintiff's alleged leasing markets, much less establish the competitive significance of Broker Defendants in those markets.

## IV. Plaintiff Fails to Plead Antitrust Injury, Cannot Recover Damages from the Broker Defendants, and Lacks Standing to Seek Injunctive Relief

Even if the Court were to conclude that the Complaint plausibly alleges a conspiracy and anticompetitive effects, Plaintiff's claim would still fail for three independent reasons specific to its own position as a plaintiff. A private antitrust plaintiff must allege not merely injury, but "injury of the type the antitrust laws were intended to prevent" that flows from the allegedly unlawful conduct. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The Seventh Circuit likewise requires a sufficiently direct relationship between the alleged violation and the claimed injury to avoid speculative recovery. *See Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743–44 (7th Cir. 2018). Plaintiff alleges neither; nor does it allege the direct-purchaser status necessary to recover federal damages from the Broker Defendants or a threatened future injury supporting prospective relief.

***First***, Plaintiff alleges that it paid "artificially inflated" rent, Compl. ¶ 9, but supplies no facts identifying the rent it paid or connecting the rent to any conduct by any Broker Defendant. It does not identify which Broker Defendant allegedly brokered Plaintiff's lease, what CoStar information that broker supposedly accessed, how the broker used any CoStar information in Plaintiff's negotiation, or how any such use affected the rent Plaintiff's landlord ultimately accepted. Instead, Plaintiff relies on the conclusory assertion that Defendants' alleged conduct inflated its rent. *Id.* ¶¶ 9, 100. That causal gap defeats the claim. *See Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1042 (N.D. Ill. 2017) (finding "conclusory statement that supracompetitive prices were a direct and proximate result of defendants' unlawful acts" cannot survive dismissal), *aff'd*, 902 F.3d 735; *Mirage Wine + Spirit's, Inc. v. Apple Inc.*, 2025 WL

1896006, at *12 (S.D. Ill. July 9, 2025) (dismissing for failure to allege a "sufficient link between the alleged antitrust violation and antitrust injury").[8]

***Second***, Plaintiff's federal damages claim against the Broker Defendants fails because Section 4 of the Clayton Act generally limits recovery to the direct purchaser. 15 U.S.C. § 15; *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729, 746 (1977). Where intermediaries participate in a conspiracy, the first purchaser outside the conspiracy is the direct purchaser. *See Marion Healthcare*, 952 F.3d at 838–39. Here, Plaintiff's alleged overcharge is inflated rent, but Plaintiff does not allege that it leased space from any Broker Defendant or paid rent to any Broker Defendant. Compl. ¶ 9. Nor does it plausibly allege that its landlord—the party from whom Plaintiff allegedly leased space and to whom rent would have been paid—belonged to the alleged conspiracy. *Id*. Plaintiff therefore has not alleged that it was the first purchaser outside the alleged conspiracy that paid the alleged rent overcharge, and it cannot recover that alleged overcharge from the Broker Defendants. *See Leeder v. Nat'l Ass'n of Realtors*, 601 F. Supp. 3d 301, 308–11 (N.D. Ill. 2022).

Finally, Plaintiff lacks standing to seek prospective injunctive relief, which requires a significant threat of future antitrust injury. *See id.* at 312–14 (no standing where plaintiff did not allege intent to engage in another transaction). Plaintiff alleges only that it leased commercial property during the putative class period, Compl. ¶ 9; it does not allege that it currently is seeking, or intends to seek, another commercial lease subject to the challenged conduct.

## CONCLUSION

Broker Defendants respectfully request that the Complaint be dismissed with prejudice.

[8] Broker Defendants incorporate by reference CoStar's additional points on standing. *See* CoStar Br. at Section I.

Dated: August 17, 2026

Respectfully submitted,
**WINSTON TAYLOR LLP**

*/s/ Eva Cole*
Eva Cole (*pro hac vice*)
Caitlin Bailey (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
eva.cole@winstontaylor.com

Kevin B. Goldstein (Bar ID: 6326150)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654
Telephone: (312) 558-5600
kevin.goldstein@winstontaylor.com

*Counsel for Defendant CBRE Group, Inc.*

**SIDLEY AUSTIN LLP**

*/s/ Benjamin R. Nagin (signed with consent)*
Tacy F. Flint (Bar ID: 6284806)
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
Tel.: (312) 853-7875
Fax: (312) 853-7036
tflint@sidley.com

Benjamin R. Nagin (*pro hac vice*)
Kristina A. Gliklad (*pro hac vice*)
**SIDLEY AUSTIN LLP**
787 Seventh Avenue
New York, New York 10019
Tel.: (212) 839-5911
Fax: (212) 839-5599
bnagin@sidley.com
kgliklad@sidley.com

*Counsel for Defendant Newmark Group, Inc.*

**VINSON & ELKINS LLP**

*/s/ Michael W. Scarborough (signed with consent)*
Michael W. Scarborough (*pro hac vice*)
Dylan I. Ballard (*pro hac vice*)
**VINSON & ELKINS LLP**
555 Mission Street
Suite 2000
San Francisco, CA 94105
Tel.: (415) 979-6900
Fax: (415) 651-8786
mscarborough@velaw.com
dballard@velaw.com

Stephen M. Medlock
Adam L. Hudes (*pro hac vice*)
Marisa (Reese) Poncia (*pro hac vice*)
**VINSON & ELKINS LLP**
2200 Pennsylvania Ave., N.W.
Suite 500 W
Washington, D.C. 20037
Tel.: (202) 639-6500
Fax: (202) 639-6604
smedlock@velaw.com
ahudes@velaw.com
rponcia@velaw.com

Nicole L. Castle (*pro hac vice*)
**VINSON & ELKINS LLP**
1114 Avenue of the Americas
New York, NY 10036
Tel.: (212) 237-0000
Fax: (212) 237-0100
ncastle@velaw.com

*Counsel For Defendant*
*Colliers International USA, LLC*

**MORGAN, LEWIS & BOCKIUS LLP**

*/s/ Kenneth M. Kliebard (signed with consent)*
Kenneth M. Kliebard
**MORGAN, LEWIS & BOCKIUS LLP**
110 North Wacker Drive, Suite 2800
Chicago, IL 60606-1511
Tel.: (312) 324-1445
kenneth.kliebard@morganlewis.com

Zachary M. Johns (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, PA 19103-3007
Tel.: (215) 963-5000
zachary.johns@morganlewis.com

Minna Lo Naranjo (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
600 Montgomery Street, Suite 2300
San Francisco, CA 94111-2702
Tel.: (415) 442-1000
minna.naranjo@morganlewis.com

*Counsel for Defendant*
*Jones Lang LaSalle Incorporated*

**DLA PIPER LLP (US)**

*/s/ John J. Hamill (signed with consent)*
John J. Hamill
Michael S. Pullos
Miranda Drakes
**DLA PIPER LLP (US)**
444 West Lake Street, Suite 900
Chicago, IL 60606
Tel.: (312) 368-4000
Fax: (312) 236-7516
john.hamill@us.dlapiper.com
michael.pullos@us.dlapiper.com
miranda.drakes@us.dlapiper.com

*Counsel for Cushman & Wakefield PLC*