**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| FitFactariDC, LLC, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COSTAR GROUP, INC.; CBRE GROUP, INC.; JONES LANG LASALLE INCORPORATED; CUSHMAN & WAKEFIELD PLC; COLLIERS INTERNATIONAL USA, LLC; and NEWMARK GROUP, INC.<br><br>Defendants. | Case No.: 1:26-cv-06997<br>Hon. Joan H. Lefkow<br><br>**JURY TRIAL DEMANDED** |

# AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS


I. INTRODUCTION .......... 3

II. PARTIES .......... 5

A. Plaintiff .......... 5

B. Defendants .......... 6

III. JURISDICTION AND VENUE .......... 7

IV. THE MARKET FOR THE LEASE OF COMMERCIAL REAL ESTATE .......... 8

A. Relevant Product Markets .......... 8

B. Relevant Geographic Markets .......... 14

C. The Role of Brokers and the Broker Defendants .......... 18

D. Defendants' Dominant Role in the Relevant Markets .......... 24

V. DEFENDANTS' HUB-AND-SPOKE CONSPIRACY .......... 30

A. CoStar Acted as the Hub .......... 30

i. CoStar Built and Exercised Market Power Over CRE Information Services .......... 30

ii. CoStar Actively Solicited Non-Public Lease Transaction Data .......... 32

iii. CoStar's Subscription Model Monetizes Access to a Tool That Enables Price Coordination Among Competing Brokers .......... 34

iv. CoStar Reinforced Its Role as the Industry Hub Through Sponsored Events and Industry Convenings .......... 36

B. Broker Defendants Acted as Spokes .......... 38

i. Broker Defendants Entered into Vertical Agreements with CoStar .......... 38

ii. Broker Defendants Disclosed Competitively Sensitive Lease Data Against Their Unilateral Self-Interest .......... 42

iii. Broker Defendants Submitted Lease Data with Knowledge of Reciprocal Participation by Competitors .......... 45

C. Broker Defendants Formed and Implemented the Rim .......... 47

i. Broker Defendants Entered into a Horizontal Agreement to Exchange Non-Public Lease Data .......... 47

ii. Broker Defendants Implemented the Horizontal Agreement Through Shared Use of CoStar's Lease Comps System ... 52

D. Defendants Exchanged Current, Non-Public Lease Transaction Data ... 53

E. Defendants Rejected Less Restrictive Alternatives ... 60

VI. DEFENDANTS CAUSED ANTICOMPETITIVE EFFECTS IN THE INDUSTRIAL, OFFICE, AND RETAIL LEASE MARKETS ... 61

A. Defendants Reduced Pricing Uncertainty and Facilitated Coordinated Pricing ... 62

B. Tenants Were Harmed Even If They Could Access the Information ... 64

C. Defendants Caused Supracompetitive Rents and Harm to Tenants ... 66

D. Defendants' Conduct Substantially Affected Interstate Commerce ... 70

VII. CLASS INJURY AND STANDING ... 70

VIII. CLASS ALLEGATIONS ... 71

CLAIMS FOR RELIEF ... 73

DEMAND FOR JURY TRIAL ... 75

PRAYER FOR RELIEF ... 76

FitFactariDC, LLC ("FitFactariDC" or "Plaintiff"), individually and on behalf of all others similarly situated, brings this action against CoStar Group, Inc. ("CoStar"), CBRE Group, Inc. ("CBRE"), Jones Lang LaSalle Incorporated ("JLL"), Cushman & Wakefield plc ("Cushman & Wakefield"), Colliers International USA, LLC ("Colliers"), and Newmark Group, Inc. ("Newmark," and collectively with CBRE, JLL, Cushman & Wakefield, and Colliers, the "Broker Defendants"), and alleges as follows:

## I. INTRODUCTION

1. This action challenges a hub-and-spoke conspiracy among competing commercial real estate brokers to exchange current, non-public, deal-specific lease information through a dominant data intermediary, resulting in supracompetitive rents paid by commercial tenants.

2. Defendants are not accused of merely using the same vendor or relying on public data. Rather, Defendant CoStar facilitated and orchestrated the exchange of confidential, property-level lease transaction terms—including effective rents, concessions, and other lease economics—among competing brokers and landlords. This information would otherwise remain confidential between the negotiating parties.

3. The Broker Defendants knowingly submitted competitively sensitive lease data to CoStar to access competitors' similarly sensitive data. Each acted against its unilateral self-interest in disclosing sensitive pricing information and did so with the understanding that competitors were simultaneously contributing and receiving the same type of information, making reciprocal participation essential to the scheme's value.

4. Through this conspiracy, Defendants eliminated the uncertainty that ordinarily promotes price competition in industrial, office, and retail leasing markets. Armed with near-real-time visibility into competitors' bottom-line lease terms, Defendants were able to align asking rents, reduce concessions, and resist tenant negotiations without fear of being undercut.

5. CoStar, which controls an overwhelming share of the market for commercial real estate information services, acted as the hub of the conspiracy. It collected and redistributed non-public lease transaction data; designed its products to permit property- and unit-level inference; and promoted its services as enabling landlords and brokers to "optimize [their] pricing."[1] The value of CoStar's platform increased as more competitors participated, reinforcing the coordinated conduct.

6. The Broker Defendants, acting as spokes, entered into vertical agreements with CoStar and a horizontal agreement with one another, as inferred from their conduct and shared understanding, to exchange and use current, disaggregated lease pricing information. Through mutual monitoring enabled by CoStar, the Broker Defendants detected deviations from prevailing market rents, replacing independent pricing decisions with coordinated conduct.

7. Defendants' conduct has caused and continues to cause net anticompetitive harm. Competition in the industrial, office, and retail real estate leasing markets was suppressed, effective rents were inflated above competitive levels, and Plaintiff and the proposed Classes paid more for commercial space than they would have in a competitive market.

8. Accordingly, on behalf of two classes of individuals and businesses that leased commercial real estate in the local geographic markets affected by Defendants' conspiracy and described below, Plaintiff seeks to redress Defendants' unlawful conduct, which began prior to 2022 and continues through the present (the "Class Period").

---

[1] *Owners and Investors*, CoStar, https://www.costar.com/who-we-serve/owners-investors (last visited Sept. 30, 2026).

## II. PARTIES

### A. Plaintiff

9. Plaintiff FitFactariDC, LLC is a Florida limited liability company doing business as FitLearning Denver. On June 8, 2022, FitFactariDC entered into a five-year Shopping Center Lease with Alto Quebec Square, LP, an affiliate of Alto Real Estate Funds, for an approximately 1,406-square-foot store unit at 7505 E. 35th Avenue, Suite 345, in Quebec Square, a 207,611-square-foot retail power center in the Central Park neighborhood of Denver. The lease commenced later that month, was modified thereafter, and Plaintiff made payments regularly through at least August 2025.

10. The landlord was represented in the negotiation of FitFactariDC's lease by Defendant CBRE. FitFactariDC was represented by a broker from a non-defendant firm. Under the lease, the landlord paid the fees of both brokers pursuant to a separate fee agreement with CBRE. Because Plaintiff's landlord used a Broker Defendant—which is itself a CoStar client—for the transaction, Plaintiff is a member of both the Hub-and-Spoke Class and the Information Exchange Class defined below.

11. Although it did not know at the time (and had no reason to know at the time),[2] FitFactariDC paid effective rents that were higher, and received concessions that were smaller, than it would have in a market free of Defendants' conduct. FitFactariDC's lease required triple-net base rent, in addition to its proportionate share of taxes, insurance, and common-area costs, of $2,812.00 per month for months seven through twenty-four of the term ($24.00 per square foot

[2] Indeed, Defendants attributed rising prices to other factors. Colliers, for example, pointed to "declining vacancy," which it asserted had "allowed landlords to push rates once again." Colliers, *Retail | Denver 22Q3*, at 1, 2, 5 (Nov. 2022), https://cisgdenver.com/wp-content/uploads/2022/11/3Q2022Retail.pdf (square-footage-weighted asking averages across all space sizes)

per year), escalating to $3,164.67 per month, or $27.01 per square foot per year, in the final year, after an initial six-month rent-free period.

**B. Defendants**

12. Defendant CoStar Group, Inc. ("CoStar") is a Delaware corporation with its principal place of business in Arlington, Virginia. CoStar is the dominant provider of commercial real estate ("CRE") lease transaction data and analytics, offering subscription-based information services that include property-level and transaction-level leasing data, market analytics, and related tools used by brokers, landlords, and other commercial real estate professionals throughout the United States. CoStar describes itself as "[t]he most comprehensive platform for commercial real estate information, analytics & news."[3] CoStar is a publicly traded company with estimated revenue of US$2.7 billion (2024).

13. Defendant CBRE Group, Inc. ("CBRE") is a Delaware corporation with its principal place of business in Dallas, Texas. CBRE is a global commercial real estate services and investment firm that provides brokerage, leasing, property management, valuation, and advisory services to owners, occupiers, and investors of commercial real estate. CBRE is a publicly traded company with estimated revenue of US$35.8 billion (2024).

14. Defendant Jones Lang LaSalle Incorporated ("JLL") is a Maryland corporation with its principal place of business in Chicago, Illinois. JLL is a global provider of commercial real estate brokerage, leasing, investment management, and professional services, serving corporate, institutional, and public-sector clients. JLL is a publicly traded company with estimated revenue of US$23.4 billion (2024).

---

[3] CoStar Grp., Inc., https://www.costargroup.com (last visited Sept. 30, 2026).

15. Defendant Cushman & Wakefield plc ("Cushman & Wakefield") is a public limited company organized under the laws of England and Wales, with its principal place of business in Chicago, Illinois. Cushman & Wakefield provides commercial real estate brokerage, leasing, capital markets, valuation, and advisory services worldwide. Cushman & Wakefield is a publicly traded company with estimated revenue of US$9.5 billion (2023).

16. Defendant Colliers International USA, LLC ("Colliers") is a Delaware limited liability company and an indirect wholly owned U.S. subsidiary of Colliers International Group Inc., a publicly traded Canadian corporation headquartered in Toronto, Ontario, with estimated revenue of US$4.8 billion (2024).

17. Defendant Newmark Group, Inc. ("Newmark") is a Delaware corporation with its principal place of business in New York, New York. Newmark provides commercial real estate brokerage, leasing, capital markets, valuation, and advisory services to institutional and corporate clients. Newmark is a publicly traded company with estimated revenue of $2.7 billion (2024).

18. The Broker Defendants are all reported clients of CoStar,[4] compete with one another in leasing CRE, and act on behalf of landlords in negotiating lease terms with tenants. Through their participation in CoStar's platform, the Broker Defendants submitted and accessed competitively sensitive lease transaction data and used comparable information supplied by competitors, with CoStar serving as the centralized intermediary facilitating that exchange.

## III. JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the value of $5,000,000, exclusive of interest and costs, and is a

[4] CoStar Grp., Inc., Annual Report (Form 10-K), at 14 (Feb. 20, 2015), https://investors.costargroup.com/static-files/2b47fb98-af52-4ff8-96a0-baf5769347fe.

class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant. This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 15.

20. Venue lies within this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

21. This Court has personal jurisdiction over Defendants because Defendants transacted business in this District, and this action arises out of Defendants' conduct in this District.

## IV. THE MARKET FOR THE LEASE OF COMMERCIAL REAL ESTATE

### A. Relevant Product Markets

22. The relevant product markets are three distinct markets for the lease of commercial real estate where landlords and brokers, including Broker Defendants, compete for commercial tenants: the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market. Each market involves properties with distinct physical characteristics, tenant requirements, and competitive conditions, and none is reasonably interchangeable with the others or with other real estate transactions. CoStar itself recognizes and separately tracks these property types as distinct market segments.[5]

23. The **Industrial Lease Market** consists of properties adapted for uses such as assemblage, processing, manufacturing, warehousing, and distribution. Industrial properties are characterized by high ceiling heights, heavy industrial zoning, and may include features such as loading docks, cranes, floor drains, and trailer parking.[6] Tenants in this market include logistics

[5] *CoStar Glossary,* CoStar, https://www.costar.com/about/costar-glossary (last visited Sept. 30, 2026).

[6] *Id.*

companies, e-commerce fulfillment operators, manufacturers, and wholesalers. Industrial space is not reasonably interchangeable with office or retail space because such properties lack the physical characteristics, infrastructure, and zoning required for industrial operations. Accordingly, the cross-elasticity of demand between properties in the Industrial Lease Market and other types of commercial real estate is such that a hypothetical monopolist in the Industrial Lease Market could profitably increase prices by 5% (or more) above competitive levels.

24. The **Office Lease Market** consists of properties whose primary intended use supports the activities of knowledge workers and professional services. Office buildings are typically configured for high-density use and feature interior finishes and structural designs that support administrative, corporate, and professional activities.[7] Tenants in this market include law firms, financial services companies, technology companies, healthcare organizations, and other professional service providers. Office space is not reasonably interchangeable with industrial or retail space because office tenants require professional environments configured for administrative work, and such properties lack the physical characteristics required for manufacturing, warehousing, or direct-to-consumer retail sales. Accordingly, the cross-elasticity of demand between properties in the Office Lease Market and other types of commercial real estate is such that a hypothetical monopolist in the Office Lease Market could profitably increase prices by 5% (or more) above competitive levels.

25. The **Retail Lease Market** consists of properties whose primary intended use is to promote, distribute, or sell products and services to the general public. Retail buildings are configured for the display of merchandise or the interaction of company sales personnel with customers, and are often located in high-traffic or easily accessible areas. Tenants in this market

[7] *Id.*

include retailers, restaurants, personal service providers, and entertainment venues. Retail space is not reasonably interchangeable with office or industrial space because retail tenants require customer-facing environments, prominent signage, and locations optimized for consumer access rather than professional services or logistics operations. Accordingly, the cross-elasticity of demand between properties in the Retail Lease Market and other types of commercial real estate is such that a hypothetical monopolist in the Retail Lease Market could profitably increase prices by 5% (or more) above competitive levels.

26. The purchase of commercial real estate is not a substitute for leasing in any of these markets because ownership requires substantial capital investment, access to financing, long-term balance-sheet commitments, and exposure to property-specific risk, whereas leasing allows businesses to preserve capital and maintain operational flexibility. Nor are residential properties substitutes, as they are not zoned, designed, or legally permitted for commercial operations and cannot serve the same functional use.

27. Consistent with these market realities, a hypothetical monopolist in any of the Industrial Lease Market, the Office Lease Market, or the Retail Lease Market could profitably impose a small but significant and non-transitory increase in rents without inducing sufficient substitution to ownership, other CRE lease markets, or other real estate transactions to defeat the price increase.

28. Industry participants likewise recognize industrial, office, and retail CRE leasing as distinct markets: commercial real estate brokers, landlords, and market data providers—including CoStar—separately track, analyze, and price lease transactions by property type, reflecting the lack of reasonable interchangeability among these markets.[8] Accordingly, the

---

[8] *Id.* (*recognizing* Office, Retail, and Industrial as separate "property types used by CoStar COMPS"); *see also* https://www.costar.com/sites/costar.com.na/files/2025-10/Listings_EN_

relevant product markets are the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market.

29. CoStar itself treats the three as separate markets. In its annual report filed with the Securities and Exchange Commission, CoStar told investors that "[t]he different sectors of the large and fragmented real estate industry, such as office, industrial, retail, multifamily, single family, and others, are influenced differently by different factors, and have historically moved through economic cycles with different timing."[9] CoStar codes every lease in its database by space-use type, employs separate national directors of analytics for office, industrial, and retail who issue separate forecasts for each, and presents its annual Power Broker leasing awards to brokers "in three categories: Office Leasing, Retail Leasing and Industrial/Flex Leasing."[10] Indeed, CoStar has stated: "Commercial real estate markets are organized by five main categories: office, industrial, multifamily, retail and hospitality."[11]

30. The Broker Defendants also organize their businesses, brokers, and research by property type.[12] Each Broker Defendant publishes separate quarterly office, industrial, and retail market reports for each metropolitan area, including Denver.[13]

---

US_Product_1.jpg (CoStar platform breaking down properties into leasing and sales).

[9] CoStar Grp., Inc., Annual Report (Form 10-K), Item 1A (Feb. 20, 2025), https://www.sec.gov/Archives/edgar/data/1057352/000105735225000016/csgp-20241231.htm.

[10] *2026 Methodology for Determining Winners of CoStar Power Broker Awards*, CoStar Power Broker Awards, https://www.costarpowerbrokers.com/methodology (last visited Sept. 30, 2026).

[11] *Exploring Office and Retail Markets of Commercial Real Estate*, CoStar, https://costarmanager.com/commercial-real-estate (last visited Sept. 30, 2026).

[12] *See*, *e.g.*, *Property Types & Industries*, CBRE, https://www.cbre.com/services/property-types (last visited Sept. 30, 2026) (listing office, retail, and industrial & logistics as property types); *Property Types*, JLL, https://www.jll.com/en-us/property-types (last visited Sept. 30, 2026) (listing office, retail, and industrial and logistics as property types).

[13] *See*, *e.g.*, Cushman & Wakefield, *MarketBeat: Denver Office Q2 2026*; Cushman & Wakefield, *MarketBeat: Denver Industrial Q2 2026*; CBRE Research, *Figures | Denver Retail | Q2 2026* (July

31. Other market participants and industry groups similarly recognize that the office, industrial, and retail segments are distinct markets and that splicing those markets more narrowly is not necessary to meaningfully understand market dynamics. For example, commercial real estate platform Crexi lists "Office Spaces," "Retail Properties," and "Industrial Properties" as separate categories, with no further subdivisions within those categories.[14] MSCI, in its "Global Industry Classification Standard" methodology, classifies REITs that lease industrial, office, and retail space separately,[15] while the CRE Finance Council does the same in its Investor Reporting Package.[16]

32. In addition, BOMA, which describes itself as "the leading trade association and credential provider in the commercial real estate industry,"[17] promulgates separate standards (without further subdivision) for measuring area in office, industrial, and retail spaces,[18] and produces reports with other industry groups (*e.g.*, IREM) that track costs and prices for office and

---

17, 2026); Colliers, *Retail | Denver 26Q1* (Apr. 2026); Newmark Research, *1Q26 Denver Office Market Overview*; JLL Research, *Denver | Office | Q2 2026*.

[14] Shanti Ryle, *Commercial Real Estate Investing 101*, Crexi (Feb. 20, 2025), https://www.crexi.com/blog/commercial-real-estate-investing-101.

[15] MSCI, *Global Industry Classification Standard (GICS) Methodology*, at 45, https://www.msci.com/documents/1296102/11185224/GICS+Methodology+2023.pdf (last visited Sept. 30, 2026).

[16] CRE Fin. Council, *Investor Reporting Package*, https://www.crefc.org/common/Uploaded%20files/CREFC%20IRP%20v8.4_Final.pdf (last visited Sept. 30, 2026).

[17] BOMA, https://boma.org/ (last visited Sept. 30, 2026).

[18] *BOMA Standards*, BOMA, https://boma.org/boma-standards/ (last visited Sept. 30, 2026).

industrial space.[19] These reports demonstrate that economic conditions (including rent and operating expenses) substantially differ between those spaces.[20]

33. Consistent with those differences in market dynamics, the National Association of Realtors offers separate certifications for industrial and office transaction specialists,[21] and the Commercial Real Estate Development Association, an industry trade group, provides distinct demand forecasts for industrial and office space based on distinct factors.[22]

34. Indeed, data providers routinely create separate price indices for industrial, office, and retail property. MSCI treats these as "the major property sectors" (without further subdivision);[23] the Federal Reserve Bank of Atlanta similarly analyzes these categories as distinct "asset types";[24] and the Bureau of Labor Statistics specifically tracks lease pricing for industrial, office, and retail property separately.[25] Collectively, this market data demonstrates that prices for

---

[19] IREM, *Income/Expense IQ National Summary 2024* Operating Data, https://www.irem.org/file%20library/globalnavigation/learning/tools/irem-income-expense-iq-national-summary-24.pdf (last visited Sept. 30, 2026).

[20] *Id.*

[21] *Society of Industrial and Office Realtors*, Nat'l Ass'n of Realtors, https://www.nar.realtor/education/designations-and-certifications/society-of-industrial-and-office-realtors-sior (last visited Sept. 30, 2026).

[22] *Office Space Demand Forecast*, CREDA, https://www.credaglobal.org/research-and-publications/space-demand-forecasts/office-space-demand-forecast (last visited Sept. 30, 2026); *Industrial Space Demand Forecast*, CREDA, https://www.credaglobal.org/research-and-publications/space-demand-forecasts/industrial-space-demand-forecast (last visited Sept. 30, 2026).

[23] *Latest on US Commercial-Property Pricing*, MSCI, https://www.msci.com/research-and-insights/paper/rca-commercial-property-price-indexes-rca-cppi (last visited Sept. 30, 2026).

[24] *Commercial Real Estate (CRE) Market Index*, Fed. Rsrv. Bank of Atlanta, https://www.atlantafed.org/research-and-data/data/commercial-real-estate-market-index (last visited Sept. 30, 2026); *see also Office Leads the Pack in Commercial Real Estate's Emerging Price Recovery*, Trepp, https://www.trepp.com/trepptalk/office-leads-the-pack-in-commercial-real-estates-emerging-price-recovery-tppi-q3-2025 (last visited Sept. 30, 2026).

[25] *Producer Price Index by Industry: Lessors of Nonresidential Buildings: Leasing of Professional and Office Buildings*, FRED, https://fred.stlouisfed.org/series/PCU5311205311202 (last visited

industrial, office, and retail property are not only different, but are driven by different factors and are properly analyzed separately.

**B. Relevant Geographic Markets**

35. The relevant geographic markets are no broader than the metropolitan statistical areas ("MSAs") identified below, because commercial real estate leasing competition occurs at the local (as opposed to national) level. Broker Defendants compete with one another for tenants and lease transactions within discrete metropolitan areas, not on a nationwide basis. Accordingly, competition is appropriately analyzed at the MSA level. To be sure, each MSA may include more granular geographic submarkets, the precise contours of which will be determined in discovery with the aid of transaction-level data, including CoStar's own market and submarket designations.[26]

36. A hypothetical monopolist in each MSA could profitably impose a small but significant and non-transitory increase in lease prices or terms without losing sufficient business to properties located outside the MSA to defeat the price increase. MSAs provide a sound and commonly used framework for evaluating competitive effects in industrial, office, and retail leasing.

37. Commercial real estate customers do not regard properties in different MSAs as reasonable substitutes. Before searching for commercial real estate listings, and before searching for commercial real estate information or services, tenants focus on a specific MSA. Accordingly,

---

Sept. 30, 2026); *Producer Price Index by Industry: Lessors of Nonresidential Buildings: Leasing of Manufacturing and Industrial Buildings*, FRED, https://fred.stlouisfed.org/ouisfed.org/series/PCU5311205311203 (last visited Sept. 30, 2026); *Producer Price Index by Industry: Lessors of Nonresidential Buildings: Leasing of Shopping Centers and Retail Stores*, FRED, https://fred.stlouisfed.org/series/PCU5311205311201 (last visited Sept. 30, 2026).

[26] A list of such submarkets that CoStar itself has deemed appropriate is available here: https://www.costar.com/about/submarketmaps.aspx (last visited Sept. 30, 2026).

tenants seeking commercial space would not regard office space in one MSA as a substitute for office space in another MSA; for example, tenants seeking commercial space in the Chicago–Naperville–Elgin MSA would not consider a comparable space in the Los Angeles–Long Beach–Anaheim MSA to be a reasonable substitute. That is, a hypothetical monopolist in the Chicago–Naperville–Elgin MSA could profitably raise prices by 5%.

38. Competition is local because a tenant's need for space is tied to a specific area. An office tenant must locate where its workforce can commute; a retailer within the trade area of its customers; a logistics company with access to the highways, airports, and rail that serve its region. An MSA is, by federal definition, an urban core "plus adjacent territory that has a high degree of social and economic integration with the core as measured by commuting ties."[27]

39. Consistent with the government's description, the industry and Defendants measure commercial real estate competition at the MSA level. For example, the National Association of Realtors publishes a "Commercial Real Estate Metro Market Dashboard," which provides MSA-specific data for office, retail, and industrial properties.[28] Defendant CBRE has stated in SEC filings that "We believe we are the market leader for leasing services in most leading U.S. metropolitan statistical areas (as defined by the U.S. Census Bureau), including Atlanta, Austin, Boston, Chicago, Dallas, Denver, Kansas City, Los Angeles, New York, Orlando, Philadelphia, Phoenix, San Francisco, Seattle and St. Louis."[29]

---

[27] Office of Mgmt. & Budget, OMB Bulletin No. 23-01, *Revised Delineations of Metropolitan Statistical Areas*, app. § 1, at 2 (July 21, 2023).

[28] Nat'l Ass'n of Realtors, *Commercial Real Estate Metro Market Dashboard* (Q2 2026), https://www.nar.realtor/research-and-statistics/research-reports/commercial-real-estate-metro-market-reports (last visited Sept. 30, 2026).

[29] CBRE Grp., Inc., Annual Report (Form 10-K) (FY2020), https://www.sec.gov/Archives/edgar/data/1138118/000113811821000012/cbre-20201231.htm.

40. CoStar for its part has stated: "In analyzing metropolitan areas, CoStar has developed geographic designations to help group properties together, called Markets, Submarket Clusters and Submarkets. Markets are the equivalent of metropolitan areas, or areas containing a large population nucleus, that together with adjacent communities have a high degree of economic and social integration."[30] CoStar further explains that a "Market" is defined by "[g]eographic boundaries that serve to delineate core areas that are competitive with each other and constitute a generally accepted primary competitive set of areas."[31] CoStar's understanding of the relevant geographic markets thus tracks the U.S. Census Bureau's standard for defining MSAs.

41. CoStar's database—the instrument of the exchange alleged here—is built on this same architecture. CoStar organizes the United States into more than 125 "Markets," which roughly correspond to MSAs.[32] CoStar then divides each into property-type-specific "submarkets," defined as "the division of the primary market" that "[o]utlines a specific geographic boundary that describes a core area that is competitive with other submarkets," "[r]epresents similar property types (office, industrial, retail, etc.)," and "[d]oes not overlap other submarkets."[33] Upon information and belief, every lease comparable in CoStar's database is coded to a market and a submarket (*i.e.*, the comparable is labeled with a market and submarket), and CoStar's market reports list each lease by submarket alongside the names of the tenant-representative and leasing-representative firms.[34]

---

[30] CoStar Grp., Inc., *CoStar Office Statistics: Tucson Office Market*, at 4, https://bomagt.org/downloads/Economic_Forecast_2017/tucson_office_report___costar.pdf (last visited Sept. 30, 2026).

[31] *Id.* at C.

[32] *Submarket Maps for Commercial Real Estate*, CoStar, https://www.costar.com/about/SubmarketMaps.aspx (last visited Sept. 30, 2026).

[33] *Id.*

[34] CoStar Grp., Inc., *Denver Retail Market Report*, at 6, 22–24 (Oct. 1, 2024),

42. Defendants' exchange of lease information, described in more detail below, operated at both the market and submarket levels. Because CoStar codes each lease comparable to a market and a submarket, a Broker Defendant negotiating a lease at a particular building could retrieve the effective rents, free-rent periods, tenant-improvement allowances, and escalations that its competitors had recently achieved at the buildings in the same submarket and benchmark those terms against the metro-wide statistics that CoStar and the Broker Defendants publish for each Local Market.

43. The following MSAs each independently constitute a relevant geographic market for purposes of antitrust analysis (the "Local Markets"): Boston-Cambridge-Newton; Seattle-Tacoma-Bellevue; Washington-Arlington-Alexandria; Charlotte-Concord-Gastonia; Atlanta-Sandy Springs-Alpharetta; Nashville-Davidson-Murfreesboro-Franklin; San Francisco-Oakland-Berkeley; Minneapolis-St. Paul-Bloomington; Denver-Aurora-Lakewood; San Diego-Chula Vista-Carlsbad; Phoenix-Mesa-Chandler; Portland-Vancouver-Hillsboro; Louisville/Jefferson County; Jacksonville; Austin-Round Rock-Georgetown; Columbus; Philadelphia-Camden-Wilmington; Orlando-Kissimmee-Sanford; Milwaukee-Waukesha; Tampa-St. Petersburg-Clearwater; Tucson; New York-Newark-Jersey City; Riverside-San Bernardino-Ontario; Las Vegas-Henderson-Paradise; Bridgeport-Stamford-Norwalk; Cincinnati; St. Louis; Providence-Warwick; Indianapolis-Carmel-Anderson; Oklahoma City; Chicago-Naperville-Elgin; Memphis; Sacramento-Roseville-Folsom; Los Angeles-Long Beach-Anaheim; Albany-Schenectady-Troy; Miami-Fort Lauderdale-Pompano Beach; Dallas-Fort Worth-Arlington; Salt Lake City; San Antonio-New Braunfels; Hartford-East Hartford-Middletown; Cleveland-Elyria; Omaha-Council

https://uniqueprop.com/wp-content/uploads/2024/11/Denver-CO-USA-Retail-Market-2024-10-01.pdf; *CoStar Market Analytics*, CoStar, https://www.costar.com/products/market-analytics (last visited Sept. 30, 2026).

Bluffs; Pittsburgh; Kansas City; Detroit-Warren-Dearborn; Grand Rapids-Kentwood; New Haven-Milford; New Orleans-Metairie; and Houston-The Woodlands-Sugar Land.

### C. The Role of Brokers and the Broker Defendants

44. The Broker Defendants offered commercial real estate brokerage and leasing services within the Local Markets and competed with one another for tenants, listings, and lease transactions in each such market.

45. When a Broker Defendant represents a landlord, it does not merely help find tenants; it effectively sets and negotiates price. For example, Cushman & Wakefield tells investors that in "owner representation leasing, we typically contract with a building owner on a multi-month or multi-year agreement to provide strategic advice and execution to lease their available space," and tells landlords that its agency advisors work "to maximize asset visibility, stabilize occupancy and secure optimal rents," from "market analysis and property positioning" through "lease negotiations."[35] Colliers tells landlords that its representation includes "assessing similar properties in your marketplace" and describes using competitive information "to attract the right tenants and achieve stronger rents."[36]

46. Institutional landlords delegate leasing to the Broker Defendants through exclusive agency mandates: for example, Newmark brokers "serve as the exclusive leasing agents" for a Blackstone-affiliated office tower in downtown Denver, and Vornado Realty Trust "named

---

[35] Cushman & Wakefield plc, Annual Report (Form 10-K), Item 1 (Feb. 19, 2026); *Agency Leasing Services*, Cushman & Wakefield, https://www.cushmanwakefield.com/en/united-states/services/agency-leasing (last visited Sept. 30, 2026).

[36] *Landlord Representation*, Colliers, https://www.colliers.com/en/services/landlord-representation (last visited Sept. 30, 2026).

Newmark as the exclusive leasing agent" for the retail component of its $2.5 billion Penn District redevelopment in New York.[37]

47. Landlords cede decision making on rents and lease terms to brokers, who are specialized in negotiation and whose financial interests are aligned with landlords through the commission structure. Indeed, the asking rent, the concession package, and the negotiated effective rent for a brokered lease are the product of the landlord's broker's pricing advice and negotiation, informed by the lease-comparable data that broker holds; the landlord's signature ratifies a price its Broker Defendant agent set.

48. Empirical research confirms that brokers move transaction prices. A study of office lease transactions co-authored by a Cushman & Wakefield professional found that a landlord represented by a broker "pays 9 percentage points less incentives" (such as rent-free periods and renovations) than an unrepresented landlord, and that a tenant's broker "increases incentives by 7 percentage points."[38] A peer-reviewed experimental study of commercial real estate professionals likewise found that "brokers are able to influence transaction pricing," and that "privately communicated signals from reliable sources have significantly greater impact than signals which are made widely available."[39]

---

[37] Press Release, Newmark, *Newmark Facilitates 125,000 SF of Office Leasing Activity at 1800 Larimer in Downtown Denver* (Sept. 14, 2026); Press Release, Vornado Realty Trust, *Vornado Realty Trust Engages Newmark for Next Phase of THE PENN DISTRICT Retail Renaissance* (Feb. 2, 2026).

[38] Martijn Dröes, Boris Ziermans & Philip Koppels, *Information Asymmetry, Lease Incentives, and the Role of Advisors in the Market for Commercial Real Estate*, Tinbergen Inst. Discussion Paper No. 17-106/IV (2017).

[39] Matthew Cypher, S. McKay Price, Spenser Robinson & Michael J. Seiler, *Price Signals and Uncertainty in Commercial Real Estate Transactions*, 57 J. Real Est. Fin. & Econ. 246, 246 (2018) (abstract).

49. Commercial leasing brokers—including the Broker Defendants—benefit from, and have an incentive to push for, higher lease prices, to the benefit of landlords and the detriment of tenants. This is true regardless of whether the broker represents the landlord or tenant.

50. Specifically, commercial leasing brokers are paid by commission calculated as a percentage of the aggregate rent the tenant commits to pay over the term of the lease—commonly 3% to 6% of total lease value. The landlord pays the commission whether the broker represents the landlord or the tenant; in the typical transaction the landlord pays a single commission divided between its own broker and the tenant's broker, and where the tenant has no broker the landlord's broker keeps the whole.[40] The Broker Defendants confirm this structure in their SEC filings. Cushman & Wakefield, for example, states that its leasing fees "are calculated as a percentage of the total value of rent payable over the life of the lease."[41]

51. Accordingly, brokers on both the landlord and tenant side make more if the lease price increases. The United States government has recognized the resulting conflict in its own leasing. The General Services Administration retains national brokers—including CBRE and JLL—to represent it as a tenant. The Government Accountability Office found that this arrangement "creates, by design, an inherent conflict between the brokers' interest in promoting and negotiating higher commissions and their responsibility to effectively represent GSA's interest."[42] In other words, there is a conflict "between the brokers' interest in receiving higher

[40] *Leasing Commissions*, A.CRE, https://www.adventuresincre.com/glossary/leasing-commissions/ (last visited Sept. 30, 2026); *How Much Does It Cost to Use a Tenant Representation Broker?*, AQUILA Commercial (updated Jan. 20, 2026), https://aquilacommercial.com/learning-center/cost-to-use-tenant-broker-austin/ (last visited Sept. 30, 2026).

[41] Jones Lang LaSalle Inc., Annual Report (Form 10-K), Item 1 (FY2021); Cushman & Wakefield plc, Annual Report (Form 10-K), Item 1 (FY2025); Cushman & Wakefield plc, Annual Report (Form 10-K), Item 1 (FY2023); CBRE Grp., Inc., Annual Report (Form 10-K), Item 1 (FY2018).

[42] U.S. Gen. Servs. Admin., *Leasing Desk Guide* ch. 16, at 16-1 (rev. Sept. 30, 2010); U.S. Gov't Accountability Office, GAO-07-17, *GSA Leasing: Initial Implementation of the National Broker*

commission rates and the government's interest in acquiring the most suitable leased space, including its interest in cost matters."[43] Indeed, once a prospective landlord and tenant are matched, their brokers' interests become aligned with the landlord's interest in maximizing rent prices at the tenant's expense.[44]

52. The Broker Defendants represent both landlords and tenants, sometimes in the same transaction. For example, CBRE discloses that "conflicts may arise from our position as broker to both owners and tenants in commercial real estate lease transactions."[45]

53. Although the Broker Defendants also represent tenants, they derive far more revenue from landlord-side work. For example, Cresa, a brokerage that represents only occupiers, estimated that tenant representation accounts for approximately 13% of CBRE's revenue, 22% of JLL's, 15% of Cushman & Wakefield's, 11% of Colliers', and 11% of Newmark's, with most of the remainder earned from investors and landlords, as shown in Figure 1.[46]

---

*Services Contracts Demonstrates Need for Improvements* (Jan. 31, 2007).

[43] *Id.*

[44] Thomas J. Miceli, Katherine A. Pancak & C.F. Sirmans, *Is the Compensation Model for Real Estate Brokers Obsolete?*, 35 J. Real Est. Fin. & Econ. 7 (2007).

[45] CBRE Grp., Inc., Annual Report (Form 10-K), Item 1A (FY2018).

[46] Craig Van Pelt, *The Truth About Conflict in Commercial Real Estate*, Cresa (2023), https://www.cresa.com/blog/2023-the-truth-about-conflict-in-commercial-real-estate (last visited Sept. 30, 2026) (chart sourced to "publicly available sources including 10-K submittals").




**Figure 1**: Tenant representation as a share of Broker Defendants' revenue[47]

54. These findings are consistent with other data. For example, in a recent law review article, the author observed that full-service brokerage firms "annually receive the lion's share of their brokerage fees from landlords," and that such firms have an incentive to pursue the interests of landlords at the expense of tenants.[48]

---

[47] Chart prepared from the firm-by-firm estimates published in Craig Van Pelt, *The Truth About Conflict in Commercial Real Estate*, Cresa (2023), https://www.cresa.com/blog/2023-the-truth-about-conflict-in-commercial-real-estate (last visited Sept. 30, 2026) (chart "CRE Broker Tenant vs Landlord Representation, Big Five"; "Source: Financial data and information was taken from various publicly available sources including 10-K submittals").

[48] Peter Smirniotopoulos & Ryan Mathisen, *David v. Goliath: How the Replacement of a Commercial Real Estate Agent's Common Law Duty of Undivided Loyalty with Washington State's More-Limited Statutory Obligations Advantages Landlords to the Detriment of Commercial Tenants*, 43 Seattle U. L. Rev. 169, 170, 173, 177 n.25 (2019) (acknowledging research funding from Hughes Marino, LLC, a tenant-only brokerage).

55. That the Broker Defendants depend on, and benefit most from, their relationships with landlords follows from the structure of the market. Landlords, not tenants, are the Broker Defendants' recurring clients. Landlords award multi-building listing assignments, property-management contracts, and investment-sales mandates, and pay commissions again when a tenant renews or expands; tenants, in contrast, transact once every several years.

56. Industry participants describe the consequence plainly: a landlord relationship is "a daily, year-round relationship that is highly lucrative," while the tenant is "the client you only see once every few years."[49] Accordingly, the Broker Defendants' tenant-representation business gives them no interest in lower rents. A tenant broker with access to CoStar's comps has no financial reason to use them to drive the rent below the level its competitors' comps support, and every financial reason not to.

57. The Broker Defendants therefore have a strong incentive to pursue higher rents—they directly benefit from greater commissions on those rents and indirectly from repeat business with their biggest revenue source, landlords. As a result, they have a motive to pursue the conduct alleged in this amended complaint—namely, a hub-and-spoke conspiracy and unlawful information exchange. They also have the market power to collectively push rents upward through coordination.

[49] Michael Rareshide, *Conflicts of Interest: Who Is Representing the Tenant?*, Site Selection Group (Apr. 11, 2016); Miriam Hall & Molly Armbrister, *'Inherently Suspect': Why Is Dual Agency Everywhere In U.S. CRE When It's Banned In The UK?*, Bisnow (Sept. 14, 2022) (quoting the former President of Americas Tenant Representation at Cushman & Wakefield); Smirniotopoulos & Mathisen, *supra* note 48.

### D. Defendants' Dominant Role in the Relevant Markets

58. Defendants play dominant roles in the relevant markets. As explained below, available evidence indicates that most commercial real estate lease transactions in these markets are covered by CoStar and are brokered by one or more of the Broker Defendants.

59. As to CoStar, it "dominates commercial real estate data with 6 million properties" and "11 million comps."[50] Indeed, CoStar is used by 100% of the top 10 U.S. brokerage firms,[51] including each of the Broker Defendants, and 91% of all institutional commercial real estate firms.[52] Underscoring CoStar's central position, it has recently been accused by brokers and other market participants of monopolizing the market for commercial real estate information.[53]

60. Litigation records show that CoStar admits that "nearly 90% of all CRE activity occurs on a CoStar Network."[54] Consistent with that, such records also indicate that the dollar value of for-sale CRE listings on CoStar's platform far exceeds 50% of the total value of closed CRE sales transactions in each MSA.[55] This data is shown below:

| **Metropolitan Statistical Area** | **CoStar Market Share** |
| --- | --- |
| Boston-Cambridge-Newton | 97% |

[50] *CoStar Review: The Industry Standard for CRE Data and Analytics*, Best CRE, https://bestcre.com/costar-review-cre-ai/ (last visited Sept. 30, 2026).

[51] Press Release, CoStar Grp., Inc., *CoStar Group Signs Landmark Global Agreement With CBRE* (Jan. 9, 2019), https://www.costargroup.com/press-room/2019/costar-group-signs-landmark-global-agreement-cbre (last visited Sept. 30, 2026).

[52] *CoStar Review: The Industry Standard for CRE Data and Analytics*, *supra* note 50.

[53] *CoStar Monopoly Lawsuits Consolidated in Virginia*, Virginia Business, https://virginiabusiness.com/costar-monopoly-lawsuits-consolidated-virginia-federal-court/ (last visited Sept. 30, 2026).

[54] Compl. ¶¶ 2, 154, *Malm, Inc. v. CoStar Grp., Inc.,* No. 2:26-cv-04052 (C.D. Cal. Apr. 15, 2026), Dkt. No. 1.

[55] *See CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, No. 2:20-cv-08819 (C.D. Cal.), First Am. Countercl., Dkt. No. 162-2; *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1070 (9th Cir. 2025). We have rounded values to the nearest percentage point.

| | |
|---|---|
| Seattle-Tacoma-Bellevue | 96% |
| Washington-Arlington-Alexandria | 95% |
| Charlotte-Concord-Gastonia | 94% |
| Atlanta-Sandy Springs-Alpharetta | 94% |
| Nashville-Davidson-Murfreesboro-Franklin | 93% |
| San Francisco-Oakland-Berkeley | 92% |
| Minneapolis-St. Paul-Bloomington | 91% |
| Denver-Aurora-Lakewood | 91% |
| San Diego-Chula Vista-Carlsbad | 91% |
| Phoenix-Mesa-Chandler | 91% |
| Portland-Vancouver-Hillsboro | 90% |
| Louisville/Jefferson County | 90% |
| Jacksonville | 89% |
| Austin-Round Rock-Georgetown | 89% |
| Columbus | 87% |
| Philadelphia-Camden-Wilmington | 87% |
| Orlando-Kissimmee-Sanford | 87% |
| Milwaukee-Waukesha | 86% |
| Tampa-St. Petersburg-Clearwater | 85% |
| Tucson | 85% |
| New York-Newark-Jersey City | 84% |
| Riverside-San Bernardino-Ontario | 84% |
| Las Vegas-Henderson-Paradise | 84% |
| Bridgeport-Stamford-Norwalk | 84% |
| Cincinnati | 83% |
| St. Louis | 82% |
| Providence-Warwick | 82% |
| Indianapolis-Carmel-Anderson | 81% |
| Oklahoma City | 80% |
| Chicago-Naperville-Elgin | 79% |
| Memphis | 79% |
| Sacramento-Roseville-Folsom | 77% |
| Los Angeles-Long Beach-Anaheim | 75% |
| Albany-Schenectady-Troy | 75% |
| Miami-Fort Lauderdale-Pompano Beach | 74% |
| Dallas-Fort Worth-Arlington | 74% |
| Salt Lake City | 70% |
| San Antonio-New Braunfels | 68% |
| Hartford-East Hartford-Middletown | 66% |

| | |
|---|---|
| Cleveland-Elyria | 66% |
| Omaha-Council Bluffs | 65% |
| Pittsburgh | 63% |
| Kansas City | 61% |
| Detroit-Warren-Dearborn | 60% |
| Grand Rapids-Kentwood | 59% |
| New Haven-Milford | 59% |
| New Orleans-Metairie | 58% |
| Houston-The Woodlands-Sugar Land | 58% |

**Table 1**: Estimated shares of CoStar in the market for CRE information service (2022)[56]

61. Although this data concerns commercial real estate sales rather than lease transactions, it is reasonable to infer that the numbers are similar, if not higher, for lease transactions. Indeed, all five Broker Defendants operate in both sales and leasing,[57] nearly all commercial real estate professionals use CoStar, and the vast majority of commercial leases involve brokers or other similar professionals.[58] For example, data from Tucson indicates that 85% of the 40 largest office leases in 2017 included a broker on the landlord side.[59] That is consistent with 2018 data on a national level.[60]

[56] *See* First Am. Countercl., *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, *supra* note 55.

[57] *Commercial Property Executives Say Recovery Has Arrived*, CoStar, https://www.costar.com/article/1393632065/commercial-property-executives-say-recovery-has-arrived (last visited Sept. 30, 2026).

[58] *See Multiple Real Estate Brokers: Help or Hindrance*, Metro Manhattan Office Space, https://www.metro-manhattan.com/blog/multiple-real-estate-brokers-help-or-hindrance/ (last visited Sept. 30, 2026).

[59] *CoStar Office Statistics: Tucson Office Market*, *supra* note 30, at 13.

[60] CoStar Grp., Inc., *CoStar Office Statistics: National Office Market*, at 35, https://www.compass-commercial.com/wp-content/uploads/2019/02/2018-Year-End-National-Office-Report.pdf (last visited Sept. 30, 2026).

62. Critically to CoStar's centrality, the Broker Defendants all use CoStar services. Together, the Broker Defendants comprise the dominant group of CRE brokerage firms in the United States, commonly referred to as the "Big Five."[61] Industry reporting notes that these firms "have expanded geographically and gained market share by swallowing up smaller firms in consolidations over the years."[62]

63. Defendant CBRE alone is estimated to account for over 20% of the U.S. CRE brokerage services market (with the remaining Broker Defendants collectively accounting for an additional estimated 38%),[63] which has estimated combined annual revenue of about $112 billion.[64] Other data sources similarly estimate that the Broker Defendants collectively account for 60% of all broker revenue from commercial real estate transactions.[65]

64. Indeed, the Broker Defendants are the largest commercial leasing intermediaries in the United States. In 2025, CBRE reported $4.497 billion in advisory leasing revenue; JLL reported $2.902 billion in leasing revenue; Cushman & Wakefield reported $2.099 billion in

---

[61] CoStar News Staff, *Commercial Real Estate's Big Five See Profits Surge: Explore CoStar's Full Coverage*, CoStar News (Oct. 30, 2025), https://www.costar.com/article/1058498563/commercial-real-estates-big-five-see-profits-surge-explore-costars-full-coverage (last visited Sept. 30, 2026).

[62] Elizabeth Cryan, *Meet NYC's Next Generation of Top Office Brokers: How the Younger Dealmakers Are Reshaping the Business*, The Real Deal (May 1, 2024), https://therealdeal.com/magazine/may-2024/new-yorks-next-top-leasing-brokers/ (last visited Sept. 30, 2026).

[63] Jordan B., *Broker Rankings 2025 Show CBRE Leading Small Deal Surge*, CRE Daily (Aug. 22, 2025), https://www.credaily.com/briefs/broker-rankings-2025-show-cbre-leading-small-deal-surge/ (last visited Sept. 30, 2026).

[64] *Commercial Real Estate Brokerage Industry Profile*, First Research (Dec. 1, 2025), https://www.firstresearch.com/industry-research/Commercial-Real-Estate-Brokerage.html (last visited Apr. 15, 2026).

[65] *United States Commercial Real Estate Market Size & Share Analysis*, Mordor Intelligence, https://www.mordorintelligence.com/industry-reports/commercial-real-estate-market-in-usa (last visited Sept. 30, 2026).

leasing fee revenue, of which $1.674 billion was earned in the Americas; and Newmark reported $1.003 billion in leasing and other commissions. Colliers' commercial real estate segment, which includes leasing, generated $3.29 billion.[66] CBRE alone handled more than 66,000 leasing transactions with $157.6 billion in leasing volume in 2024; Colliers' advisors "completed 44,000 sale and lease transactions" in 2025; and Commercial Property Executive's 2026 ranking of brokerage firms, based on 2025 activity, places Cushman & Wakefield first, CBRE second, Colliers third, and Newmark fourth, with those four firms accounting for more than $400 billion of the $477.2 billion in leases closed by the twenty ranked firms (JLL did not participate).[67]

65. The Broker Defendants dominate commercial leasing in the Local Markets, and available evidence indicates that they participate in most transactions in those markets. For example, CBRE boasts: "We believe we are the market leader for leasing services in most leading U.S. metropolitan statistical areas (as defined by the U.S. Census Bureau), including Atlanta, Austin, Boston, Chicago, Dallas, Denver, Kansas City, Los Angeles, New York, Orlando, Philadelphia, Phoenix, San Francisco, Seattle and St. Louis."[68] CBRE has further represented to investors that it "[d]oes more of the largest leasing transactions" (with a 30% share of the top 25

[66] CBRE Grp., Inc., Annual Report (Form 10-K), Notes to Consolidated Financial Statements, Disaggregation of Revenue (Feb. 12, 2026); Press Release, JLL, *JLL Reports 2025 Financial Results for Fourth Quarter and Full Year* (Feb. 18, 2026); Cushman & Wakefield, Current Report (Form 8-K), Ex. 99.1, at 11 (Feb. 19, 2026); Newmark Grp., Inc., Current Report (Form 8-K), Ex. 99.1 (Feb. 25, 2026); Press Release, Colliers Int'l Grp. Inc., *Colliers Reports Fourth Quarter and Full Year 2025 Results* (Feb. 13, 2026).

[67] *Landlord Leasing*, CBRE, https://www.cbre.com/services/manage-properties-and-portfolios/landlord-leasing (last visited Sept. 30, 2026); Colliers Int'l Grp. Inc., Annual Information Form (Form 40-F), at 9 (FY2025); *2026 Top CRE Brokerage Firms*, Commercial Property Executive (May 28, 2026), https://www.commercialsearch.com/news/top-commercial-real-estate-brokerage-firms/ (last visited Sept. 30, 2026).

[68] CBRE Grp., Inc., Annual Report (Form 10-K) (FY2020), *supra* note 29.

office leasing transactions) and is "most often the local market leader in US occupier transactions."[69]

66. Data broadly corroborates that the Broker Defendants are involved in most commercial lease transactions. For example, of the 40 largest office transactions in 2018 in the United States occurring in the Local Markets, more than two-thirds involved a Broker Defendant.[70] That number was similar for commercial office leases in Tucson,[71] and for commercial industrial leases nationwide,[72] with participation skewed toward the landlord side.

67. Similarly, CoStar compiles annual "Power Broker" rankings for each metropolitan market from closed deals submitted to and verified by CoStar's research team. As an illustrative example, for Denver in 2025, CoStar named all five Broker Defendants among the ten "Top Leasing Firms"; all ten of its "Top Office Leasing Brokers" and nine of its ten "Top Industrial Leasing Brokers" in Denver were employed by Broker Defendants. CoStar's 2024 Denver rankings were materially the same.[73]

68. Ultimately, data on commercial lease transactions is largely nonpublic, so it is difficult to precisely estimate the percentage of commercial lease transactions that flow through the Broker Defendants in each Local Market. Nevertheless, based on the available data, it is

---

[69] CBRE Grp., Inc., *Investor Overview*, at 24 (2019), https://ir.cbre.com/financial-reports/sec-filings/content/0001564590-19-034256/cbre-ex991_6.htm (last visited Sept. 30, 2026).

[70] *CoStar Office Statistics: National Office Market*, *supra* note 60, at 35.

[71] *CoStar Office Statistics: Tucson Office Market*, *supra* note 30, at 13.

[72] CoStar Grp., Inc., *CoStar Industrial Statistics: National Industrial Market*, at 30, https://www.compass-commercial.com/wp-content/uploads/2019/02/2018-Year-End-Industrial-Report.pdf (last visited Sept. 30, 2026).

[73] *Annual Award Winners — Denver — 2025, 2024*, CoStar Power Broker Awards, https://www.costarpowerbrokers.com/annual-award-winners (last visited Sept. 30, 2026); CoStar Research, *Top Dealmakers in Denver Named CoStar Power Brokers*, CoStar News (Feb. 27, 2026).

reasonable to infer that most transactions involve at least one Broker Defendant on the landlord side, the tenant side, or both.

## V. DEFENDANTS' HUB-AND-SPOKE CONSPIRACY

69. This case challenges a voluntary exchange of timely, disaggregated, deanonymized, and non-public lease transaction data among horizontal competitors (the Broker Defendants) through a third party (CoStar). Defendants entered into a hub-and-spoke conspiracy in which CoStar served as the central hub collecting and disseminating Broker Defendants' proprietary data and enabling them to benchmark against competitors; the Broker Defendants served as spokes; and a horizontal agreement (the "rim") existed among competing Broker Defendants, formed through mutual understanding, reciprocal participation, and coordinated conduct. To maintain stable coordination, CoStar monitored who was contributing non-public information, verified the information's reliability, and obligated mutual exchange from participants—a common role of the hub in a hub-and-spoke conspiracy.[74]

### A. CoStar Acted as the Hub

#### *i. CoStar Built and Exercised Market Power Over CRE Information Services*

70. CoStar has spent more than three decades building and entrenching dominance in commercial real estate data and analytics. Since its founding in 1987, CoStar has pursued a deliberate strategy of growth through acquisition and exclusion, acquiring more than thirty competitors and systematically eliminating rival sources of CRE information. As a result of this strategy, CoStar has become what industry participants describe as an "industry behemoth,"[75] with

---

[74] OECD, Roundtable *on Hub-and-Spoke Arrangements – Background Note*, DAF/COMP(2019)14, ¶ 19 (2019), https://one.oecd.org/document/DAF/COMP(2019)14/en/pdf (last visited Sept. 30, 2026).

[75] Cheryl Reid-Simons, *FTC Weighs In on Antitrust Allegations Leveled Against CoStar*, Real Estate News (Jan. 31, 2024), https://www.realestatenews.com/2024/01/31/ftc-weighs-in-on-

a market capitalization exceeding tens of billions of dollars and a scope and scale unmatched in the history of CRE information services.[76]

71. CoStar's acquisition strategy culminated in CoStar's consolidation of the markets for internet CRE listing services, internet CRE information services, and related analytics tools. After the acquisition of LoopNet and the subsequent exit of Xceligent—its last significant nationwide competitor—CoStar was left with what plaintiffs in prior litigation describe as a monopoly position. CoStar allegedly now holds over 90% of the U.S. internet CRE information services market, including databases used to research space available for lease, lease histories, comparable lease pricing, tenant information, and vacancy data.[77]

72. With competition largely eliminated, and with the Broker Defendants' participation on the platform, CoStar's subscription database became the *de facto* industry standard. Commercial real estate professionals, including brokers, brokerages, owners, investors, and lenders, routinely rely on CoStar in their day-to-day work. In the words of JLL Senior Vice President Andy O'Brien, "[f]rom a pure broker perspective, it's crucial," so much so that "[w]e can't do our job without it."[78]

73. As CoStar's dominance increased, so did customer dependence. Industry participants reported high renewal rates, regularly over 90%,[79] and rising subscription prices,

---

antitrust-allegations-leveled-against-costar (last visited Sept. 30, 2026).

[76] *See* Konrad Putzier et al., *Search and Destroy: How CoStar Became a $15B Juggernaut*, The Real Deal (Sept. 1, 2018), https://therealdeal.com/magazine/new-york-september-2018/how-costar-became-a-15-billion-dollar-juggernaut/ (last visited Sept. 30, 2026).

[77] *See* First Am. Countercl., *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, *supra* note 55.

[78] Jon Banister & Ethan Rothstein, *Xceligent Files Antitrust Suit Against CoStar, Alleges Years of Anticompetitive Behavior*, Bisnow (June 28, 2017), https://www.bisnow.com/national/news/commercial-real-estate/xceligent-costar-antitrust-lawsuit-76054 (last visited Sept. 30, 2026).

[79] CoStar Grp., Inc., Annual Report (Form 10-K), at 37 (Feb. 19, 2025),

consistent with the exercise of market power. As key competitors exited the market, CoStar significantly increased prices—by as much as 80% for new customers within months—while customers continued to subscribe due to the lack of viable alternatives.[80]

74. This dependence further entrenched CoStar's position as the primary, and in many markets the only, comprehensive source of CRE leasing data, including for industrial, office, and retail properties.

### *ii. CoStar Actively Solicited Non-Public Lease Transaction Data*

75. CoStar operates one of the largest and most comprehensive CRE information and analytics platforms in the world. Since its founding, CoStar has continuously built and expanded a proprietary database covering millions of commercial properties and related transactions.

76. A key component of CoStar's dataset is its lease comparables ("lease comps") database, through which subscribers can access detailed transaction records tied to specific properties, tenants, and units. These records include terms that are not otherwise publicly accessible, such as effective rents (net of concessions), free rent periods, tenant improvement allowances, escalation clauses,[81] lease start and end dates, contract terms, and other economic details of lease transactions. Lease comps reflect deal terms that would otherwise remain confidential between the landlord, broker, and tenant. Figure 2 below shows the form through which users input their non-public lease data.

---

https://investors.costargroup.com/static-files/43112839-fea7-435f-bff3-5f53ec531a0d.

[80] Putzier et al., *supra* note 76 ("The research firm Morningstar recently characterized the company as a 'borderline monopoly' with 'no true threats in terms of competition.' Seven months after Xceligent filed for bankruptcy, CoStar said the average monthly price it charges new customers had jumped to $466 per broker, up from $255 the previous January — an increase of over 80 percent.").

[81] Clause in a lease which increases rent over the term of the lease, usually on an annual basis. Most multi-year leases will have an escalation clause.




**Figure 2**: CoStar form used to collect lease comp data[82]

77. CoStar describes its data-gathering process as a "census-level approach to researching the world of commercial real estate . . . gathering data from market participants."[83] CoStar actively solicits commercially sensitive and non-public lease information from its network of brokers, including the Broker Defendants, who are induced to submit detailed lease transaction data to populate the lease comps database.[84]

---

[82] *New Lease Comp Entry*, CoStar Lease Analysis Help, https://product.costar.com/LeaseComps/Help/en-US/main.htm#LC_New_Lease_Comp_Entry.htm (last visited Sept. 30, 2026).

[83] CoStar Grp., Inc., *CoStar Brochure* (n.d.), https://www.costar.com/sites/costar.com.na/files/costar-brochure---lenders.pdf (last visited Sept. 30, 2026).

[84] *See, e.g.*, video testimonial from Morguard Investments (https://www.costar.com/case-studies#owners-1301414892) and Marcus and Millichap (https://www.costar.com/case-studies#brokers-1568642112) (last visited Sept. 30, 2026).

78. CoStar customers describe routinely and enthusiastically sharing transaction data with CoStar. For example, Capworth Commercial Realty stated: "If we know a deal has transacted, we send an email to our researcher at CoStar, and they verify it immediately . . . [everyone] should treat CoStar as their own database. This will help maintain the most accurate database in the market."[85] CoStar further encourages frequent self-reporting by instructing users to "update [their] listings every 30-60 days to make sure that the information is accurate" and warning that "[l]istings that have not been updated in 75 days will be removed."[86] Critically, brokers who update a listing status to "leased" are consistently prompted to provide the deal terms, ensuring that executed lease information is captured and shared.[87]

79. CoStar also proactively extracts data beyond subscriber submissions through its own research operations, which are organized around direct outreach to brokers and landlords to gather and refresh commercial property- and space-level data. CoStar touts its research team of more than 1,600 employees, who collect non-public lease information and regularly communicate directly with brokers and landlords—often by phone—to verify and update transaction details.[88]

### ***iii. CoStar's Subscription Model Monetizes Access to a Tool That Enables Price Coordination Among Competing Brokers***

80. CoStar's business is built on a subscription-based revenue model that monetizes access to a tool enabling commercial real estate brokers and owners to observe and benchmark

---

[85] CoStar Grp., Inc., *Capworth Commercial Realty Testimonial* (Aug. 2023), https://www.costar.com/sites/costar.com.na/files/2023-08/Testimonial-Capworth-Commercial-Realty-EN.pdf (last visited Sept. 30, 2026).

[86] CoStar Grp., Inc., *Marketing Center User Guide: Update a Listing* (Feb. 2023), https://www.costar.com/sites/costar.com.na/files/2023-02/update-a-listing.pdf (last visited Sept. 30, 2026).

[87] *Id.*

[88] *CoStar Market Analytics*, *supra* note 34.

against their competitors' confidential lease terms. CoStar's high market share combined with broad adoption among competing brokers and landlords is what makes the information exchange effective and valuable. The more market participants that subscribe, the more comprehensive the non-public lease data becomes. According to CoStar's investor disclosures, the vast majority of its revenue comes from subscriptions,[89] making ongoing renewals—not one-time transactions—the central driver of its financial performance.[90]

81. This subscription-based model gives CoStar a direct financial incentive to facilitate coordination among the Broker Defendants, because the more effectively brokers can use CoStar's data to align their pricing, the greater their willingness to pay for—and renew—CoStar's services.

82. For the information exchange to most effectively facilitate coordination, subscribers must keep the platform continuously updated with current lease transaction data. CoStar's economic incentives are therefore directly tied to ensuring the data quality and scope needed for horizontal competitors to benchmark against each other in near real time. Stale or incomplete information would undermine the value of the benchmarking tool, weaken renewals, and limit CoStar's ability to command premium pricing. The breadth and density of CoStar's lease comps and property coverage therefore increase the platform's value and reinforce customer dependence, enabling CoStar to raise prices, expand subscriptions, and earn high margins at relatively low marginal cost. Conversely, it is only in landlords' and brokers' interest to pay for

---

[89] CoStar Grp., Inc., Annual Report (Form 10-K), at 37 (Feb. 19, 2025), https://investors.costargroup.com/static-files/43112839-fea7-435f-bff3-5f53ec531a0d ("Revenues from our subscription-based contracts were approximately 96%, 95%, and 93% of total revenues for the years ended December 31, 2024, 2023, and 2022, respectively.").

[90] *CSGP Investor Relations - CoStar Group Inc*, Alpha Spread, https://www.alphaspread.com/security/nasdaq/csgp/investor-relations (last visited Sept. 30, 2026).

this service if the information exchange increases their profits, by enabling them to charge higher rents and reduce competitive uncertainty.

83. CoStar now serves a large user base of commercial real estate professionals across the United States and internationally, with over 300,000 paying subscribers[91] relying on its data. Combined with high renewal rates, this scale has produced a steady and predictable revenue stream, contributing to annual revenues exceeding $2 billion and sustained financial returns.

#### ***iv. CoStar Reinforced Its Role as the Industry Hub Through Sponsored Events and Industry Convenings***

84. In addition to controlling the primary channels through which CRE data is collected and distributed, CoStar has positioned itself as a central convener of the CRE industry by sponsoring and organizing industry events, conferences, and recognition programs attended by brokers, landlords, and other market participants.

85. CoStar sponsors and hosts proprietary industry programs, including its annual CoStar Impact Awards, which it markets as a nationwide initiative recognizing CRE transactions and professionals across multiple markets.[92] Each year, CoStar solicits nominations, selects award recipients, and convenes brokers and landlords at award ceremonies and related events held in more than 120 locations nationwide. In each location, CoStar assembles a panel of up to ten judges—often comprising senior industry leaders and direct competitors—to evaluate nominations. For example, in Atlanta in 2025, the judging panel included executives affiliated with all five Broker Defendants; the Washington, D.C. panel included research and brokerage executives of JLL and Cushman & Wakefield; and the Dallas–Fort Worth panel included research

[91] *Products - Overview*, CoStar, https://www.costar.com/products (last visited Sept. 30, 2026).

[92] Press Release, CoStar Grp., Inc., *CoStar Group Opens Nominations for Its Fifth Annual CoStar Impact Awards* (2025), https://www.costargroup.com/press-room/2025/costar-group-opens-nominations-its-fifth-annual-costar-impact-awards (last visited Sept. 30, 2026).

staff of Newmark and CBRE.[93] These CoStar-branded events repeatedly bring together competing brokers and landlords in a CoStar-curated environment closely tied to CoStar's data, analytics, and market narratives.

86. Each quarter CoStar also publishes, market by market, the "top" leases of the prior quarter with the tenant, square footage, and the names and firms of the brokers on each side, and the Broker Defendants advertise these awards on their websites.[94] For example, for the second quarter of 2026, CoStar publicized Denver office leases "negotiated by top dealmakers from CBRE, JLL and Cushman & Wakefield."[95]

87. CoStar and the Broker Defendants also meet through the Society of Industrial and Office Realtors ("SIOR"), whose members are industrial and office leasing brokers. CoStar Group is an SIOR "Annual Industry Partner," and JLL, Cushman & Wakefield, and Colliers are SIOR "Corporate Brokerage Partners";[96] a Cushman & Wakefield broker takes office as SIOR's global president at its October 2026 conference.[97] CoStar also sponsors and participates in third-party industry conferences and meetings attended by commercial real estate professionals, including events that feature structured programming and networking opportunities.[98]

---

[93] *CoStar Impact Award Winners*, CoStar Impact Awards, https://www.costarimpactawards.com/winners?field_market_target_id=11&field_year_value=2025 (last visited Sept. 30, 2026).

[94] *Jon Stanley*, CBRE, https://www.cbre.com/people/jon-stanley (last visited Sept. 30, 2026) ("honored with the CoStar Power Broker Award for ten consecutive years (2016-2025)"); *David DeMatteis*, Cushman & Wakefield, https://www.cushmanwakefield.com/en/united-states/people/david-dematteis (last visited Sept. 30, 2026).

[95] CoStar Research, *Top Office Leases Recognized for Denver*, CoStar News (Aug. 3, 2026).

[96] *Partners and Supporters*, SIOR, https://www.sior.com/partners-and-supporters/overview (last visited Sept. 30, 2026).

[97] Joshua S. Andino, *Cushman Broker Elected SIOR President*, CoStar News (Apr. 30, 2026).

[98] *See, e.g.,* Am. Real Est. Soc'y, ARES Spring Program 2023 Meeting Program (2023), https://cdn.ymaws.com/www.ares.org/resource/resmgr/docs/meetingprograms/ARES-Spring-Pro

88. By sponsoring such events while simultaneously serving as the dominant source of lease transaction data and analytics, CoStar facilitates direct communication among rival brokers, (i) further entrenching its position as the central hub through which industry participants connect, communicate, and interpret market conditions, and (ii) complementing its control over the flow of competitively sensitive lease information.

## B. Broker Defendants Acted as Spokes

### *i. Broker Defendants Entered into Vertical Agreements with CoStar*

89. The Broker Defendants entered into agreements with CoStar governing access to CoStar's commercial real estate information services. Those agreements did not merely grant access to data; they also affirmatively required and encouraged brokers to provide and update information concerning properties available for lease and completed transactions.[99]

90. Under CoStar's Terms and Conditions, brokers that purchase a license agree "to use reasonable efforts to keep CoStar informed about properties available for lease and/or sale and transaction information with respect to properties that Licensee owns, controls, represents or holds exclusives."[100] This provision applies directly to Broker Defendants engaged in leasing commercial space and obligates them to provide CoStar with current transaction-level information.

91. In addition, licensees grant CoStar a broad, non-exclusive, and irrevocable license to use, reproduce, modify, and distribute the real estate information they submit. This license

gram-2023.pdf (showing CoStar as largest sponsor); *see also* list of live webinars at Available Webinars, CoStar Grp., Inc., https://costar.ewebinar.com (last visited Sept. 30, 2026).

[99] *Marketing Center User Guide: Update a Listing*, *supra* note 86.

[100] *CoStar License Agreement Terms and Conditions* § 10 (eff. Feb. 6, 2025), https://www.costar.com/CoStarTerms-and-Conditions (last visited Sept. 30, 2026).

authorizes CoStar to integrate broker-supplied lease data into its databases and make it available to other subscribers, including competitors of the submitting broker.[101]

92. Each Broker Defendant, directly or through a predecessor, has licensed CoStar's information services continuously since at least 2000. CoStar's annual reports for fiscal years 2000 through 2014 each list CB Richard Ellis (now CBRE), Cushman & Wakefield, Jones Lang LaSalle (now JLL), and Colliers among its "representative" brokerage clients[102] or among the brokerage clients that are "well known or have the highest annual subscription fees,"[103] together with Grubb & Ellis (whose brokerage assets Newmark acquired in 2012) and Trammell Crow Company (which CBRE acquired in 2006); Newmark & Company Real Estate appears beginning with the report for 2002.[104] CoStar has stated that Cushman & Wakefield "has been a CoStar customer since 1996,"[105] that JLL "has been a major CoStar client since 2000,"[106] and that CBRE "has relied on CoStar . . . for three decades."[107]

93. The Broker Defendants deepened their commitments in two clusters. Between 2002 and 2005, each Broker Defendant or its predecessor entered what CoStar described to investors as

---

[101] *Id.*

[102] CoStar Grp., Inc., Annual Report (Form 10-K405), at 7 (Mar. 30, 2001); *see also* Annual Report (Form 10-K405), at 5–6 (Mar. 28, 2002); Annual Report (Form 10-K), at 6 (Mar. 28, 2003).

[103] CoStar Grp., Inc., Annual Report (Form 10-K), at 9 (Mar. 12, 2004); *see also* Annual Report (Form 10-K), at 13 (Mar. 1, 2013); Annual Report (Form 10-K), at 14 (Feb. 26, 2015) (last report containing a named client list).

[104] CoStar Grp., Inc., Annual Report (Form 10-K), at 6 (Mar. 28, 2003).

[105] Press Release, CoStar Grp., Inc., *Cushman & Wakefield Extends National License Agreement* (Feb. 18, 2009), https://www.costar.com/article/85706/cushman-wakefield-extends-national-agreement-for-costars-information-services (last visited Sept. 30, 2026).

[106] Press Release, CoStar Grp., Inc., *Jones Lang LaSalle Signs New Enterprise Agreement to Expand Use of CoStar Group's Comprehensive Commercial Property Information* (Mar. 24, 2011), https://www.nbcnews.com/id/wbna42256419 (last visited Sept. 30, 2026).

[107] Press Release, CoStar Grp., Inc., *CoStar Group Signs Landmark Global Agreement With CBRE*, *supra* note 51.

"multi-year, multi-market" national license agreements.[108] Between 2007 and 2011, they converted those licenses into "enterprise-wide" agreements covering all of their U.S. professionals. CBRE's September 2007 agreement, with a potential term of eleven years and "a potential value in excess of $100 million," was "the largest financial commitment CoStar has ever received from a single client," and "CoStar and CBRE have agreed to mutual non-competition covenants." Cushman & Wakefield's February 2009 agreement, with a potential term of ten years and a value exceeding $37 million, likewise included "mutual non-competition covenants." Grubb & Ellis, then "one of [CoStar's] largest clients," extended in 2010, and JLL signed an enterprise agreement covering all of its U.S. professionals in March 2011.[109]

94. Participation has continued without interruption into the Class Period. In January 2019, CoStar announced a new global contract with CBRE "for up to seven years" and stated that, "[a]s a result of the new agreement, CoStar is now used by 100% of the top 10 U.S. brokerage firms," that "[i]n 2018, CBRE professionals logged into CoStar more than one million times," and that "CBRE usage of CoStar doubled in 2018 over 2016."[110]

95. Since at least June 2015, CoStar's standard license terms have provided that a brokerage licensee "shall use reasonable efforts to keep CoStar informed about commercial and

---

[108] CoStar Grp., Inc., Annual Report (Form 10-K), at 7 (Mar. 28, 2003); Annual Report (Form 10-K), at 10 (Mar. 12, 2004); Current Report (Form 8-K), Ex. 99.1 (Feb. 17, 2005); Annual Report (Form 10-K), at 10 (Mar. 7, 2006).

[109] CoStar Grp., Inc., Current Report (Form 8-K), Item 8.01 (Sept. 12, 2007), https://www.sec.gov/Archives/edgar/data/1057352/000105735207000065/form_8-k.htm; Current Report (Form 8-K), Item 8.01 (Feb. 20, 2009), https://www.sec.gov/Archives/edgar/data/1057352/000105735209000011/form_8-k.htm; Current Report (Form 8-K), Ex. 99.1 (Oct. 21, 2010); Press Release, CoStar Grp., Inc., *Jones Lang LaSalle Signs New Enterprise Agreement*, *supra* note 106.

[110] Press Release, CoStar Grp., Inc., *CoStar Group Signs Landmark Global Agreement With CBRE*, *supra* note 51.

investment space available for lease and/or sale and transaction information with respect to properties that Licensee owns, controls, represents or holds exclusives"; the terms in effect on June 1, 2022, contain the same obligation, and the current terms carry it forward.[111] CoStar has told investors since 2006 that "[b]ecause of the importance commercial real estate professionals place on our data and our prominent position in the industry, many of these professionals routinely take the initiative and proactively report available space and transactions to our researchers," and in 2025 that it has "set up direct feeds from larger apartment sites, owners, and brokers."[112]

96. CoStar is the industry standard *because* the Broker Defendants each agreed to use it and to feed it—not the other way around. Indeed, CoStar's platform is only useful to market participants to the extent that it is actually used by such participants. As the number of users increases, the value of the platform also increases. CoStar's value thus depends on the Broker Defendants—the largest and most prominent participants in the commercial leasing market—using the platform. Similarly, the value of CoStar to each Broker Defendant depends on each competing Broker Defendant also using CoStar.

97. Consistent with this dynamic, when CoStar acquired LoopNet in 2012, the Federal Trade Commission found that "[s]ignificant network effects characterize the market for CRE listings databases and create a substantial barrier to new entry" and that CoStar's products were of an "indispensable nature"; to preserve CoStar's last national rival, Xceligent, the FTC's order barred CoStar from restricting customers' ability to support Xceligent so that "industry

[111] CoStar Realty Info., Inc., *CoStar Market Analytics Terms and Conditions* § 9 (June 15, 2015), https://www.costar.com/sites/costar.com.na/files/t-cs-june-2015-oct-2016.pdf; CoStar Realty Info., Inc., *CoStar Product Terms and Conditions* § 9 (eff. June 1, 2022); *CoStar License Agreement Terms and Conditions* § 10 (eff. Feb. 6, 2025); *see Archived Terms and Conditions*, CoStar, https://www.costar.com/about/archived-terms-conditions (last visited Sept. 30, 2026).

[112] CoStar Grp., Inc., Annual Report (Form 10-K), at 5 (Mar. 7, 2006); Annual Report (Form 10-K), at 9 (Feb. 20, 2025).

participants, including the largest national CRE brokerage firms, can bolster entry efforts—whether through financial investment, CRE information-sharing, or public endorsement—without fear of reprisal."[113] Xceligent ceased operations in December 2017, and within two months CoStar had signed roughly one thousand former Xceligent brokerage firms, whose brokers, CoStar's chief executive told investors, "are regularly contributing updates and sharing information with our research team much more proactively than they had been."[114]

#### *ii. Broker Defendants Disclosed Competitively Sensitive Lease Data Against Their Unilateral Self-Interest*

98. The lease transaction information that the Broker Defendants were required and encouraged to submit to CoStar included competitively sensitive, non-public data, such as effective rents net of concessions, free rent periods, tenant improvement allowances, escalation terms, and lease start and end dates. Absent coordination, the routine disclosure of such information would be against a broker's unilateral economic self-interest. Revealing bottom-line lease terms and concessions risks weakening a broker's negotiating position by allowing direct competitors—representing rival landlords or tenants—to infer pricing strategies, reservation points, and resistance to concessions.

99. Indeed, Broker Defendants' vertical agreements with CoStar have a horizontal effect. The exchange of current, disaggregated pricing and concession data among competitors reduces uncertainty and facilitates coordinated outcomes. Nonetheless, the Broker Defendants

---

[113] Fed. Trade Comm'n, *CoStar Group, Inc., Lonestar Acquisition Sub, Inc., and LoopNet, Inc.; Analysis of Agreement Containing Consent Order To Aid Public Comment*, 77 Fed. Reg. 26009, 26011–12 (May 2, 2012).

[114] Jon Banister, *Gift Baskets And Apple Watches: How CoStar Courted 1,000 Former Xceligent Clients In 2 Months*, Bisnow (Feb. 22, 2018), https://www.bisnow.com/news/national/commercial-real-estate/costar-converts-over-1000-former-xceligent-companies-closes-forrent-acquistion-85368 (last visited Sept. 30, 2026).

supplied precisely this type of information to CoStar on a recurring basis under their vertical agreements with CoStar.

100. They did so because participation provided access to the same non-public, transaction-level lease data submitted by their direct competitors, enabling each Broker Defendant to observe prevailing market terms, benchmark its own negotiations, and adjust its conduct accordingly. In other words, the value of submitting sensitive lease information depended on reciprocal participation by competing brokers and landlords, without which disclosure would have conferred no rational competitive benefit.

101. For example, among other things, a broker that unilaterally published its lease terms and concessions could expect (i) competing brokers and landlords to use that information to undercut the broker in subsequent transactions and (ii) tenants to demand similar terms and concessions in future transactions. In a world where its competitors are not also sharing information, the broker therefore reduces its profits by sharing its transaction data, and has no unilateral incentive to do so. Sharing non-public transaction information only becomes rational when competitors share a mutual understanding that they will each share their data, and will use that information to increase prices rather than undercut each other.

102. The conclusion that brokers would not share information absent reciprocal participation follows from settled economics. A landlord's willingness to accept a lower effective rent, grant free rent, or fund tenant improvements is private information—the commercial real estate equivalent of a seller's cost. Economists who study information sharing among competitors have shown that where firms compete on price and the information at issue is firm-specific, each firm's dominant strategy, acting alone, is to conceal it,[115] and that "there is never a mutual

[115] Esther Gal-Or, *Information Transmission—Cournot and Bertrand Equilibria*, 53 Rev. Econ. Stud. 85, 85, 91–92 (1986); *see also* Xavier Vives, *Information Sharing Among Firms*, in The New

incentive for all firms in an industry to share unless they may cooperate on strategy once information has been shared."[116] Information pools among competitors are accordingly modeled not as unilateral conduct but as collective arrangements that operate "on a quid pro quo basis."[117]

103. Such pools are also fragile. If a firm could obtain the pooled information without contributing its own, every firm would prefer to free-ride and none would contribute; a costly information pool is stable only if access is conditioned on participation, because otherwise "[e]veryone wants a free ride."[118] CoStar's structure supplies that condition: the lease comps database is available only to paying licensees who are obligated—and prompted by CoStar—to provide similar information. Network effects explain why each broker wants *others* to contribute; they don't explain why a broker would disclose its own confidential deal terms rather than consume its rivals'—unless contribution is the condition of access and each expects the others to reciprocate.

104. To further encourage participation, CoStar verifies the data that brokers submit, which builds the trust among participants on which the arrangement depends. Without verification, each broker would have an incentive to misreport rents and concessions to mislead its competitors,

---

Palgrave Dictionary of Economics (2008), at 1–2 (IESE pagination) (summarizing the literature).

[116] Richard N. Clarke, *Collusion and the Incentives for Information Sharing*, 14 Bell J. Econ. 383, 383 (1983).

[117] Alison J. Kirby, *Trade Associations as Information Exchange Mechanisms*, 19 RAND J. Econ. 138, 138 (1988); *see also* Joseph E. Harrington, Jr. & Andrzej Skrzypacz, *Private Monitoring and Communication in Cartels: Explaining Recent Collusive Practices*, 101 Am. Econ. Rev. 2425, 2425–27 (2011); Yu Awaya & Vijay Krishna, *Information Exchange in Cartels*, 51 RAND J. Econ. 421, 421 (2020) (where collusion is otherwise "difficult," firms' reporting of private sales to a third party that publishes only aggregate sales makes "nearly perfect collusion" possible).

[118] Xavier Vives, *Trade Association Disclosure Rules, Incentives to Share Information, and Welfare*, 21 RAND J. Econ. 409, 409, 412, 418 (1990); Vives, *Information Sharing Among Firms*, *supra* note 115, at 2 (IESE pagination) (under a non-exclusionary disclosure rule, costly sharing "will not ensue" because a firm "can free ride" on others' disclosures, whereas "[w]ith an exclusionary disclosure rule," sharing "may occur if the membership fee is not too high").

and the exchange would lose its value. CoStar performs that verification function through its research staff of approximately 1,600, which contacts brokers and owners, cross-checks reported terms, and standardizes them into comparable fields such as effective rent net of concessions. CoStar thus seeks to ensure that brokers, including the Broker Defendants, financially benefit from disclosing information that, if shared, would ordinarily (in the absence of coordination) cause those brokers financial harm.

#### *iii. Broker Defendants Submitted Lease Data with Knowledge of Reciprocal Participation by Competitors*

105. The Broker Defendants understood that CoStar's lease comps database was populated by nonpublic information from multiple competing market participants and that the transaction-level information they submitted would be made available to other CoStar subscribers. CoStar's Terms expressly authorize the redistribution and use of submitted data within CoStar's products,[119] making clear that information provided by one broker would not remain siloed or exclusive.

106. CoStar's product descriptions and marketing reinforce this understanding by characterizing the platform as delivering broad, market-wide commercial real estate information and analytics, offering subscribers access to millions of detailed lease records that can be searched and analyzed alongside property, tenant, and ownership data. *See, e.g.*, Figure 3.

---

[119] *Id.*




**Figure 3**: YouTube ad for CoStar's lease comps, advertising that "commercial real estate professionals use CoStar to see key details on over 14.9 million lease transactions. With CoStar, you'll see the lease transactions and deal terms that matter to you, including tenant information, starting and effective rent, lease length, time on market, and the players involved." [120]

107. Each Broker Defendant therefore submitted non-public lease transaction data knowing that it would be shared with competitors and with the understanding that competitors

[120] CoStar, *CoStar In A Minute | Lease Comps*, YouTube (Apr. 16, 2024), https://www.youtube.com/watch?v=oL1G16UJ4Gg (last visited Sept. 30, 2026).

were simultaneously contributing similar data. Participation was thus conditional rather than unilateral, as no rational broker or landlord would repeatedly disclose confidential lease pricing, concessions, and deal economics absent such mutual reliance.

108. This shared understanding was reinforced through CoStar's onboarding processes, product demonstrations, and training materials emphasizing the breadth, accuracy, and market coverage of the lease comps database.[121]

### C. Broker Defendants Formed and Implemented the Rim

#### *i. Broker Defendants Entered into a Horizontal Agreement to Exchange Non-Public Lease Data*

109. Through CoStar, competing Broker Defendants entered into a horizontal agreement, inferred from their conduct and shared understanding, to exchange current, non-public lease pricing and concession information.

110. The existence of this agreement is supported by the following circumstantial facts (among others): (i) widespread and simultaneous participation by competing brokers in submitting and accessing non-public lease transaction data through CoStar, despite the costs of doing so—including CoStar subscription fees and the staffing required to keep the platform updated on a timely basis; (ii) conduct against unilateral self-interest, in that each Broker Defendant repeatedly disclosed sensitive lease pricing and concession information that would ordinarily be kept confidential, thereby exposing its negotiating position to direct competitors; and (iii) conditional participation, because the value of submitting such information depended on competitors

[121] CoStar Grp., Inc., *The Power of Knowing: CoStar for Commercial Real Estate Professionals* (2021), https://www.costar.com/sites/costar.com.na/files/costar-brochure---general.pdf (last visited Sept. 30, 2026) (listing 48 "Top commercial real estate firms rely on CoStar").

contributing similar data, as understood by market participants, ensuring that the database reflected the broader market rather than isolated transactions.

111. The purpose and effect of this hub-and-spoke conspiracy was to fix, stabilize, or otherwise coordinate effective rents and lease concessions by eliminating or reducing uncertainty over competitors' pricing and pricing strategies. As set forth in Section VI below, economic analysis confirms that the hub-and-spoke conspiracy reduced pricing uncertainty, weakened competition, and kept rents artificially high. For example, from 2015 to 2025, every 1-point increase in CoStar's market share corresponded to a 0.3% to 0.8% increase in rent per square foot across industrial, office, and retail leases.

112. Access to current lease comps through CoStar allowed Broker Defendants to observe competitors' effective rents and concessions for comparable properties, reducing uncertainty about prevailing market terms and diminishing reliance on independent negotiation or market testing in the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market. Indeed, CoStar's website markets to its clients that it can help "optimize your pricing" by using "verified sale and lease comps to value your properties, set rents and evaluate investment opportunities."[122]

113. Brokers and other industry participants tout how CoStar's platform helps them raise prices and otherwise increase revenue. One property manager explained: "I was looking for a tenant for our commercial space, and I initially surmised that we could likely find a lease deal for $10 per square foot. I felt this was a bit low, so I did further research in the CoStar database, and learned similar spaces were leasing for $18 per square foot. We earned $240,000 more than we

[122] *Owners and Investors*, *supra* note 1.

expected in our first month of using CoStar."[123] The property manager further explained that—because of CoStar—it was "able to sign our prospective tenant at the best price" and that "CoStar has boosted my confidence – I'm quickly prepared to speak to any prospective tenant knowing I have the latest data at my fingertips."[124]

114. Capworth Commercial Realty, a brokerage, similarly stated that "CoStar is the reason why we've been able to increase our revenues by 25% in our first year of using the product."[125] Defendant JLL reported that "CoStar has been one of our integral partners in helping JLL to increase its revenues by 20 percent in the past year alone."[126] And Marcus & Millichap, another large brokerage, reported: "By using CoStar, we've been able to increase our revenues by 25% - and double the value of broker commissions."[127]

115. JLL executives further stated that "the first place [brokers] need to include the information is in the CoStar database," that listings placed on CoStar "generate leads fast," and that "it just doesn't get better than that."[128] CoStar functions as the default and indispensable

---

[123] CoStar Grp., Inc., *Lease Comps Product Information* (Aug. 20, 2018), archived at https://web.archive.org/web/20180820041042/http:/www.costar.com/docs/default-source/costar_compare_pdfs/lease_comps.pdf?sfvrsn=2.

[124] CoStar Grp., Inc., *Manakin Property Services Earns $240K in a Single Month, Cuts Research Time by 70 Percent Using CoStar Suite*, https://www.costar.com/sites/costar.com.na/files/2021-07/manakin-property-services-case-study.pdf (last visited Sept. 30, 2026).

[125] *Capworth Commercial Realty Testimonial*, *supra* note 85.

[126] CoStar Grp., Inc., *Case Study: JLL Boosts Productivity, Fuels Continued Market Leadership Using CoStar Suite* (Feb. 2023), https://www.costar.com/sites/costar.com.na/files/2023-02/case-study---jll.pdf; *see also* CoStar Grp., Inc., *Case Study: JG Capital Realty Inc. Firm Uses CoStar and LoopNet to Boost Revenues by 25%; Finds 70% More Listings* (Feb. 2023), https://www.costar.com/sites/costar.com.na/files/2023-02/case-study---jg-capital-realty_0.pdf (CoStar helped him reduce research time by 80% and increase revenues by 25%).

[127] *Commercial Real Estate Brokers Compete and Win with CoStar*, CoStar, https://www.costar.com/campaign/brokers (last visited Sept. 30, 2026).

[128] *Id.*

platform through which Broker Defendants access market information, distribute listings, and compete for leasing business.

116. Industry participants and CoStar emphasize CoStar's importance to price setting. Chesapeake Realty Partners touts CoStar data's ability to "compel our property managers to make sure rents are set appropriately," while CoStar boasts that it has enabled Chesapeake to "[a]void having to concede rent for occupancies rents."[129] Indeed, CoStar informs "commercial real estate professionals" that its data and services will enable them to "immediately assess what rents their competitors are charging this minute; understand the concessions they're offering right now; and set rents competitively to achieve the highest possible incomes on their properties."[130] In another case study, CoStar states that it provided "[t]imely competitive rent data"—including "[r]eal-time, constantly verified and updated information about competitor rents, occupancies, and concessions – down to the individual unit level"—that enabled its customer to "maximize rents and occupancy."[131]

117. Although some (but not all) of these statements concern CoStar's related "Market Analytics" product, CoStar markets its lease comparables to landlords as a tool for setting rents and to brokers as a tool for earning more. Under the heading "Optimize Your Pricing," CoStar tells owners and investors: "Use verified sale and lease comps to value your properties, set rents and

---

[129] CoStar Grp., Inc., *Chesapeake Realty Partners Uses Real-Time Insights To Make Profitable Decisions*, https://www.costar.com/sites/costar.com.na/files/2021-07/chesapeake-realty-partners-case-study.pdf (last visited Sept. 30, 2026).

[130] CoStar Grp., Inc., *Heatherwood Gains Competitive Edge, Furthers Reputation Using CoStar Market Analytics*, https://www.costar.com/sites/costar.com.na/files/2021-07/heatherwood-casestudy40b04f6c06876090b239ff0500412858.pdf (last visited Sept. 30, 2026).

[131] CoStar Grp., Inc., *Bozzuto Leverages CoStar Market Analytics to Help Clients Act on New Opportunities in Real Time*, https://www.costar.com/sites/costar.com.na/files/2021-07/bozzuto-case-study.pdf (last visited Sept. 30, 2026).

evaluate investment opportunities," and states that "Over 43K Owners and Investors Choose CoStar."[132] CoStar tells brokers that, "[w]hether you represent sellers, buyers, landlords, or tenants, CoStar gives you the data to prospect smarter, negotiate better, and close more deals," that they should "[u]se verified comps . . . to uncover price benchmarks" to "Help Your Clients Price Their Listings and Properties," and that they can "earn more commissions"; it states that "Over 81K Brokers Choose CoStar," and the broker testimonial it features is delivered by an Executive Director of Defendant Cushman & Wakefield.[133]

118. CoStar's value proposition is thus simple: in exchange for paying between approximately $5,000 and $30,000 per user per year for a subscription, landlords and brokers can substantially increase their revenues through higher rents and higher commissions.

119. Because a broker's fee is a fixed percentage of rent, a broker gains from every dollar of rent until pushing rents higher costs it enough lost transactions to outweigh the gain. The exchange of current, deal-specific effective-rent and concession data through CoStar relaxes that limit. When every landlord's broker can see the terms its rivals have just accepted, each can hold out for those terms with less risk of being undercut. The commission supplies the motive, and the information exchange lowers the competitive cost of acting on it.

120. In 2026 CoStar launched "Rent Benchmark," which it describes as showing subscribers "how commercial deals are being structured across US markets" through "starting rents, net effective rents, tenant improvement allowances, free rent concessions, rent escalations, and lease terms," so that they can "understand how landlords are structuring deals and competing for tenants."[134] CoStar's chief executive told investors that the product is "built from 4 million AI-

[132] *Owners and Investors*, *supra* note 1.

[133] *Brokers*, CoStar, https://www.costar.com/who-we-serve/brokers (last visited Sept. 30, 2026).

[134] *CoStar Rent Benchmark*, CoStar, https://www.costar.com/products/rent-benchmark (last

abstracted actual leases and lease documents"—"[r]ather than using less reliable asking rents or broker report information, this is real data"—and that net new bookings to brokers had increased 48% year over year, "including a multi-year renewal of our largest brokerage client." Describing a companion benchmarking product on the same call, he explained that a participant who discovers that "peers are at a more conservative" level would be prompted to make "a shift" in their own policy.[135] The same dynamic operates when landlord-side brokers see that peers are achieving higher effective rents or granting fewer concessions.

### *ii. Broker Defendants Implemented the Horizontal Agreement Through Shared Use of CoStar's Lease Comps System*

121. By providing competitors with ongoing access to current, transaction-level lease data, the information exchange through CoStar altered the conditions under which Broker Defendants made leasing decisions. Broker Defendants themselves describe CoStar as a centralized and indispensable source of market information. For example, Defendant JLL has described CoStar as its "principal and most significant supplier of third-party market data," explaining that it has "discontinued use of all other commercial real estate data services in favor of CoStar." JLL further stated that its listings placed on CoStar are "put in front of thousands of other brokers."[136]

122. Similarly, other brokers emphasize the collective and continuous nature of data submission to CoStar. As one CoStar case study explains:

> If we know a deal has transacted, we send an email to our researcher at CoStar, and they verify it immediately[.]

visited Sept. 30, 2026).

[135] CoStar Grp., Inc., Q2 2026 Earnings Call (July 28, 2026) (remarks of Andrew Florance).

[136] *Case Study: JLL Boosts Productivity, Fuels Continued Market Leadership Using CoStar Suite*, *supra* note 126.

> Everyone should treat CoStar as their own database. This will help maintain the most accurate database in the market.[137]

123. Rather than negotiating in isolation, Broker Defendants therefore operated with a shared understanding of prevailing lease terms derived from the same centralized data source—described by one broker as "an assistant, researcher, and analyst, all in one." [138]

124. Accordingly, the Broker Defendants' parallel participation in CoStar's lease comps system connected otherwise competing brokers through shared access to non-public lease information, consistent with the rim of a hub-and-spoke conspiracy.

**D. Defendants Exchanged Current, Non-Public Lease Transaction Data**

125. The lease comps data visible to and accessible by competing brokers and landlords through CoStar consisted of current, deal-specific, non-public transaction information that went directly to the bottom-line economic terms of commercial lease negotiations. This competitor-facing data included, among other things:

- Gross Asking Rent: Total rent asked for by a landlord including utilities, taxes, insurance, and maintenance.
- Gross Starting Rent: Total rent paid by tenant including utilities, taxes, and insurance.
- Effective Rent: Rent paid by tenant, including any rent-free periods.
- Discount to Asking Rent: Discount given by landlord on rent.
- TI Allowance: Tenant improvement allowance. A benefit given by a landlord to a tenant as reimbursement for property improvements.
- Months Free Rent: Months where rent is not paid. A benefit given by landlords.
- Months on Market: How long it takes for a property to be rented after being listed.
- Deal Size: The total value of the lease.
- Lease Term in Years: Length of lease.

---

[137] *Capworth Commercial Realty Testimonial*, *supra* note 85.

[138] *Case Study: JG Capital Realty Inc. Firm Uses CoStar and LoopNet to Boost Revenues by 25%; Finds 70% More Listings*, *supra* note 126.

- Floor Number: Number of floors in the property.

126. This information was not aggregated or meaningfully anonymized. Instead, CoStar presents lease comps at the property and unit level, allowing subscribers to identify comparable transactions for specific buildings and spaces and to infer competitors' pricing strategies, concession thresholds, and negotiation outcomes. The data reflects completed lease transactions, routinely revealing the actual terms landlords accepted rather than asking prices or aspirational listings. In the words of CoStar:[139]

> Powered by 37 years of commercial real estate data and analytics, 1,600 researchers and cutting-edge technology, commercial real estate professionals use CoStar to see key details on over 14.9 million lease transactions. With CoStar, you'll see the lease transactions and deal terms that matter to you, including tenant information, starting and effective rent, lease length, time on the market, and the players involved. You can even generate leasing analytics for a custom set of properties. Get the data you need to make informed commercial real estate decisions in the markets that matter to you.

127. CoStar has similarly touted its platform as enabling customers to "[f]ind a comprehensive inventory of properties, for-sale and for-lease listings" and "[e]xplore who is buying and selling commercial real estate and know the details behind the deals."[140] When selecting a building, users are able to see all the units available within (see Figure 4). This enables them to see competitors' properties in a market.

---

[139] *CoStar In A Minute | Lease Comps*, *supra* note 120.

[140] CoStar Grp., Inc., *The Power of Knowing*, *supra* note 121.

**REVIEWING A PROPERTY'S INFORMATION**

# Options for Reviewing

**There are two ways to review a property's information.**

1. If you want to do it in Map View, you can click View More on the search result. This lets you examine some of the property's information while still keeping the map in view.
2. To view all of the property's information, click on the property's address or photos. This will bring you to the property's Detail Page.




**A Detail Page contains all the information CoStar has on the property. You'll use this to see if a property meets your needs. The Detail Page is organized by tabs.**

3. **Summary:** Displays basic information about the building, its location and surrounding infrastructure, as well as summarized bits of information from the other tabs.

**Lease:** Contains the stacking plan, any lease comparables, and any available information about the building's available spaces.

**Lease Analysis:** Lets you create a cash flow model that includes the property or some of its spaces.

**Peers:** Shows you comparable properties as determined by CoStar. You can also modify these results.

**Sale:** Shows you relevant sale comparables, any available information on previous sales, and information on the current sale listing, if applicable.

**Tenant:** Contains any available information on the current tenants as well as the stacking plan.

**Analytics:** Contains analytic information on the property, submarket, and market.

**Changes:** Houses a running record of important changes to the property such as space additions, space removals, sale status changes, and more.




**Demographics:** Find stats on demographic factors such as the area's population, household income, and more.

**Public Record:** View any public record information that is available for the property.

**Contacts:** Shows all contacts associated with a building, as well as their contact information. A research contact is also displayed at the bottom should you need help finding additional building information.

**Images:** View the images you see on the right of the Summary page more easily.

**Map:** Shows you the property on a Google map, complete with street view and enhanced with CoStar's analytic layer options.

**My Data:** Lets you create, view and edit custom data sets, which you can update to include information from this detail page if desired.

**News:** See any CoStar News stories related to the property.

CoStar

18 /

**Figure 4**: Reviewing properties on CoStar and accessing lease comps.[141]

141 CoStar Grp., Inc., *Introduction to For Lease* (Feb. 2023),

128. The lease comps data is current and continuously updated.[142] CoStar represents that its platform provides near real-time access to transaction information, driven by constant updates to its listings database and ongoing communications between CoStar researchers and market participants. CoStar emphasizes that subscribers can access updated lease data "without waiting for periodic reports,"[143] and that its researchers update listings and transaction records on a rolling basis throughout the day. CoStar customers are encouraged and contractually required to update listings frequently and to report lease executions promptly, ensuring that the database reflects close to real-time market outcomes rather than historical averages.[144]

129. Figure 5 below shows the results a subscriber searching specific lease comps would see. Data entries in blue reflect "My Data," which are the lease comps that the subscriber conducting this search had previously inputted. It is "their own private lease comps database" showing "proprietary data" that "[o]nly [they] can see."[145] Any data in black reflect data from "CoStar Research." This data is collected by CoStar by "speaking with thousands of industry

---

https://www.costar.com/sites/costar.com.na/files/2023-02/introduction-to-for-lease.pdf (last visited Sept. 30, 2026).

[142] *See* Amazon Web Servs., Inc., *Achieving 30-Millisecond Search Results Using Amazon OpenSearch Service with CoStar Group* (2023), https://aws.amazon.com/solutions/case-studies/costar-opensearch-case-study/ (last visited Sept. 30, 2026) ("In most use cases, CoStar stores model topic data using Amazon DynamoDB, a fully managed, serverless, key-value NoSQL database service for single-digit millisecond performance at virtually any scale.").

[143] CoStar Grp., Inc., *Market Analytics for Owners, Investors and Lenders* (July 2021), https://costar.co.uk/sites/costar.com.uk/files/resources/files/2021-07/CoStar%20Market%20Analytics%20for%20Owners%2C%20Investors%20and%20Lenders.pdf (last visited Apr. 15, 2026).

[144] *Capworth Commercial Realty Testimonial*, *supra* note 85 ("If we know a deal has transacted, we send an email to our researcher at CoStar, and they verify it immediately[.]").

[145] *Lease Comps Sources* (tutorial video), CoStar Lease Comps Help, http://bcove.me/umohzlkh (last visited Apr. 15, 2026).

participants each day to gather and maintain information on lease transactions."[146] The data collected "includes Tenant Names, Square Footage, Sign & Move Date, Starting & Effective Rent, Concessions, Lease Term, and more" and "is searchable by CoStar Lease Comps subscribers."[147]

130. The added red frames show how the conspiracy operates. The same data entry appears in both blue and black. This means that the "private" data was directly shared with the CoStar "research" team and is now fully available to any subscriber at the same level of granularity.




| Sign Date | Start Date | Address | City | Floor | SF Leased | Rent/SF/Yr | Services | Rent Type | Use | Lease Type | Term | Ex |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan 2015 | Feb 2015 | 14 Wall St | New York | 5th | 5,000 | $35.89 | FS | Effective | Office | Direct | 5 yrs | Ja |
| Sep 2014 | Nov 2014 | 14 Wall St | New York | 4th | 5,018 | $38.00 | +ELEC | Asking | Office | Direct | 5 yrs | N |
| Sep 2014 | Nov 2014 | 14 Wall St | New York | 4th | 5,018 | $38.00 | MG | Asking | Office | Direct | 5 yrs | N |
| Aug 2014 | Sep 2014 | 14 Wall St | New York | 4th | 4,546 | $38.00 | +ELEC | Asking | Office | Direct | | |
| Aug 2014 | Sep 2014 | 14 Wall St | New York | 4th | 4,546 | $41.04 | MG | Effective | Office | Direct | 5 yrs | Au |
| Aug 2014 | Oct 2014 | 88 Pine St | New York | 5th | 5,359 | $41.00 | +ELEC | Starting | Office | Direct | 7 yrs 4 m... | Fe |
| Jul 2014 | Sep 2014 | 40 Wall St | New York | 47th | 4,730 | $47.00 | +ELEC | Asking | Office | Direct | | |
| Mar 2014 | Jun 2014 | 14 Wall St | New York | 3rd | 5,006 | $38.00 | +ELEC | Asking | Office | Direct | | |
| Mar 2014 | Jun 2014 | 14 Wall St | New York | 3rd | 5,006 | $38.00 | MG | Asking | Office | Direct | | |
| Feb 2014 | May 2014 | 40 Wall St | New York | 25th | 4,698 | $40.00 | +ELEC | Starting | Office | Direct | 10 yrs | M |
| Feb 2014 | Mar 2014 | 17 State St | New York | 4th | 4,507 | | | | Office | Sublease | | Fe |
| Jan 2014 | Apr 2014 | 17 State St | New York | 3rd | 5,138 | | +ELEC | | Office | Direct | 10 yrs | M |
| Jan 2014 | Mar 2014 | 17 State St | New York | 22nd | 5,213 | | +ELEC | | Office | Direct | | |
| Jan 2014 | Jan 2015 | 14 Wall St | New York | 5th | 4,931 | $40.48 | MG | Effective | Office | Direct | 10 yrs | D |
| Dec 2013 | Jan 2014 | 100 Wall St | New York | 2nd | 5,243 | | +ELEC | | Office | Direct | | |
| | Jan 2015 | 32 Old Slip | New York | | 4,612 | | | | Office | Direct | 120 yrs | D |
| | Jan 2015 | 14 Wall St | New York | | 4,931 | | | | Office | Direct | 120 yrs | D |
| | Jan 2015 | 40 Wall St | New York | | 4,698 | | | | Office | Direct | 10 yrs | D |
| | Jan 2015 | 33 Whitehall St | New York | | 4,573 | | | | Office | Direct | 10 yrs | D |

**Figure 5**: Screenshot showing a lease comps search; highlighted in red are private data that were made public through CoStar

131. Subscribers can search, filter, and sort lease comps by building, submarket, size, tenant type, execution date, and economic terms, enabling direct comparisons among competing

[146] *Id.*

[147] *Id.*

landlords and brokers. By revealing effective rents net of concessions—rather than headline asking rents—the platform exposes the true economic price of leasing transactions, information that would otherwise remain confidential between the negotiating parties.

132. The data is not anonymized. Subscribers can identify specific owners using "intuitive search filters including owner type, portfolio composition and transaction history to quickly identify suitable owner and investor targets,"[148] as shown in Figure 6.




**Figure 6**: Searching owners on CoStar[149]

133. Similarly, subscribers can obtain "a detailed view of commercial tenants at the location or portfolio level." CoStar "continuously tracks commercial tenants across industries and

---

[148] *CoStar Owners*, CoStar (U.K.), https://costar.co.uk/products/owners (last visited Sept. 30, 2026).

[149] *Id.*

geographies,”[150] allowing users to identify specific tenants associated with particular properties. Figure 7 shows a non-anonymized list of tenants available to subscribers.




| Tenant Name | Industry | Territory | HQ Market | Locations | SF Occupied | Highest Use By SF | Employees | Growth |
|---|---|---|---|---|---|---|---|---|
| Walmart Inc. | Retailer | International | Northwest Arkansas | 6,437 | 958,124,629 | 83% Retail | 2,100,000 | Stable |
| Amazon | Retailer | International | Seattle | 2,707 | 777,296,070 | 91% Industrial | 1,551,000 | Stable |
| The Home Depot Inc | Retailer | International | Atlanta | 3,331 | 356,251,898 | 67% Retail | 500,000 | Growing |
| Target Corporation | Retailer | International | Minneapolis | 2,044 | 297,973,642 | 79% Retail | 400,000 | Stable |
| Lowe's Companies, Inc. | Retailer | International | Charlotte | 1,845 | 270,194,591 | 81% Retail | 340,000 | Stable |
| Berkshire Hathaway Inc. | Finance and Insurance | International | Omaha | 15,724 | 235,374,347 | 64% Industrial | 396,500 | Stable |
| Ford Motor Company | Manufacturing | International | Detroit | 4,624 | 214,713,200 | 70% Industrial | 177,000 | Stable |
| Volkswagen AG | Wholesaler | International | Germany North | 1,854 | 208,940,990 | 82% Industrial | 672,000 | Stable |
| Kroger | Retailer | National | Cincinnati | 3,048 | 204,092,307 | 83% Retail | 430,000 | Stable |
| Dollar General Corporation | Retailer | International | Nashville | 18,932 | 194,084,664 | 87% Retail | 19,643 | Growing |
| Dollar Tree, Inc. | Retailer | International | Norfolk | 16,740 | 180,150,128 | 89% Retail | 211,000 | Downsizing |
| FedEx Corporation | Transportation and Warehousing | International | Memphis | 3,338 | 166,514,562 | 90% Industrial | 530,000 | Stable |
| General Motors Company | Manufacturing | International | Detroit | 7,758 | 153,419,907 | 53% Industrial | 165,000 | Stable |
| The TJX Companies, Inc. | Retailer | International | Boston | 4,722 | 145,215,944 | 81% Retail | 349,000 | Stable |
| Costco Wholesale Corporation | Retailer | International | Seattle | 964 | 142,766,235 | 88% Retail | 316,000 | Growing |
| Walgreens Boots Alliance | Retailer | International | Chicago | 9,902 | 127,991,498 | 88% Retail | 311,000 | Downsizing |
| Albertsons Companies, Inc. | Retailer | National | Boise | 2,353 | 120,657,351 | 87% Retail | 290,000 | Stable |
| PepsiCo, Inc. | Manufacturing | International | New York | 863 | 113,343,436 | 96% Industrial | 318,000 | Stable |
| Apollo Global Management | Finance and Insurance | International | New York | 2,684 | 107,221,600 | 58% Industrial | 4,900 | Stable |
| Kohl's | Retailer | National | Milwaukee | 1,126 | 101,058,314 | 90% Retail | 110,000 | Growing |



**Figure 7**: Searching tenants on CoStar[151]

134. This exchange of current, disaggregated, transaction-level pricing and concession data among competitors created opportunity for coordination because it reduces uncertainty about competitors’ pricing behavior and future conduct. CoStar markets its platform as providing *exactly* this type of information. Users get access to real-time data “without waiting for periodic reports,”[152] driven by its large number of daily phone calls and round-the-clock updates to its

---

[150] *CoStar Tenants*, CoStar (U.K.), https://www.costar.co.uk/products/tenants (last visited Sept. 30, 2026).

[151] *Id.*

[152] CoStar Grp., Inc., *Market Analytics for Owners, Investors and Lenders*, *supra* note 143.

listings databases. CoStar's lease comps system therefore delivers current, transaction-level information in a form that allows competing brokers and landlords to observe recent lease outcomes, assess how aggressively competitors are pricing space, and adjust their own negotiation strategies accordingly.

135. Market participants themselves describe using CoStar's lease comps data to monitor competitors' leasing activity and inform negotiation strategy. For example, an executive at Fiera Real Estate explained that his team "needs to constantly monitor activity in key markets so that we are armed with accurate comps to help negotiate leases and make the best decisions, quickly," and that CoStar allows "access to leasing velocity and lease deals done for a specific period in our markets of interest."[153]

136. In short, the data exchanged through CoStar is competitively sensitive by design: it is relevant, timely, disaggregated, transaction-specific, tied to identifiable properties and units, and focused on the effective economic terms that determine leasing prices.

**E. Defendants Rejected Less Restrictive Alternatives**

137. Information that is aggregated across multiple market participants, stripped of property- and transaction-level identifiers, and released only after a meaningful delay does not reveal competitors' current pricing strategies and is far less likely to facilitate coordination.

138. Such less restrictive alternatives are well known and widely used in the CRE industry. For example, providers such as *MSCI Real Capital Analytics* and *Moody's Analytics REIS* publish market-level commercial real estate data that is aggregated across properties and participants and typically reported with a historical lag. These products report statistics such as

[153] CoStar Grp., Inc., *Fiera Real Estate Case Study* (Feb. 2023), https://www.costar.com/sites/costar.com.na/files/2023-02/case-study---fiera-real-estate.pdf (last visited Sept. 30, 2026).

average rents, vacancy rates, absorption, pricing indices, and market trends at the market or submarket level, without disclosing property-specific or unit-level lease terms. These products are widely relied upon by investors, lenders, and analysts to assess market conditions and long-term trends, demonstrating that useful and commercially valuable market intelligence can be provided without exposing current, deal-specific pricing information.

139. Despite the availability and feasibility of these less restrictive alternatives, CoStar instead facilitated the routine exchange of current, disaggregated, property- and unit-level lease transaction data, including effective rents and concessions. By distributing the most competitively sensitive form of information—rather than aggregated or lagged data—CoStar and the Broker Defendants adopted an approach that exceeded what was necessary to provide market insight, in direct violation of Section 1 of the Sherman Act.

140. Competition authorities have long recognized the distinction between competitively sensitive information exchanges and aggregated and lagged benchmarks. The OECD has concluded that "[t]he anti-competitive risks associated with the direct exchange of prices can be significantly reduced by requiring the data exchanged to be sufficiently aggregated and old," because such data are "considerably less useful in reaching and maintaining anti-competitive arrangements than up to date individualised price data."[154] Defendants chose the individualized, current form.

## VI. DEFENDANTS CAUSED ANTICOMPETITIVE EFFECTS IN THE INDUSTRIAL, OFFICE, AND RETAIL LEASE MARKETS

141. Defendants' conduct constitutes a hub-and-spoke conspiracy, in which CoStar facilitated a horizontal agreement among competing brokers to exchange current, non-public lease

[154] OECD, *Price Transparency*, DAFFE/CLP(2001)22, at 10–11 (2001).

pricing and concession information. Because the exchanged information revealed competitors' current effective rents and concessions, it directly constrained price competition and functioned as a mechanism to fix or stabilize prices.

142. Because *per se* price-fixing agreements are inherently anticompetitive, Plaintiff is not required to plead or prove actual market harm. Nevertheless, and in the alternative under the rule of reason, Defendants' conduct produced anticompetitive effects in the relevant markets, as described below.

**A. Defendants Reduced Pricing Uncertainty and Facilitated Coordinated Pricing**

143. The challenged information exchange between Defendants eliminated uncertainty that ordinarily promotes competition in the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market at the local level, including uncertainty regarding competitors' bottom-line effective rents and the concessions offered to comparable tenants. By providing competing brokers and landlords with access to current, transaction-level lease data, Defendants were able to observe recent lease outcomes and prevailing market terms rather than negotiate in isolation or with more limited information.

144. This reduction in uncertainty facilitated coordinated pricing behavior. Armed with near real-time visibility into competitors' effective rents and concessions, Defendants were better able to align asking rents, limit or standardize concessions, and resist tenant negotiations without fear of being undercut. As a result, independent pricing discretion was diminished, and competitive pressures that would otherwise lead to discounting or more aggressive concessions were reduced.

145. Competition in leasing works through discounts that rivals do not see. A landlord that quietly lowers its effective rent or enlarges its concessions wins the tenant before competing landlords can match. Economists have recognized that a significant obstacle to coordinated pricing

is the difficulty of detecting rivals' secret discounts, and that the most effective way to remove it is to give each competitor timely, firm-specific information about the prices its rivals have actually charged.[155] CoStar's lease comps remove that obstacle, with four consequences.

146. *First*, a discount can no longer be secret, so the would-be discounter can no longer win business without being matched; rivals would see the discount and successfully outbid the discounter on the next transaction, and every subsequent prospective tenant would demand the same discount. The information exchange thus increases the economic cost of offering a discount on any given transaction. As a result, discounting is deterred and becomes both less common and smaller in magnitude, and prices are pushed upward on a market-wide basis. This is particularly true because landlords and their brokers are repeat players, with many subsequent transactions to consider. For example, landlords and their brokers often offer leases for many different units in the same building or in similar buildings.

147. *Second*, each landlord's broker learns precisely how much concession the market requires—and no more. The risk of discounting more than necessary to win the deal is thus removed, or at least substantially reduced. Discounting is thus further reduced and prices are pushed further upward on a market-wide basis.

148. *Third*, brokers incur a cost in sharing their information (the financial cost of subscribing to CoStar and the risk of more easily being undercut) that is only rational to incur if it is offset by a mutual understanding that brokers will use the information to coordinate CRE rents upward.

---

[155] George J. Stigler, *A Theory of Oligopoly*, 72 J. Pol. Econ. 44 (1964); Edward J. Green & Robert H. Porter, *Noncooperative Collusion under Imperfect Price Information*, 52 Econometrica 87 (1984); Kai-Uwe Kühn & Xavier Vives, *Information Exchanges Among Firms and Their Impact on Competition* 47–50, 53–54 (European Commission 1995).

149. *Fourth*, because deviations are observable, a mutual understanding across competing landlords and landlord-side brokers to hold the line on concessions becomes enforceable.[156]

150. These are the characteristics that economists and the federal antitrust agencies identify as making an information exchange most dangerous. The agencies' Collaboration Guidelines state that sharing information on price (as here) is more likely to raise concern than sharing other information, that sharing current information (as here) is more likely to raise concern than sharing historical information, and that sharing individual-company data (as here) is more likely to raise concern than sharing aggregated data.[157]

**B. Tenants Were Harmed Even If They Could Access the Information**

151. These problems are in some respects compounded where, as here, the information is not publicly available (indeed, it is not accessible without a costly subscription) and access to the information is skewed toward the landlord side, where broker representation is more common. Under such circumstances, there is an information advantage on the landlord side that enables landlords (and their brokers) to charge higher prices than they otherwise could. Indeed, published academic work has recognized that information asymmetries in CRE leasing benefit landlords and harm tenants.[158]

---

[156] Kühn & Vives, *supra* note 155, at 49–50, 53 (individualized data "allows the design of individualized punishment strategies that single out individual firms"); Marc Ivaldi et al., *The Economics of Tacit Collusion* 22–26 (Final Report for DG Competition, European Commission, Mar. 2003).

[157] U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for Collaborations Among Competitors* § 3.31(b), at 15–16 (Apr. 2000).

[158] Smirniotopoulos & Mathisen, *supra* note 48.

152. Critically, though, the harm of Defendants' conduct does not depend on the information being concealed from prospective tenants or their brokers. For example, the information exchange deters discounting regardless of whether tenants have access to the information: it still, among other things, transforms a landlord or landlord-side broker's decision to offer a one-time discount into a decision to offer a one-time discount *and* provide (i) competitors with the information necessary to undercut the landlord or landlord-side broker on subsequent transactions and (ii) other prospective tenants with the information necessary to demand the same discount on subsequent transactions. In fact, to the extent that tenants have access to the information, their access makes discounting *more costly* for would-be discounters and thus discourages it even more than if the information were concealed from the tenant side. Intuitively, tenants' access to CoStar data matters little if the Broker Defendants use the exchange to collectively elevate CRE rents and minimize discounts, because tenants' alternatives are few and far between—no matter how much market visibility they have.

153. Empirical literature supports the notion that the harm from information sharing among competitors is not eliminated when buyers can also see the exchanged information. For example, economists found that, after Denmark's competition authority began publishing firm-specific concrete transactions prices (on the theory that "publishing such firm-specific price information would improve information on the buyer side," such that "seller competition would be stimulated and average transactions prices pushed down"), prices *increased* by 15–20% within less than a year and converged across firms.[159] The authors concluded that the increase resulted not from "business upturn and/or capacity constraints"—but from "the change in the information

[159] *See* Svend Albaek et al., *Government-Assisted Oligopoly Coordination? A Concrete Case*, 45 J. Indus. Econ. 429, 429–32 (1997).

structure resulting from the publication of firm-specific prices," which "allowed firms to reduce the intensity of oligopoly competition."[160] Indeed, although "secret discounts and price-shading" are hallmarks of a competitive oligopoly, the publication of price information resulted in "the largest discounts" being "abandoned."[161] Recognizing that its efforts had backfired, the competition authority soon "stopped the publication of concrete prices."[162] Notably, similar efforts in the United States also resulted in higher prices.[163]

### C. Defendants Caused Supracompetitive Rents and Harm to Tenants

154. As a consequence of Defendants' conduct, competition in the affected markets was substantially restrained. In markets where Defendants participated in the exchange of non-public lease transaction data through CoStar, effective rents were higher than in comparable markets, and tenants paid inflated prices relative to competitive benchmarks, consistent with reduced uncertainty over competitors' pricing and facilitated coordination.

155. Economic analysis using market data from the top 50 MSAs confirms this impact. Figure 8 shows the correlation between CoStar's market share and rent levels in the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market. As shown, rents in each market are positively correlated with CoStar's market share.

---

[160] *Id.*

[161] *Id.* at 440.

[162] *Id.* at 430.

[163] *Id.* at 441.




**Figure 8:** There is a correlation between CoStar's market share and rent levels in the industrial, office, and retail leasing markets.

156. The relationship between CoStar's presence and rental prices is confirmed by regression analysis, as shown in Figure 9. Using CoStar market share data and controlling for other

factors that may influence rental prices—including MSA-level variables such as GDP, vacancy rates, and inventory levels—Figure 9 shows rental prices increase with CoStar's market share. Results are positive and statistically significant for all three markets—showing rents per square foot increase by 0.3% to 0.8% with each additional point of market share CoStar has in a local MSA market. In other words, all else equal, as the share of transactions listed on CoStar's platform in a given MSA increases, rental prices in the Industrial Lease, Office Lease, and Retail Lease Markets in that MSA also increase.

157. Controlling for factors like MSA-level GDP and vacancy rates helps account for the possibility that economic factors may drive both CoStar adoption and higher commercial rents (*e.g.*, that CoStar chooses to have a greater presence in more lucrative areas). In fact, some MSAs with high GDP per capita such as Houston-The Woodlands-Sugar Land, Salt Lake City, and Hartford-East Hartford-Middletown have a lower CoStar market share than MSAs with lower GDP per capita such as Charlotte-Concord-Gastonia, Milwaukee-Waukesha, and St. Louis.[164] Additionally, the adjusted $R^2$, denoted by "R2 Adj" in Figure 9, indicates that between 56.9% and 72.7% of the variation in commercial rents is explained by the four variables included in the regression analysis.[165]

[164] Statista Research Department, *Per Capita Real Gross Domestic Product of the United States in 2021, by Metropolitan Area (in Chained 2012 U.S. Dollars)*, Statista (Dec. 8, 2022), https://www.statista.com/statistics/248112/per-capita-us-real-gross-domestic-product-gdp-by-metro-area/ (last visited Sept. 30, 2026).

[165] *Coefficient of Determination*, Britannica, https://www.britannica.com/science/coefficient-of-determination (last visited Sept. 30, 2026).

| | Industrial | Office | Retail |
|---|---|---|---|
| | 1 | 2 | 3 |
| Intercept | 1.154*** | 2.931*** | 3.144*** |
| | (0.048) | (0.055) | (0.042) |
| CoStar Market Share | 0.008*** | 0.007*** | 0.003*** |
| | (0.001) | (0.000) | (0.000) |
| MSA GDP | 0.000*** | 0.000*** | 0.000*** |
| | (0.000) | (0.000) | (0.000) |
| Vacancy Rate | -0.036*** | -0.033*** | -0.062*** |
| | (0.002) | (0.001) | (0.002) |
| Inventory (Million SF) | -0.000** | 0.000*** | -0.000 |
| | (0.000) | (0.000) | (0.000) |
| Num.Obs. | 1037 | 1680 | 1680 |
| R2 | 0.570 | 0.647 | 0.728 |
| R2 Adj. | 0.569 | 0.646 | 0.727 |
| Log.Lik. | 125.008 | 380.052 | 999.318 |
| F | 342.644 | 767.712 | 1118.121 |
| RMSE | 0.21 | 0.19 | 0.13 |
| + p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001 | | | |

**Figure 9**: Regression results showing the impact of four variables, including CoStar market share, on commercial rents in a given MSA (2015-2025)[166]

158. These anticompetitive effects were market-wide and flowed directly from Defendants' uniform conduct. By replacing independent negotiation with coordinated reliance on shared, current lease data, Defendants suppressed competition on price and terms, harming

[166] Regression results of log average commercial real estate rent on CoStar market share, including MSA-level controls for GDP, vacancy rates, and inventory levels.

commercial tenants and reducing the benefits of competition in the Industrial Lease, Office Lease, and Retail Lease Markets.

159. Precise estimation of the anticompetitive effects of Defendants' conduct will ultimately require further data than what is publicly available (precisely because Defendants exchanged non-public information) and expert analysis. Nonetheless, the aggregated public information that is available shows a *prima facie* relationship between CoStar penetration and elevated CRE rental prices—even when only comparing areas with moderate CoStar penetration (50-60%) against areas of extremely high CoStar penetration (more than 90%). By construction, this analysis is therefore conservative and provides strong evidence of antitrust injury stemming from Defendants' conduct.

### D. Defendants' Conduct Substantially Affected Interstate Commerce

160. At all relevant times, Defendants' conduct substantially affected interstate commerce. CoStar provides CRE information services nationwide and transmits data, analytics, and communications across state lines. The Broker Defendants operate on a national scale and regularly negotiate and execute commercial leases for tenants engaged in interstate business activity. The challenged conduct affected lease transactions, pricing, and negotiations in multiple states, involved interstate communications and financial transactions, and restrained competition in a manner that had a substantial effect on interstate commerce within the meaning of Section 1 of the Sherman Act.

## VII. CLASS INJURY AND STANDING

161. Defendants' unlawful conduct caused antitrust injury of the type the antitrust laws were intended to prevent, and that flows directly from the challenged restraint. By entering into and implementing a hub-and-spoke conspiracy, or otherwise agreeing, to exchange disaggregated, current, non-public lease pricing and concession information, Defendants suppressed competition

in the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market in the Local Markets and caused commercial tenants to pay supracompetitive rents.

162. Plaintiff and the Classes paid higher effective rents, received fewer concessions, and faced diminished negotiating leverage as a direct and proximate result of Defendants' conduct. These injuries were not speculative or incidental; they were the foreseeable and intended result of Defendants' coordinated actions to stabilize and inflate lease pricing.

## VIII. CLASS ALLEGATIONS

163. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all others similarly situated. The proposed Classes consist of the following:[167]

a. Hub-and-Spoke Class: All persons and entities that leased industrial, office, or retail commercial real estate in the Local Markets during the Class Period, from a landlord that used a Defendant Broker for the transaction.

b. Information Exchange Class: All persons and entities that leased industrial, office, or retail commercial real estate in the Local Markets during the Class Period, from a landlord that was a CoStar client or used a broker for the transaction that was a CoStar client.

164. Excluded from each Class are (i) Defendants, their officers, directors, management, employees, subsidiaries, parents, and affiliates; (ii) the Judge, his or her law clerks, spouse, and

[167] Discovery has not begun in this action. Plaintiff reserves the right to modify these proposed class definitions or to include subclasses (*e.g*, for renters in the Industrial Lease Market, Office Lease Market, or Retail Lease Market) to the extent such modification or inclusion is necessary or appropriate in light of, among other things, information obtained in discovery or expert analysis.

any person within the third degree of relationship living in the Judge's household and the spouse of such a person; and (iii) any federal governmental entities.

165. The members of each Class are so numerous that joinder of all members is impracticable. Commercial tenants in the Local Markets number in the thousands, and Defendants' conduct affected leasing transactions in the Industrial Lease Market, Office Lease Market, and Retail Lease Market throughout the Class Period.

166. Questions of law and fact common to each Class include, but are not limited to:

(a) Whether Defendants entered into a hub-and-spoke conspiracy in violation of Section 1 of the Sherman Act;

(b) Whether Defendants exchanged current, non-public lease pricing and concession data;

(c) Whether Defendants' conduct suppressed competition and inflated effective rents;

(d) Whether Plaintiff and Class members were injured by Defendants' conduct; and

(e) The proper measure of damages.

167. Plaintiff's claims are typical of those of each Class because Plaintiff and all Class members were injured by the same unlawful conduct and suffered the same type of antitrust injury—payment of supracompetitive rents.

168. Plaintiff will fairly and adequately protect the interests of each Class. Plaintiff's interests are aligned with those of each Class, and Plaintiff has retained counsel experienced in prosecuting complex antitrust class actions.

169. Common questions of law and fact predominate over any questions affecting only individual members of each Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual damages are relatively small

compared to the cost of litigation, and absent a class action, Defendants would retain the benefits of their unlawful conduct.

## CLAIMS FOR RELIEF

**Count One**
(On Behalf of the Hub-and-Spoke Class)
(Violation of Section 1 of the Sherman Act)
(Hub-and-Spoke Conspiracy)

170. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

171. Defendants are separate and distinct economic entities capable of conspiring under Section 1 of the Sherman Act.

172. At all relevant times, Defendants entered into, participated in, and implemented a hub-and-spoke conspiracy in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

173. Through this conspiracy, Defendant CoStar acted as the hub, and the Broker Defendants acted as spokes, entering into vertical agreements with CoStar and an inferred horizontal agreement among themselves to exchange current, non-public lease pricing and concession information and to use that information to coordinate leasing conduct.

174. The purpose and effect of Defendants' conspiracy was to fix, stabilize, or otherwise coordinate effective rents and lease concessions, eliminate price uncertainty, and suppress competition in the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market.

175. Defendants' conduct constitutes horizontal price fixing, which is unlawful *per se*. The challenged agreements are not ancillary to any legitimate procompetitive collaboration and lack any redeeming competitive justification.

176. In the alternative, if analyzed under the rule of reason, Defendants' conduct constitutes an unreasonable restraint of trade. Defendants' agreements and coordinated conduct produced substantial anticompetitive effects in each Local Market in the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market, including inflated effective rents, reduced concessions, diminished negotiation leverage for tenants, and the suppression of independent pricing decisions.

177. Defendants' conspiracy was nationwide in scope and affected multiple Local Markets. It involved interstate communications, data transmissions, and financial transactions, and substantially affected interstate commerce.

178. Plaintiff and the Hub-and-Spoke Class suffered antitrust injury as a direct and proximate result of Defendants' unlawful conduct. In each relevant market, Plaintiff and Class members paid supracompetitive rents and received fewer or less favorable lease concessions than they would have in a competitive market.

179. Defendants' conduct was knowing, willful, and intentional, and Plaintiff and the Hub-and-Spoke Class are entitled to treble damages, costs, and attorneys' fees under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

**Count Two**
(On Behalf of the Information Exchange Class)
(Violation of Section 1 of the Sherman Act)
(Unlawful Information Exchange)

180. Plaintiff incorporates by reference paragraphs 1–169 of this Complaint as if fully set forth herein.

181. Defendants are separate and distinct economic entities capable of conspiring under Section 1 of the Sherman Act.

182. At all relevant times, Defendants—along with the landlords and landlord-side brokers that use CoStar—entered into, participated in, and implemented an unlawful agreement to exchange information, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

183. The purpose and effect of Defendants' agreement was to fix, stabilize, or otherwise coordinate effective rents and lease concessions, eliminate price uncertainty, and suppress competition in the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market.

184. Defendants' conduct constitutes an unreasonable restraint of trade and produced substantial anticompetitive effects in each Local Market in the Industrial Lease Market, the Office Lease Market, and the Retail Lease Market, including inflated effective rents, reduced concessions, diminished negotiation leverage for tenants, and the suppression of independent pricing decisions.

185. Defendants' agreement was nationwide in scope and affected multiple Local Markets. It involved interstate communications, data transmissions, and financial transactions, and substantially affected interstate commerce.

186. Plaintiff and the Information Exchange Class suffered antitrust injury as a direct and proximate result of Defendants' unlawful conduct. In each relevant market, Plaintiff and Class members paid supracompetitive rents and received fewer or less favorable lease concessions than they would have in a competitive market.

187. Defendants' conduct was knowing, willful, and intentional, and Plaintiff and the Information Exchange Class are entitled to treble damages, costs, and attorneys' fees under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

## **DEMAND FOR JURY TRIAL**

188. Plaintiff respectfully demands a jury trial.

## PRAYER FOR RELIEF

189. WHEREFORE, Plaintiff, individually and on behalf of the Classes, respectfully requests the following relief:

(a) Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Classes;

(b) Require the Defendants to pay for sending notice to the certified Classes;

(c) Appoint Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

(d) Award compensatory damages to Plaintiff and the proposed Classes in an amount to be established at trial;

(e) Award treble damages as permitted by law;

(f) Award pre- and post-judgment interest;

(g) Award reasonable attorneys' fees and costs; and

(h) Award any other and further relief as may be just and proper.

Dated: October 1, 2026

Respectfully Submitted,

/s/ Devin (Velvel) Freedman
**FREEDMAN NORMAND FRIEDLAND LLP**
Devin (Velvel) Freedman
Kyle Roche
Stephen Lagos (*pro hac vice*)
Joseph Lemoine (*pro hac vice forthcoming*)
155 E. 44th Street, Suite 915
New York, New York 10017
(646) 494-2900
vel@fnf.law
kroche@fnf.law
slagos@fnf.law
jlemoine@fnf.law

*Counsel for Plaintiff*